# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Bankruptcy Appeal**

In re
**ACCESS CARDIOSYSTEMS, INC.**

**Civil Action No. 05CV40125NG**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | **Chapter 11** |
| | ) | |
| **ACCESS CARDIOSYSTEMS, INC.,** | ) | **Case No. 05-40809-HJB**[1] |
| Debtor. | ) | |
| | ) | |
| **ACCESS CARDIOSYSTEMS, INC.,** | ) | |
| **JAMES A. RADLEY, JOHN J.** | ) | |
| **MORIARTY, RICHARD F. CONNOLLY, JR.,** | ) | |
| **AND JOSEPH R. ZIMMELL,** | ) | |
| Plaintiffs/Appellees, | ) | |
| | ) | |
| **OFFICIAL COMMITTEE OF** | ) | |
| **UNSECURED CREDITORS OF ACCESS** | ) | |
| **CARDIOSYSTEMS, INC.,** | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | **Adv. P. No. 05-4076** |
| | ) | |
| **RANDALL FINCKE,** | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

## DESIGNATION OF APPELLEES ACCESS CARDIOSYSTEMS, INC., JAMES A. RADLEY, JOHN J. MORIARTY, RICHARD F. CONNOLLY, JR., AND JOSEPH R. ZIMMELL OF ITEMS TO BE INCLUDED IN THE RECORD

The appellees, Access CardioSystems, Inc., James A. Radley, John J. Moriarty, Richard F.

Connolly, Jr., and Joseph Zimmell, pursuant to Bankruptcy Rule 8006, hereby designate the

---

[1] This designation is being filed in both the District Court and the Bankruptcy Court out of an abundance of caution to ensure that it is filed with the proper court.

following additional items for inclusion in the record on appeal.  In accordance with Bankruptcy Rule 8006, copies of these items are attached.

<u>Additional Items for Inclusion In The Record On Appeal</u>

1.     Plaintiffs' Joint Opposition To Defendant's (i) Motion To Extend Discovery (ii) Motion For A Protective Order And (iii) The Motion of Holland & Knight To Withdraw As Counsel For Randall Fincke.

2.     Joinder Of Official Committee Of Unsecured Creditors To Plaintiffs' Joint Opposition To Defendant's (i) Motion To Extend Discovery (ii) Motion For A Protective Order And (iii) The Motion of Holland & Knight To Withdraw As Counsel For Randall Fincke.


ACCESS CARDIOSYSTEMS, INC.,

By its attorneys,

/s/ Jennifer L. Hertz
Anthony J. Fitzpatrick (BBO # 564324)
Jennifer L. Hertz (BBO # 645081)
jlhertz@duanemorris.com
Duane Morris LLP
470 Atlantic Avenue
Boston, MA 02210
(617) 289-9200

JAMES A. RADLEY,
JOHN J. MORIARTY,
RICHARD F. CONNOLLY, JR. and
JOSEPH R. ZIMMEL,
By their attorney,

/s/ Jerry E. Benezra*
Jerry E. Benezra (BBO # 037100)
26 Island Rock
Plymouth, MA 02360
(508) 209-0077

## **CERTIFICATE OF SERVICE**

I, Jennifer L. Hertz, hereby certify that on the 19th day of August, 2005, I caused true and correct copies of the following to be served, via first class mail postage prepaid (unless otherwise noted), on those parties listed on the Service List attached hereto:

1.      DESIGNATION OF APPELLEE'S ACCESS CARDIOSYSTEMS, INC.,
JAMES A. RADLEY, JOHN J. MORIARTY, RICHARD F. CONNOLLY, JR.,
AND JOSEPH R. ZIMMELL OF ITEMS TO BE INCLUDED IN THE RECORD

/s/ Jennifer L. Hertz
Jennifer L. Hertz (BBO # 645081)
 DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, Massachusetts  02210
Telephone:  617-289-9200
Facsimile:  617-289-9201

Dated: August 19, 2005

**ACCESS CARDIOSYSTEMS, INC.**

**Chapter 11 - Case No. 05-40809-HJB**

<u>**Service List**</u>

Jerry E. Benezra
26 Island Rock
Plymouth MA  02360
Fax:    508-861-1597
email:   jeblaw@benezra.net
***Counsel for the Pre and Post Petition Secured Lenders***

Harold B. Murphy, Esq.
Christian Urbano, Esq.
Hanify & King P.C.
One Beacon Street
Boston, MA 02110
Tel:    617-423-0400
Fax:    617-556-8985
Email: cub@hanify.com
***Counsel for the Official Committee of Unsecured Creditors***

David G. Sobol, Esq.
Ieuan G. Mahony, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Tel:    617-523-2700
***Counsel for Randall Fincke***

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| **In re** | ) | **Chapter 11** |
| | ) | |
| **ACCESS CARDIOSYSTEMS, INC.,** | ) | **Case No. 05-40809-HJB** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |
| **ACCESS CARDIOSYSTEMS, INC.,** | ) | |
| **JAMES A. RADLEY, JOHN J.** | ) | |
| **MORIARTY, RICHARD F. CONNOLLY, JR.,** | ) | |
| **AND JOSEPH R. ZIMMELL,** | ) | |
| **Plaintiffs,** | ) | **Adv. P. No. 05-4076** |
| **v.** | ) | |
| | ) | |
| **RANDALL FINCKE,** | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFFS' JOINT OPPOSITION TO DEFENDANT'S
(i) MOTION TO EXTEND DISCOVERY (ii) MOTION FOR A
PROTECTIVE ORDER AND (iii) THE MOTION OF HOLLAND &
KNIGHT TO WITHDRAW AS COUNSEL FOR RANDALL FINCKE**

### Introduction

Access CardioSystems, Inc. plaintiff, and as debtor and debtor in possession ("Access"), and the plaintiffs, James A. Radley, John J. Moriarty, Richard F. Connolly, Jr., and Joseph R. Zimmel (the "Investors") (collectively the "Plaintiffs") file this Memorandum in opposition to the Defendant's Motion To Extend Discovery Order and Motion for a Protective Order and in conditional opposition to the Motion of Holland & Knight To Withdraw LLP To Withdraw As Counsel For Randall Fincke.

From the very onset of this case, the Plaintiffs and the Defendant have agreed, as did the Superior Court, and this Court, that an expedited discovery schedule and disposition of this case is in the interest of all parties. An expedited resolution is also in

the best interests of the creditors. The Defendant's Motion to Withdraw, and the Motion

to Extend Discovery Deadlines and Motion for Protective Order that they spawned, are

contrary to those interests.

On its face, the Motion to Withdraw fails to meet the established criteria for the

granting of the motion. When reviewed in the factual context of this case, the Motion to

Withdraw is without merit. Holland & Knight's ("H&K") papers are most noteworthy

for their breezy failure to address the requirements of the applicable rules and the

teachings of the cases that have discussed them. H&K acts as if the motion process, and

allowance of their motion, is a foregone conclusion, based entirely on their unsupported

assertion of "irreconcilable differences".

When the circumstances of this case, and the applicable rules and case law are

examined, this Court should conclude that the Motion to Withdraw as drafted should be

denied, or allowed with stringent conditions, and that the Motion to Extend Discovery

Deadlines should be denied outright.

## ARGUMENT

### I.    THE HOLLAND & KNIGHT MOTION FAILS TO DEMONSTRATE A BASIS FOR ITS ALLOWANCE.

1.    The Motion to Withdraw fails to meaningfully address the usual criteria

used by the Court to decide these motions. In fact, H&K's Motion to Withdraw itself

provides the reasons why it should be denied. H&K's motion is based entirely upon an

unexplained statement that:

> Since the removal of this case [by Fincke on March 25,
> 2005], the relationship between Counsel and Fincke has
> deteriorated. Fincke and Counsel have had numerous
> communications seeking to resolve these differences.
> Counsel has notified Fincke of Counsel's intent to withdraw

<u>if these differences could not be resolved.</u> The <u>most recent</u> communications provided <u>a deadline of Monday, June 27, 2005</u> for such resolution or failing resolution a withdrawal.

(Motion to Withdraw ¶ 10) (Emphasis supplied.)   Although there is absolutely no explanation of what the "differences" are, a fair reading of the papers and other circumstances revealing the lack of active prosecution of this case by H&K indicate that this is a fee dispute that has been ongoing since March 25, 2005.  The Court is not told when the most recent deadline was set, but obviously this dispute existed before the pretrial conference at which time a revised discovery schedule, which included later dates than originally discussed were agreed to in order to meet the personal vacation schedules of two attorneys from H&K.

2.    Although the Motion to Withdraw recognizes that Local Bankruptcy Rule permits a notice of withdrawal without leave of court if there is an appearance of successor counsel, and there are no pending motions, or a set trial date, H&K seems to believe that these criteria are irrelevant to the Court's exercise of its discretion when determining whether to grant a permissive withdrawal. H&K completely ignores the fact that from the first time scheduling was discussed in the Superior Court, through several appearances before this Court, H&K stated that it was in its client's interest, as well as that of other parties, that this case be heard expeditiously.   There is nothing in this motion, or the circumstances of this case to indicate that fact has changed.

3.    A good faith effort to act consistently with that need for  expeditious resolution would have required H&K to move for withdrawal sometime between March 25, 2005 and a time when their motion would not result in the necessity of extending discovery.  It certainly required immediate action and notice to other counsel after the

June 28, 2005 deadline for responding to discovery requests had passed. The Plaintiffs would not oppose the withdrawal, as long as it is done in manner which is consistent with the applicable law, and does not delay this case. However, that is not what H&K is seeking to accomplish, nor would it be the result if H&K's motions were allowed.

4.    H&K now seeks emergency relief from a situation of its own making, which has already prejudiced the other parties to this case and the Bankruptcy proceeding. This last minute motion has already delayed discovery by at least one week and potentially much longer, while depositions already noticed will need to be rescheduled, and new subpoenas served.

5.    Although the appearance of successor counsel is always a consideration, that factor has even more importance under the circumstances of this complex case where everyone recognizes the necessity of a speedy resolution, where there has been an agreed upon expedited schedule (which would not have been significantly impacted if a timely motion was filed) and where the Plaintiff can obviously not proceed pro se in light of the complex factual and legal issues.

6.    H&K's response to this criterion is one sentence in H&K's Motion at ¶ 11: "Counsel has assisted the Defendant in efforts to locate successor counsel." There is no indication of what those efforts were, or what the results are. No successor has been identified, nor a time frame for any successor to get up to speed. There are no facts upon which the Court or the parties can determine how long a delay is necessary, or even if there is the potential for successor counsel to appear in the near future.

7.    The two cases cited by H&K do not support their position: The decision of Judge Hillman in the case of In re Cuddy, 322 B.R. 12 (Bkrtcy. D. Mass., 2005) is

instructive on the law regarding motions to withdraw based on the failure of a client to pay. There the Court "held that debtor's failure to replenish his bankruptcy attorneys' retainer as he had promised in fee agreement did not constitute 'cause' for allowing attorneys to withdraw from representation, notwithstanding that fee agreement expressly provided that attorneys could withdraw if debtor did not timely pay attorneys' fee." Id. at 12. (A copy of that decision is attached as Exhibit A for the convenience of the Court.)

8.    A reading of federal cases dealing with motions to withdraw rely not only on their own local rules, but also on the ethical rules governing the practice of law of the state in which they sit.

9.    In V.H. v. J.P.H., 62 Mass.App.Ct. 910, 815 N.E.2d 1096 (Mass. App .Ct. 2004), the Massachusetts Appeals Court found there was an agreement that provided for monthly payments of legal fees, and the right of counsel to withdraw if the bills were not paid. Id. at 910, 1097. No such information has been provided here. In that case, counsel acknowledged payments of more than $85,000, that the latest payment of $500 was made in June of 2003, of and that in November of 2002 about $46,000 was due, of which only $10,500 had been paid since that date. Id. at 910, 1097. (Although apparently relevant to the motion, no similar information has been provided here.)

10.    The decision goes on to note that:

> The withdrawal of counsel at this point in the litigation would have a material adverse effect on the interests of their client. The case has been pending for three (3) years. It would be extremely difficult for another attorney (assuming one could be retained) to prepare for the last part of discovery and for trial in a relatively short period of time. The parties will have to work out their differences regarding payment of the legal fees.

Id. at 910-011, 1097. The same can be said in the present case. The court cites other Massachusetts rules that might permit withdrawal under certain circumstances, none of which are raised as a reason in H&K's papers. The absence of any discussion of the appropriate case law and ethical rules manifests the failure of H&K to provide this court with any reasonable basis to grant its motion before there is an appearance of successor counsel who acknowledges that he or she has been sufficiently brought up to speed so that this matter may be concluded without further delay.

11.     The Plaintiffs note that H&K chose not to attach an affidavit explaining the facts underlying its dispute with Mr. Fincke. However, it would appear that this is really a fee dispute and that there have been previous unspecified deadlines for payment that H&K has set which have not been met.

12.     The Plaintiffs are more than happy to meet reasonable requests as they did at the pretrial conference. At the pretrial the plaintiffs agreed to accommodate H&K's personal vacation schedules, to consider any proposed stipulations that could reduce the need for discovery or to bifurcate damages to reduce the need for discovery. However, they do not believe that they should be compelled to agree to a "blank check" of unlimited discovery delays.

## II.    THE MOTION TO EXTEND DISCOVERY DEADLINES AND RELATED MOTION FOR A PROTECTIVE ORDER SHOULD BE DENIED.

13.     The Motion to Extend the Discovery Deadlines appears to be based upon the undisclosed "irreconcilable differences" in the Motion to Withdraw (¶3); the inappropriateness of H&K's continued representation of Fincke based on those undisclosed differences (¶4); plaintiff's unwillingness to stay discovery (¶5); the fact that

an extension of an unspecified period of time is necessary to allow the Defendant the

opportunity to retain successor counsel; and the assertion that H&K's withdrawal will not

prejudice any party. The Plaintiffs will address each of these contentions below.

        **1.**      **There is no evidence of any "irreconcilable differences" which make the further representation, until successor counsel has appeared, inappropriate.**

14.    As discussed above, H&K has provided no facts that demonstrate the

differences they refer to, why they are irreconcilable, or why further representation until

successor counsel appears is inappropriate. Under the circumstances of this case, surely

more than bare assertions should be required in last-minute motions to withdraw, for

protective orders and extensions of schedules H&K agreed to.

        **2.**      **Based on the limited information they were provided, the Plaintiffs' actions have been reasonable.**

15.    The Plaintiffs received their first notice of any of these issues via a

telephone call after 4:00 p.m. on the day before their first deposition had been scheduled,

two and one-half weeks after the "deadline" from H&K to Fincke had elapsed. The

Plaintiffs spelled out their reasons in a letter dated July 14, 2005 (attached as Exhibit

B). Those reasons, together with those set forth herein, demonstrate why the

Plaintiffs request that the discovery in this case proceed as scheduled. The only

"unwillingness" that the Plaintiffs have is their position that under the circumstances

discussed herein this case should not be subject to further delays that could have been

easily avoided by the filing of timely motions by the Defendant.

        **3.**      **The discovery in this case has already been unduly delayed.**

16.    In its Emergency Motion to Extend Discovery Deadlines (Expedited

Determination Requested) Fincke states that written discovery and expert disclosures are

due on or before July 15, 2005. Although not docketed for some reason, as a result of the June 8, 2005 Conference, the parties agreed to a schedule which extended those dates by agreement to July 25, 2005. (See e-mail from Attorney Sobol to all parties and the attached schedule referred to attached as Exhibit C .) The Plaintiffs certainly agree to the discovery deadlines set forth in that proposed revised schedule.

      17.    This case was originally filed by the Plaintiffs in the Massachusetts Superior Court on July 6, 2004.

      18.    Based upon an agreement by all counsel that this case should be decided in an expeditious fashion, the Parties' Joint Proposed Scheduling Order was entered as an Order by Botsford, J. on October 14, 2004 ("Botsford Order"). The Botsford Order had the following deadlines:

- Parties to serve initial written discovery requests October 15, 1004.

- All written discovery completed March 7, 2005.

- Expert witnesses disclosed February 21, 2005.

- Depositions completed March 7, 2005.

- <u>Dispositive Motions served by March 21, 2005</u>.

- Oppositions to motions for summary judgment April 11, 2005.

- Hearing on motions for summary judgment April 18, 2005.

- Pre-trial conference May 11, 2005.

- <u>Trial May 16, 2005.</u>

      19.    Plaintiffs commenced discovery, but encountered innumerable delays.

      20.    Access served its First Set Of Interrogatories September 17, 2004. By an email dated November 1, 2004, the Plaintiffs agreed to extend the deadline for Defendant

to respond to November 22, 2004. Those interrogatories have still not been answered, and these answers should be filed in due course, as a condition of withdrawal, in addition to the appearance of successor counsel.[1]

21.     Access's First Request For Production of Documents to the Defendant Randall Fincke were served on Fincke by hand on October 1, 2004. Fincke's response to the Request for Production was due on November 1, 2004. On October 14, 2004, the parties executed and filed with the Superior Court their Joint Proposed Scheduling Order for this case. In that proposal, the parties agreed that "[w]hen parties respond to documents requests, parties shall at the same time produce all responsive documents." (Emphasis supplied.) Given that Fincke agreed to that provision after service of the Request for Production, without requesting any extension of time, Access expected that Fincke would produce all documents responsive to the Request for Production on November 1, 2004.

22.     On November 1, 2004, Fincke requested, and Access granted, an extension of time to produce responsive documents to November 22, 2004. By an email dated November 22, 2004, Esme Caramello, Esq. at H & K sent an email advising Access' counsel  that the electronic discovery vendor was reviewing a final list of documents for production, and that the estimated time of delivery would be the following week. Fincke's counsel further suggested postponing the pending deposition of a third-party witness until after Fincke's documents were produced, and specifically suggested scheduling the deposition for late in the week of November 29, 2004 or early in the week

---

[1]    Access served its answers to interrogatories. The answers for James Radley (the Investor with the most knowledge) have also been  served. The remaining answers from the other investors should be filed shortly.

of December 6. In light of this suggestion, Access' counsel understood that no more than two weeks' work remained to be done to complete production of Fincke's documents.

23.    In December 2004, the parties made some efforts to resolve this matter by settlement. However, those efforts were unsuccessful, and on December 23, 2004, Access' counsel requested production of Defendant's documents as soon as practicable. Defendant's counsel was then leaving for vacation, and did not respond substantively until January 7, 2005. In a telephone conversation on that date, Fincke's counsel indicated that the documents would be produced <u>no later than</u> January 14, 2005.

24.    The documents were not produced by January 14th. On January 17, 2005 counsel for Access left a voicemail for counsel for Defendant, inquiring about the documents. He did not respond. On January 19, 2005, Access' counsel wrote to Defendant's counsel requesting a Superior Court Rule 9C conference to discuss the failure to produce documents. Defendant's counsel responded by indicating that he would be "finalizing the final list confirming content for the vendor Monday," and that he "expect[ed] to produce late next week [week of January 24] or early the following week [week of January 31]."

25.    Access' counsel responded that after repeated agreed-to extensions and repeated un-realized representations as to when the documents would be produced, a Rule 9C conference was appropriate. Counsel conducted a Rule 9C conference by telephone on the morning of January 25, 2005. During that conference, Defendant's counsel represented that the documents would be produced late that week (i.e. by January 28), or early the following week (i.e. the week of January 31). The documents were not produced and a Motion to Compel was served.

26.     During the course of the extensions that were granted, the parties agreed that the Plaintiffs' responses to outstanding discovery would be subject to the same extensions granted to Defendant starting with the date the Plaintiffs received his responses.

27.     On February 11, 2005 Access served its  Second Request For Production of Documents and Things to the Defendant Randall Fincke.  That request has never been responded to.  Efforts to review some critical documents have further been delayed because H&K has demanded a "Clean Room" approach that Access' counsel has never seen used before in this type of litigation.

28.     On March 16, 2005, Defendant filed a Notice of Removal.  Access agreed to allow Defendant to inspect the documents it had while a determination was made whether this Court had jurisdiction, and whether any of Plaintiffs would file a Motion to Remand.

29.     On May 25, 2005 the parties agreed to a Pre-Trial Stipulation containing Parties' Proposed Discovery Plan which  included a deadline for responding to initial written discovery requests of June 15, 2005 and a deadline to complete depositions July 29, 2005.

30.     On June 9, 2005, the parties agreed on a revised discovery plan referred to above.  As the Court will recall, the deadlines for filing motions for summary judgment were extended to accommodate the vacation schedule of one H&K counsel and the personal schedule of another.

31.     The above facts demonstrate a continuous slippage in the schedule due to actions taken by Defendant and his counsel. Either the documents Defendant's counsel

referred to as being ready in November and December were not ready as represented, or
they were withheld.

> **4.  Discovery should be taken while successor counsel is being
> retained and brought up to speed and is not onerous to H&K
> under the circumstances.**

32.     To date, the Plaintiffs have taken one deposition of Virginia Merritt,
which H & K chose not to attend.  As noted above, although the notice for that deposition
was sent on July 7, 2005,  H & K waited until approximately 4 pm on July 13, 2005, the
day before it was scheduled to notify the Plaintiffs that it would not be appearing and
requesting a postponement.  Mrs. Merritt's deposition took less than a half a day.

33.     On June 28, 2005, the Investor Group noticed the Middlesex Savings
Bank for A Keeper of the Records deposition that did not take place, as the bank agreed
to produce the requested documents.

34.     A deposition notice was served on July 7, 2005 for Maureen Demoura  for
July 19, 2005.   The Motions before the Court were filed after 3 pm on the day before that
deposition was to take place.   This was five days after the conversation regarding the
Merritt deposition, and twenty-two days after the most recent deadline that H & K had
given to Defendant.   After the motions were filed, Access agreed to a request by Ms
Demoura to postpone her deposition until July 27, 2005.  That deposition should be less
than a full day.

35.     On July 8, 2005, after the H&K "deadline" had expired, a notice of
deposition was served on Gerald Berkelaar.  H&K did not make a timely objection to that
deposition.  Mr. Berkelaar's deposition should take less than two hours and may well be
the basis for a motion for contempt and other relief.  Without this short deposition, the

Plaintiffs believe that Defendant will be able to continue his misuse of Access property and intellectual property. That deposition should be allowed to take place so that there is no continuing harm to Plaintiffs or the creditors' interests.

36.     The deposition notice for Nancy Latady (Mr. Fincke's sister) was originally scheduled for July 8, 2005, and was continued after defendant's counsel indicated that she had a conflict. It is presently rescheduled to an agreed upon date of July 22, 2005. No mention was made at that time of any problem that might prevent that deposition from taking place on that new date.

37.     All of the above depositions were of witnesses who had to be subpoenaed, and in all cases except Middlesex Savings Bank were of persons that the Plaintiffs believe are friendly to Defendant.

38.     By filing these motions shortly before these depositions were scheduled, and weeks after the last "deadline" that H & K had set for its client, the other parties and the Court are put in the position of dealing with an emergency motion that should have been filed weeks ago in order not to delay the discovery schedule. By not filing a timely motion Fincke and H&K have already adversely impacted the discovery schedule, and obtained, at least in part, the relief they are requesting.

39.     Although the Plaintiffs have filed a long list of potential deponents, they have so far limited the depositions to those deponents listed above, and to Randy Lacasse, an out of state witness whose testimony is relevant to the patent ownership issue. Given time constrains, only a few more depositions will likely be taken.

40.     At the pretrial conference, in an effort to meet Defendant's concerns about the number of depositions to be taken, the Plaintiffs suggested that H&K consider

moving to bifurcate damages, which would shorten the list of depositions. H&K

responded positively, but said that time was needed to give that proposal more thought.

H&K never responded further to that proposal.  Likewise, the parties discussed the

possibility of stipulations to avoid the necessity for a group of depositions. Again, H&K

did not respond.  Lastly, at the two mediations and in prior pleadings,  the Plaintiffs have

repeatedly provided case law to Defendant, which they  feel are dispositive of most of the

issues in this case and contentions Defendant has raised.  The memoranda demonstrate

why those contentions are  irrelevant as a matter of law, and contrary to the facts.

Exploration of those issues, would further reduce the need for depositions.  All of these

alternatives would reduce the time that all of the counsel, including H&K will have to

spend in discovery, and H&K should respond to them as a condition to further

consideration of its motions.

## CONCLUSION

41.    Based upon the foregoing, the Plaintiffs respectfully request that the Court

deny the pending Motion to Withdraw until such time as successor counsel has filed an

appearance, and represented to the Court that he or she is ready to take over the

prosecution of Defendant's case without unduly delaying the existing schedule.   During

that time period, the Plaintiffs should be permitted to take the depositions that they have

previously scheduled and up to 12 more depositions.

Dated:  July 19, 2005

ACCESS CARDIOSYSTEMS, INC.,
By its attorneys,


/s/ Barry C. Klickstein
Anthony J. Fitzpatrick (BBO # 564324)
Barry C. Klickstein (BBO # 275160)
Duane Morris LLP
470 Atlantic Avenue
Boston, MA 02210
(617) 289-9200

JAMES A. RADLEY, JOHN J.
MORIARTY,
RICHARD F. CONNOLLY, JR, AND
JOSEPH R. ZIMMEL,


By their attorney,


/s/ Jerry E. Benezra
Jerry E. Benezra (BBO # 037100)
26 Island Rock
Plymouth, MA 02360
(508) 209-0077


## CERTIFICATE OF SERVICE

I, Barry C. Klickstein, hereby certify that on the 19th day of July, 2005, I caused true and correct copies of the foregoing document to be served, via ecf or electronic mail, as indicated, on those parties listed below:

**VIA ECF**
Richard T. King, Esq.
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608
Tel:    508-793-0555
Fax:    508-793-0558
email: Richard.t.king@usdoj.gov

**VIA E-MAIL**
Jerry E. Benezra
26 Island Rock
Plymouth MA  02360
Fax:    508-861-1597
email:  jeblaw@benezra.net

**VIA ECF & E-MAIL**
Harold B. Murphy, Esq.
Hanify & King P.C.
One Beacon Street
Boston, MA 02110
Tel:    617-423-0400
Fax:    617-556-8985
Email: hbm@hanify.com

*Counsel for the Official Committee of Unsecured Creditors*

**VIA ECF & E-MAIL**
David G. Sobol, Esq.
John J. Monaghan, Esq.
Ieuan G. Mahony, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
Tel:    617-523-2700

*Counsel for Randall Fincke*

/s/ Barry C. Klickstein
Barry C. Klickstein  (BBO # 275160)
DUANE MORRIS LLP
470 Atlantic Avenue
Boston, MA 02210
Telephone:  617-289-9200

# EXHIBIT A

LEXSEE 322 BR 12

**In Re: LAWRENCE E. CUDDY, JR. and BETSY J. GRAF CUDDY, Debtors; DANVERS SAVINGS BANK, Plaintiff v. LAWRENCE E. CUDDY, JR., Defendant**

**Chapter 7, No. 04-12166-WCH, Adversary Proc. No. 04-1208**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS**

*322 B.R. 12; 2004 Bankr. LEXIS 2319*

**March 24, 2004, Decided**

**DISPOSITION:** Motion to withdraw as defendant's counsel denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** [**1] Donald H. Adler, Dennis Ford Eagan, Newburyport MA, for Finneran & Nicholson, P.C. Astrid Stevens Daly, Wears NH, Robert L. Marder, Lynn MA, for Danvers Savings Bank Phoebe Morse, Gary L. Donahue, for the United States Trustee

**JUDGES:** WILLIAM C. HILLMAN, United States Bankruptcy Judge

**OPINIONBY:** WILLIAM C. HILLMAN

**OPINION:**

[*13] Decision on Motion to Withdraw as Counsel to Defendant

### Introduction

The issue before me is whether Donald H. Adler, Thomas G. Nicholson, and the firm of Finneran & Nicholson, P.C. ("Movants") are entitled to withdraw from their representation of Lawrence E. Cuddy, Jr. ("Defendant") as a result of Defendant's nonpayment of fees. For the reasons stated below, I will enter an order denying the motion.

### Facts

On March 17, 2004, Defendant and Betsy J. Graf Cuddy ("Mrs. Cuddy") filed a petition under Chapter 7. The schedules indicated that there were no secured or priority creditors and general creditors' claims totaled $ 1.006.966, n1 of which $ 200,000 was owed to Danvers Savings Bank ("Danvers").

> n1 The total includes some debts to taxing authorities.

[**2]

At the time of filing, Defendant and Mrs. Cuddy were both represented by the same counsel. He moved to withdraw on May 14, 2004 due to a conflict. I granted the motion on May 21, 2004. In the meantime, on May 14, 2004, new counsel entered an appearance in the main case for Mrs. Cuddy only. n2 On May 10, 2004, Defendant entered into a written "Legal Services - Fee Agreement" (the "Fee Agreement") and an Engagement Letter with Movants. The Movants did not introduce a copy of the Engagement Letter.

> n2 Mrs. Cuddy is not involved in this adversary proceeding.

The Fee Agreement provided for an initial retainer of $ 2,500 and included a provision allowing Movants to withdraw in the event that the Defendant failed to replenish the retainer or failed to pay any outstanding invoices. Specifically, paragraph 5 of the Fee Agreement provides as follows:

> **Withdrawal from Representation Where Non-Payment.** It is agreed that if any retainer is not replenished (for the initial Matter and/or any and all

Case 4:05-cv-40125-NG    Document 3-2    Filed 08/19/2005    Page 20 of 22

Page 2
322 B.R. 12, *; 2004 Bankr. LEXIS 2319, **

subsequent [**3] and/or additional legal services requested to be performed and performed by the Firm) to the amount requested by the Firm within 15 days of the date of the bill requesting the replenishment and/or interim or final statement, bill or invoice for services rendered is not paid, when and as due, the Firm may immediately cease providing services under this Agreement and **the Client will not oppose the Firm from withdrawing its representation [*14] of the Client and, if requested, Client will consent in writing to the Firm removing any court appearance it may have filed in connection with representation of the Client. This is an essential and vital agreement to the Firm's agreeing to provide services rendered."** n3

Donald H. Adler entered his appearance for Defendant in the main case on May 25, 2004.

n3 Boldface in original.

On June 25, 2004, Danvers filed an Adversary Complaint against Defendant, objecting the Defendant's discharge under *11 U.S.C. § § 727(a)(2)(A)* and *727(a)(5)* and to the [**4] dischargeability of Defendant's debt to it under *11 U.S.C. § 523(a)(2)(B)*.

On July 26, 2004, Thomas G. Nicholson filed a "limited notice of appearance" "for the sole and limited purpose of filing the parties' Assented to Motion to Extend Time...." n4 Notwithstanding that additional agreed compensation had not been paid, he filed a general appearance for Defendant on August 9, 2004.

n4 He cited to *MLBR 9010-3* in support, but that rule does not reference limited appearances. MLBR 9010-3(a) merely makes an entry of appearance unnecessary where another pleading is filed. Messrs. Nicholson and Adler appear to be members of the same firm.

Movants filed a motion to withdraw as counsel to Defendant (the "Motion") on January 4, 2005. n5 No successor counsel has entered an appearance for Defendant. As grounds, Movants assert that as a condition precedent to their representation of Defendant in the adversary proceeding, Defendant agreed to pay an additional retainer, and that Defendant has not paid [**5]

the second retainer or any additional sums for which he was billed by Movants. Under those circumstances, Movants contend that Defendant has breached the Fee Agreement and they are entitled to withdraw on that basis. In their statement of compensation, which Movants filed on February 23, 2005, n6 they acknowledge having received $ 12,811.91 in the principal case with a balance remaining unpaid of $ 2,659.51, and having received $ 2,836.09 in the adversary proceeding, with a balance remaining due of $ 1,459.10, both as of January 20, 2005.

n5 The Motion bore the captions of both the main case and the adversary proceeding and was docketed in the latter only, A.P. No. 04-1208, Docket No. 17 but I will treat it as applicable to both.

n6 The United States Trustee argued that Movants' failure to file the statement of compensation required by *11 U.S.C. § 329* and *Fed. R. Bankr. P. 2016(b)* was grounds for denying the Motion. That argument is mooted by Movants', albeit tardy, filing.

[**6]

Defendant did not oppose the Motion. I held a hearing on the Motion and took it under advisement. Movants, Danvers, and the United States Trustee filed post-hearing briefs.

**Discussion**

If the Fee Agreement is to be construed only under the basic principals of contract law, the Motion should be denied. While it allows Movants to withdraw in the event of non-payment, Movants waived that right when they entered a general appearance in the adversary proceeding without payment of the promised additional fees. This is not a simple contract dispute. It involves principles of ethics and the administration of justice.

Attorneys practicing in the Massachusetts courts are bound by the Massachusetts Rules of Professional Conduct [*15] ("RPC"). n7 Massachusetts attorneys are bound by those same standards when practicing in the local federal courts. n8 In addition, of course, they are bound by the rules of this Court, including MLBR 9010-3(d):

An attorney representing a debtor in a bankruptcy case is required to represent the debtor in any adversary proceeding filed within the bankruptcy case in which

322 B.R. 12, *; 2004 Bankr. LEXIS 2319, **

the debtor is a named defendant unless the debtor expressly agrees otherwise at the [**7] commencement of the representation.

n7 Massachusetts Rules of Professional Conduct and Comments, *Supreme Judicial Court Rule 3:07*.

n8 *Chimko v. Lucas (In re Lucas), 317 B.R. 195, 200 (D. Mass. 2004)*. See Rules of Attorney Disciplinary Enforcement for the Court of Appeals for the First Circuit, Rule IV-A; Local Rule 83.6(4)(B) (D. Mass.)).

In the case at bar only the generalized "pay-or-we-will-quit" language was applicable, and I hold that the language of the Fee Agreement does not satisfy the local rule for an express agreement *ab initio*.

MLBR 9010-3(d) is an implementation of RPC Rule 1.2(c) which, as presently in force in Massachusetts, provides that "[a] lawyer may limit the objectives of the representation if the client consents after consultation." The comment to that provision as relevant here provides:

[5] An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to [**8] agree to representation so limited in scope as to violate Rule 1.1...

Rule 1.1 directs the lawyer to "provide competent representation to a client." It continues "[c]ompetent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." n9

n9 The Model Rule was amended in 2002 to read that a lawyer is permitted to "limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." *See* Annotated Model Rules of Professional Conduct 36 (5th ed. 2004). "The amendment was intended to clarify the allowance -- and regulation -- of limited-representation agreements," *Ibid.*

Assuming without deciding that Defendant's signature on the Fee Agreement constitutes "consultation" within the meaning of the quoted rule, I

turn to whether it provides sufficient basis for the granting of the Motion.

RPC Rule 1.16(a) provides instances where withdrawal of counsel is mandatory; it is [**9] not involved here. RPC Rule 1.16(b) provides that a lawyer *may* withdraw from representing a client upon certain specified grounds. As relevant here they are:

...if withdrawal can be accomplished without material adverse effect on the interests of the client, *or if* [italics supplied]:

(4) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled ...

Thus, under the RPC standards, an attorney is allowed to withdraw from a matter even though the withdrawal will have a material adverse effect on the interests of the client, if the client has violated the type of payment agreement before me. The only check on this broad power is contained in RPC 1.16(c), which provides

if permission for withdrawal from employment is required by the rules of a tribunal a lawyer shall not withdraw [*16] from employment in a proceeding before that tribunal without its permission.

This Court has such a requirement, found in MLBR 2091-1 (a):

"An attorney may withdraw from a case or proceeding without leave of the Court by [**10] serving a notice of withdrawal on the client and all other parties in interest and filing the notice, provided that:
(1) such notice is accompanied by the filing of a notice of appearance of successor counsel;
(2) there are no motions pending before the Court; and
(3) no trial date has been set.

Unless these conditions are met, an attorney may only withdraw from a case or proceeding with leave of the court. No successor counsel has appeared in this proceeding, hence the necessity for the Motion.

322 B.R. 12, *; 2004 Bankr. LEXIS 2319, **

In considering the Motion, I find myself joining in concerns voiced by Judge Grant some years ago:

> The motion comes at a time when the court has been indulging in a high degree of self examination with regard to the circumstances which warrant giving an attorney permission to withdraw from the representation of his client. Because of this, the court feels it is appropriate to thoroughly discuss these concerns, so that members of the bar can not only understand the reasons for the court's action (even if they do not agree with it) but so they also can understand what will be expected of them when they undertake the representation of a bankruptcy debtor. n10

> n10 *Colter v. Edsall (In re Edsall)*, 89 B.R. 772, 773 (Bankr. N.D. Ind. 1988). [**11]

Where permissive withdrawal is sought by an attorney, the motion is addressed to the discretion of the trial court. n11 Withdrawal will not necessarily be appropriate in all circumstances. n12 In exercising my discretion, I am concerned with the competing interests of Movants, Defendant, and the Court, for, as Judge Keeton has said, "An attorney who agrees to represent a client in a court proceeding assumes a responsibility to the court as well as to the client." n13 It is a delicate balancing act:

> Each case must be assessed to determine a result that will be fair to the client, the attorney and the court, taking the rights and interests of each into account. n14

> n11 *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 135 (1st Cir. 1985), cert. denied 476 U.S. 1172 (1986).

> N 12 *V.H. v. J.P.H.*, 62 Mass. App. Ct. 910, 911, 815 N.E.2d 1096, 1097 (2004).

> n13 *Hammond v. T.J. Little & Co.*, 809 F. Supp. 156, 159 (D. Mass. 1992). See also *Hasbro, Inc. v. Serafino*, 966 F. Supp. 108 (D. Mass. 1997). [**12]

> n14 N.Y. State Bar Assn Comm. Prof. Ethics Op. No. 598 *1, *1989 WL 252367 (1989)*.

On the one hand, Movants had a reasonable expectation that they would be paid for services to be rendered. Anticipating the possibility of Defendant's failure to pay, they expressly reserved the right to withdraw from the representation in the event of non-payment. But this may not provide adequate grounds for the granting of the Motion:

> An attorney who undertakes to represent a client assumes obligations toward his client which are not excused merely because the client is unable to pay fees demanded by the attorney. n15

> n15 *Goldstein v. Albert (In re Albert)*, 277 B.R. 38, 46 (Bankr. S.D. N.Y. 2002).

[*17]    The primary reason for the additional services required of Movants was the adversary proceeding filed by Danvers under *11 U.S.C. § § 523* and *727*. Such actions are not common. n16 [**13] To quote Judge Grant again:

> Counsel who initiate bankruptcy proceedings on behalf of their clients can reasonably expect that the debtor's right to discharge either all or any of its debts will come under scrutiny and may be challenged in an adversary proceeding. For this reason, a complaint pursuant to either *§ 523* or *§ 727* should come as no great surprise to any debtor's attorney. n17

> n16 Statistics drawn from the records of this Court indicate how seldom counsel will be required to defend such actions:

| Year | Non-Business Cases Filed | § 727 | § 523 | Total | % |
|------|--------------------------|-------|-------|-------|---|

322 B.R. 12, *; 2004 Bankr. LEXIS 2319, **

| Year | Non-Business Cases Filed | § 727 | § 523 | Total | % |
|------|--------------------------|-------|-------|-------|-----|
| 2002 | 14,165 | 60 | 181 | 241 | 1.7 |
| 2003 | 15,070 | 60 | 211 | 271 | 1.7 |
| 2004 | 15,168 | 36 | 163 | 199 | 1.3 |

n17 *Edsall, supra, at 774*. I appreciate that Movants were not the original counsel for Defendant, but, as successors, they have assumed the mantle.

Defendant appreciated that he required the services of counsel in [**14] pursuing his bankruptcy case, in my mind an entirely sensible approach. n18 After his original counsel withdrew, he hired the Movants.

n18 Writing for a lay audience, I once devoted an entire chapter to this subject, ending with the italicized admonition "*YES, you do need a lawyer in a bankruptcy case.*" WILLIAM C. HILLMAN, PERSONAL BANKRUPTCY 23 (2nd ed. 1995).

And from the viewpoint of the bench, a *pro se* debtor presents often monumental problems of case administration. Judge Grant again:

Pro se litigants present the court with important concerns. More often than not, they are unfamiliar with legal procedures or the formality, of trial practice. For this reason they are to be indulged. Frequently, they lack a workable knowledge of the finer points of the issues being litigated. Thus, at trial, a line of questioning or chain of reasoning may not be pursued because they do not understand its significance -- something which usually would not escape the attention of a skilled attorney, In such a [**15] situation, the court is confronted with the difficult choice between raising unspoken questions and advancing silent arguments or adopting a more passive role. To follow the first course, while often promoting a decision based on the underlying merits of a case, may tarnish th appearance of judicial impartiality. The second path, while preserving appearances, may result in an unwarranted victory almost by default.

Representation by counsel generally eliminates this dilemma.

More important than the difficulties they present to the court is the fact that pro se litigants, in a very real sense, can be a danger to themselves. Without an understanding of the importance of facts in issue, the applicable law, or why their discharge has even been challenged, they often flounder helplessly at trial, aimlessly pursuing meaningless points and arguments. From the standpoint of a debtor whose discharge has been challenged, to proceed pro se presents the very real possibility that the creditor will prevail for the sole reason that its opponent did not understand the facts in issue or how to defend against the allegations raised. n19

n19 *Edsall, supra, at 775*.

[**16]

The image that has come to my mind most insistently while working on this opinion is this: A professional swim instructor takes on a new student with this understanding: You have paid me my initial fee. For that money I will lead you to [*18] the swimming pool, show you how to enter the water, and explain the basic elements of swimming. If, however, you should begin to drown, of if some other serious problem arises, I will leave you to your own resources unless you pay me more money.

Even if this message is clearly conveyed to the student, if the desire to learn to swim is strong enough (just as if the need for the bankruptcy remedy is strong enough for the debtor *in extremis*) the student will accept the terms. It looks like and sounds like a contract of adhesion, with all of the unlovely baggage that phrase carries. It is contrary to my view of the higher obligation of an attorney.

Once a lawyer accepts retainer to represent a client he is obliged to exert his best efforts wholeheartedly to advance the clients [sic] legitimate interests with

322 B.R. 12, *; 2004 Bankr. LEXIS 2319, **

fidelity and diligence until he is relieved of that obligation either by his client or the court. The failure of a client to pay for [**17] his services does not relieve a lawyer of his duty to perform them completely and on time, save only when relieved as above. n20

n20 *State Bar v. Daggs*, 384 Mich. 729, 732, 187 N.W.2d 227, 228 (1971).

The resistance of courts to the practice of offering limited services (the nonce word appears to be "unbundling") is evident in a number of recent cases. The most comprehensive is *In re Egwim*, n21 in which Judge Bonapfel carefully and extensively explained the applicable principles. He points out

three fundamental requirements that must be met before an attorney may properly limit the scope of services to be provided to a client. First, the attorney must consult with the client about the limited representation that will be provided. Second, the client must provide informed consent, and this consent should be evidenced by a writing. Most important, the limitation must be reasonable in the circumstances or, in terms of the Georgia Rule, the engagement must not be so limited [**18] as to prevent competent representation. n22

n21 *291 B.R. 559 (Bankr. N.D. Ga. 2003)*.

n22 *Id. at 571*. The "Georgia Rule" is the same as RPC Rule 1.2.

After explaining what complications can and do arise in the context of consumer bankruptcy cases, he concludes:

An attorney desiring to limit the scope of an engagement has the burden of demonstrating compliance with all of the conditions required for the validity of the limitation. *In the context of representing a consumer in an area of law as complex as bankruptcy, it will be the unusual case where the burden can be met.*

In summary, the principles and authorities addressed above establish that an attorney representing a chapter 7 debtor ordinarily may not limit the scope of that engagement. n23

n23 *Id. at 572* (emphasis added).

[**19]

A narrower but related example, *In re Johnson*, n24 involved an attorney whose contract with clients provided that, in consideration of a reduced fee, he would not attend the § 341 meeting. The practice was condemned as a matter of public policy and the attorney was sanctioned. n25

n24 *291 B.R. 462 (Bankr. D. Minn. 2003)*.

n25 To the same effect, *see In re Castorena, 270 B.R. 504 (Bankr. D. Idaho 2001); In re Bancroft, 204 B.R. 548 (Bankr. CD. Ill. 1997)*.

[*19] I hold that, in this case, the failure to replenish the retainer does not constitute cause for withdrawal.

**Conclusion**

For the reasons stated, I will enter a separate order denying the Motion.

William C. Hillman

United States Bankruptcy Judge

Dated: 3/24/05

# EXHIBIT B

DuaneMorris[*]

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
PITTSBURGH
NEWARK
ALLENTOWN
WILMINGTON
HARRISBURG
PRINCETON
WESTCHESTER

ANTHONY J. FITZPATRICK
DIRECT DIAL: 617.289.9220
E-MAIL: ajfitzpatrick@duanemorris.com

www.duanemorris.com

July 14, 2005

VIA EMAIL

Ieuan G. Mahony, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

> Re:    **Access CardioSystems, Inc., et al. v. Randall Fincke**
>        **United States Bankruptcy Court, District of Massachusetts**
>        <u>**Adv. Proc. No. 05-04076**</u>

Dear Mr. Mahony:

I am writing in response to your letter received by e-mail at 7:24 p.m. on July 13, 2005.

Your motion to withdraw indicates that you had concluded by June 27, 2005 that you could not continue your attorney-client relationship with Mr. Fincke. However, you did not advise us of your request to withdraw and for an extension until two and one-half weeks later. In that intervening two and one-half week period, you had several communications with this office, including about the scheduling of depositions. In those communications, you made no mention of irreconcilable differences with Mr. Fincke, your intention to move to withdraw, or your request for an extension.

Indeed, you did not disclose any of these issues until after 4:00 p.m. on the eve of today's deposition. Your motion to withdraw was not served until 4:42 p.m. yesterday. As you know, your client agreed to a relatively short discovery schedule in this case. In fact, Mr. Fincke agreed to that schedule during a time when, according to your motion to withdraw, your relationship with him had "deteriorated." Furthermore, the plaintiffs agreed to extend the discovery schedule to accommodate your vacation schedule and that of your colleague Mr. Sobol. Also as you know, several third-party depositions are to be taken in this case. Much of that discovery is necessitated by the positions taken and assertions made by Mr. Fincke. Given the delays in this case to date, the short discovery period, and the number of depositions to be taken, we are not in a position to agree to an extension for a still-unspecified period of time. Contrary to your characterization that we "flatly refused" your request for an extension, we explained these reasons during our telephone conversation late yesterday.

DuaneMorris

Ieuan G. Mahony, Esq.
July 14, 2005
Page 2


We know of no basis for your assertion that successor counsel (if any) will be in a position to object to and preclude the use of testimony at today's deposition.

As to your disappointment that we have not agreed to your request for an extension of time, we are disappointed that you delayed making your request to withdraw and for an extension until after 4:00 p.m. on the eve of a deposition, two and one-half weeks after you had concluded that you could no longer represent Mr. Fincke. You have offered no explanation for this delay in either your telephone conversations with this office, your motion, or your letter.

I have conferred with Jerry Benezra, counsel for the individual plaintiffs, and he has approved this letter. However, Mr. Benezra also reserves the right to respond to your letter separately on behalf of his clients.

Sincerely,

Anthony J. Fitzpatrick

AJF/lnw
cc:    Barry C. Klickstein, Esq.
       Jerry E. Benezra, Esq.

BOS\134218.1

# EXHIBIT C

-----Original Message-----
**From:** david.sobol@hklaw.com [mailto:david.sobol@hklaw.com]
**Sent:** Wednesday, June 08, 2005 5:00 PM
**To:** ieuan.mahony@hklaw.com; AJFitzpatrick@duanemorris.com
**Cc:** BCKlickstein@duanemorris.com; jeblaw@benezra.net; BLRoberts@duanemorris.com; JDSternklar@duanemorris.com
**Subject:** Access v. Fincke- Discovery Plan

Attached is a revised Discovery Plan.  Please review the dates and let me know if you have any comments.  I will plan on forwarding the Discovery Plan to the judge's calendar clerk prior to the telephonic hearing tomorrow at 9:30 am (and will also forward call-in instructions once I receive them).

Thank you.

| EVENT: | PROPOSED DEADLINE: |
|---|---|
| Parties to respond to initial written discovery requests previously propounded. (When parties respond to document requests, parties shall at the same time produce all responsive documents.)<br><br>Parties reserve the right to serve follow-up written discovery requests, if necessary, based upon deposition testimony. However, all written discovery shall be served and answered no later than July 15, 2005, prior to the deadline for filing dispositive motions. | June 28, 2005 |
| Motions to amend and other procedural motions. | June 30, 2005 |
| Parties to disclose expert witnesses, and respond to expert interrogatories | July 25, 2005 |
| Depositions – the completion of depositions (including expert depositions, if any) | August 10, 2005 |
| Dispositive motions – motions for summary judgment served by hand or overnight delivery (parties reserve the right to serve summary judgment motions prior to this date) | September 13, 2005 |
| Oppositions to motions for summary judgment served | September 27, 2005 |
| Hearing on motions for summary judgment | October __, 2005 |
| Pre-trial conference | As soon as practicable thereafter |
| Trial on all issues | As soon as practicable thereafter |

# DuaneMorris

## Information
## Services

**REMOTE ACCESS RESOURCES**


*http://mydesktop.duanemorris.com*


FOR AUTHORIZED USERS ONLY

## REMOTE ACCESS

The firm provides several different options for accessing in house computer resources remotely; e.g. DTE, (mydte – see Appendix B), Outlook (mymail) or Citrix (myCITRIX). All of the remote access options are accessed from the remote access webpage http://mydesktop.duanemorris.com.

### Accessing mydesktop.duanemorris.com

1.    From any computer with internet access, open a web browser; i.e. Internet Explorer or Netscape.

2.    Type; **mydesktop.duanemorris.com** into the address bar at the top of the window and then press [**Enter**]. The Duane Morris myDesktop webpage displays.

   **Note**: Do not type *www* before mydesktop.duanemorris.com.



### Outlook Web Access     

Outlook Web Access (OWA) is the quickest way to access information stored in Outlook; e.g. email, calendar, contacts and tasks. No specialty software downloads are required. Any computer with internet access is sufficient.

1.    From the *mydesktop.duanemorris.com* webpage, click the **Outlook Web Access** link.

2.    If you see a Window's security warning, click **Yes**. A user name and password prompt displays.

3.    Enter your *network login id* (e.g. pgf103) and *network password* into the **User name** and **Password** fields respectively.

## Citrix    myCITRIX®

Citrix is used to simulate the Duane Morris desktop environment when working remotely. Most of the programs you access while in the office are accessible via Citrix. If you have questions about a particular program's accessibility via Citrix, please contact the helpdesk.

1.  From the *mydesktop.duanemorris.com* webpage, click the **myCITRIX** link. The following webpage displays.



**Note**: We highly recommend that you download the latest Citrix client clicking on the link that is provided at the bottom of the login window. If the computer you're working at has the latest version of the Citrix client, the link does not display. See **appendix A** for Installation instructions.

2.  Enter your network login id (e.g. pfg203) and your password and then click the **Log In** button. The following webpage displays.



3.  The standard suite of applications (e.g. Word, Outlook, etc..), is represented by the **Desktop 2005** icon. If you have access to special programs (e.g. software that pertains to your practice area only), additional folders display, which contain these specialized programs.

4.    To access the standard suite of applications, click on the **Desktop 2005** icon. Your Desktop2005 desktop displays as it does within the office.



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Please Note**:  The first time you log on to Citrix, and click on the Outlook icon, Outlook will begin creating your profile for Citrix.  During this time, you will receive two messages which you need to click "OK" on.   Images of the messages are below.  Once you are in Outlook, click on the MailSite folder to load the application types in MailSite.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Failure to click "OK" on these messages will cause MailSite not to install properly.



## Trouble Shooting

If you experience trouble printing via Citrix, we have provided a utility called *Simplify Printing Client v3.18* which is located on the mydesktop.duanemorris.com menu.

> **Note**: This should **ONLY** be installed if your can **NOT** print via Citrix.

1.    To install the utility, click on the link located on the mydesktop.duanemorris.com menu, when the installation box appears, click **Open**.

2.    Click **Next** at the dialog. The following **Select Components** screen displays.



3.    Uncheck the box **Microsoft RDP5 (TSAC) Client Support** and then click **Next**.

4.    At the ReadMe File display click **Next**. The **Start Installation** window displays.



5.    Click **Next**. Installation begins.

6.    When the program has completed installing, a final window displays, click **Finish**. Full printing functionality is restored.

## Appendix A – Installing the Citrix Client

1.    Once you click on the link, the File Download window will appear, click the Open button to begin.



2.    Click Next to begin The InstallShield Wizard



3.    Click Next on the Welcome screen.



4.    Click Yes to accept the Citrix License Agreement.



5.    Select Upgrade the existing client, and click Next.  **Please Note**:  If you do not have the Citrix client this box will not appear.



6.    Check the box Use machine name as client name.



7.    Select No and Next on the following screen.



8.    Click Yes, I want to restart my computer now and the Finish button.



9.    After your PC system has restarted, go back to the Citrix link and enter your Username which is your network login id and network password and click Log In.  The system will then bring you to the Citrix desktop to which you can access the applications that you would normally have access to in the office.

# APPENDIX B – DTE EVERYWHERE

DTE can be accessed from any computer with Internet access.

1.  Connect to the Internet (via dial up, DSL, etc...) and go to **http://mydte.duanemorris.com**.

2.  The login prompt displays.  Enter your DTE **Timekeeper ID** or the DTE Timekeeper ID of the person for whom you are entering time.  **The Timekeeper ID entered MUST include all five numbers** (to bring your timekeeper up to 5 digits, add a preceding zero(s)).

3.  Enter your **User Name** and **Password**, used when logging onto your computer at the office.



4.  Click the **OK** button.

## Entering Time

To enter a new time entry in DTE Everywhere follow these steps.

1.  Click the New ⌷ button from the Calendar View.



2.  The Time Entry screen displays with a Date, Timekeeper and Operator displayed.



3.  Change the **Date**, if appropriate.

4.  Enter the **Client** and **Matter** numbers.  If the values are unknown, use the appropriate ▦ button to lookup the appropriate numbers.

**Note**: The search screen provided allows you to enter the name or a part of the name as criteria for the Client or Matter search. Once the criteria has been entered, clicking the Personal button will search the numbers you have used in the past. Clicking the Firm button will search all available Client or Matter numbers.

5.  Enter the **Hours** worked. Clicking on the ⊞ button next to the Hours field brings up a calculator to help determine the appropriate amount time worked.

6.  Enter the **Location** and **Narrative**. (Firmwide and Personal Shorthand Codes do not work in DTE Everywhere)

7.  Click the **OK** button to save the entry and return to the Calendar view or the **More** button to save this entry and add another.

## Daily View

A single day of the month can be viewed by clicking the number in the calendar that corresponds to the day of the week to be viewed. Once a day is selected, the user is taken to the **Short List**, or **Daily View**. This list displays all entries for the selected day.



Click the checkbox to the right of an entry to delete ⊠, edit ✎, release ↗ or unrelease ↺ one entry at a time using the buttons on the toolbar.

## Releasing Time

To release an entry from the **Calendar view** it must first be marked for release.

1.  To mark a date(s) for release place a check in the checkbox that appears on the date that has the unreleased time that you wish to release.



2.  Once the selected date has been marked, the entry can be released by clicking the ↗ button that appears in the calendar view view toolbar (click on ↺ to unrelease the entry). Once the entry has been released, it will appear in green on the calendar.

To release an entry from the **Daily view** it must first be checked.

1.  Click the checkbox to the right of the entry (or entries) to be released.

2.  Once the selected date has been checked, the entry can be released by clicking the ↗ button that appears in the daily view toolbar (click on ↺ to unrelease the entry).

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CERTAINTEED CORPORATION | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Case No. 03-CV-2131 (PBT) |
| | : | |
| MODERN PRODUCTS INDUSTRIES, INC. | : | |
| and ROY THEIN | : | |
| | : | |
| Defendants | : | |
| | : | |

**PLAINTIFF CERTAINTEED CORPORATION'S OPPOSITION TO
DEFENDANTS' MOTION TO CONSTRUE MEANING OF
"PREDETERMINED INTERIOR DIAMETER"**

Plaintiff CertainTeed Corporation ("CertainTeed") opposes the defendants' Motion to

Construe Meaning of "Predetermined Interior Diameter," on the grounds that: (a) CertainTeed

provided full and complete information concerning its accused Kwik-Set product to the

defendants, beginning before their patent even issued, and thus there is no reason for the Court to

re-open the claim construction process; and (b) the defendants' proposed re-construction of the

claim term "a predetermined interior diameter" is merely an attempt to re-write their patent to

cover CertainTeed's product.

The defendants' brief is replete with hyperbolic accusations against CertainTeed, its

employee witnesses, and its independent technical expert.  For example, the defendants accuse

CertainTeed of engaging in a "bait-and-switch" and of having "deceived" the defendants into

agreeing to an interpretation of the claim term at issue.  The defendants also create the (incorrect)

impression that CertainTeed re-designed its product in 2004 in a way that impacted the interior

diameter, and withheld documents concerning such change until June 2005. Further, the defendants accuse two CertainTeed employees of "false testimony" and assert that the initial report of CertainTeed's independent expert, Phillip Sharff, is "specious."

CertainTeed will not engage the defendants in an exchange of name-calling. Suffice it to say that:

(a)    the defendants' accusations are unfounded; and

(b)    the defendants' recitation of what they learned about CertainTeed's Kwik-Set product, and when they learned it, is at best materially incomplete.

**First,** CertainTeed did not make any change to its Kwik-Set pipe in 2004 that in any way impacted the interior diameter. On the contrary, CertainTeed has always made the Kwik-Set pipe in the same way, before and after issuance of the patent in suit. In particular, CertainTeed has always thickened the plastic at the ends of the pipe. This thickening in turn reduces the interior diameter of the pipe at each end, including the male end. (CertainTeed's process of making the Kwik-Set product is explained in some detail below.) As a result, CertainTeed's Kwik-Set pipe is not "[a] single piece polyvinyl chlorine (PVC) pipe of a predetermined interior diameter," as required by claim 1 of the patent. On December 8, 2003, before the patent in suit had even issued, CertainTeed provided a copy of its written design specification for Kwik-Set to the defendants' counsel. [cite] This specification expressly disclosed the end thickening process:

> The length of the bell end thickening (T2) must be long enough so that the entire bell end area [i.e. the female end] will be thickened. Overflow of this thickening is allowed into the next spigot [i.e. the male end] . . . .

2

[Cite].  It is this same language that the defendants now claim was not disclosed until June 2005.[1]  See the defendants' brief at 5.

**Second,** CertainTeed produced samples of the Kwik-Set product to the defendants in May 2004.  Apparently the defendants did not examine these samples until after the time came for expert discovery.  It appears that the defendants sent one of the samples to their technical "expert," Frank Vaden, after he had submitted his initial report.  Mr. Vaden, who is a patent lawyer rather than an engineer, measured the sample with a simple ruler.  His rebuttal report discloses his finding that the interior diameter at the male end is less than the interior diameter of the rest of the pipe.  [Cite].  The defendants' brief mentions neither CertainTeed's production of these samples, nor their "expert's" measurement thereof.

**Third,** CertainTeed's employees John Stott and Steven Gross testified at length in their depositions (in May and August 2004, respectively) concerning the process for making Kwik-Set, the end-thickening, and the consequent impact on the interior diameter.  Indeed, Mr. Stott testified as follows:

> Q.    Is the interior diameter the same?
>
> A.    Not always.
>
> Q.    Okay.  When does it vary?
>
> A.    It varies when you thicken a product for various reasons.
>
> Q.    Doesn't that—when you thicken it doesn't that just vary the exterior diameter?

---

[1]    On May 20, 2005, CertainTeed did make a change to its Kwik-Set design that impacted the interior diameter.  Specifically, CertainTeed extended the thickening so that the entire threaded area of the male end would be thickened.  CertainTeed produced its new design specification reflecting this change to the defendants on June ___, 2005.

> A.     No, just the opposite. As I said earlier when you thicken a product you make the PVC pipe to a specific outside diameter and when you thicken that thickening goes into the I.D. [i.e. the interior diameter].

[Cite]. In their brief, however, the defendants have quoted only selective portions of Mr. Stott's and Mr. Gross' testimony, and have omitted the testimony concerning end-thickening and the impact thereof on the interior diameter.

**Fourth,** the defendants assert that CertainTeed proposed the construction of "a predetermined interior diameter," and that they agreed to CertainTeed's construction "in an effort to minimize disputes." See defendants' brief at 1-2. In fact, the parties exchanged a series of proposed constructions of this claim term, and the final agreed-upon construction was proposed by the defendants, not by CertainTeed. See Exhibit F, e-mail dated ___, 2004 from the defendants' counsel to CertainTeed's counsel, attaching the defendants' proposed claim construction. This agreement was reached after CertainTeed had provided the written Kwik-Set design specification, which discloses the end-thickening; after CertainTeed had produced samples of the Kwik-Set product, which the defendants' expert later measured and found not to have "a predetermined interior diameter"; and after Mr. Stott's deposition, in which he testified that the interior diameter of the Kwik-Set pipe is "not always" the same throughout the length of the pipe.

**Fifth,** the defendants' proposed re-construction of the claim term "a predetermined interior diameter" is nothing more than an eleventh-hour attempt to re-write their patent to cover CertainTeed's product. The defendants ask the Court to re-construe this claim term to mean "an interior diameter of a portion of the pipe, other than the female end, that is determined in advance." See defendants' brief at 13 (emphasis added). However, the patent claim recites "[a] single piece polyvinyl chlorine (PVC) pipe of a predetermined interior diameter." The claim to

4

"[a] single piece . . . pipe of a predetermined interior diameter" unambiguously means that the pipe must have a single interior diameter that is: (a) consistent throughout the length of the PVC pipe (except the female end); and (b) determined in advance of making the pipe – just as the defendants suggested in June 2004. There is no basis for the defendants' argument that "a predetermined interior diameter" means only the interior diameter of a portion of the pipe.

## I.    STATEMENT OF RELEVANT FACTS:

### A.    CertainTeed's Process For Making Kwik-Set:

The patent in suit is United States Patent No. 6,666,480, entitled "Submersible Pump Drop Pipe and Casing Assembly Connection and Method of Manufacture" (the "'480 patent"). The patent is owned by defendant Modern Products Industries, Inc. ("Modern Products"). CertainTeed seeks a declaratory judgment that it has not infringed the '480 patent, and that the patent is invalid. The defendants, in turn, has filed a counterclaim asserting that CertainTeed has infringed the patent.

The field of the purported invention claimed in the '480 patent is plastic pipe for use in water wells. More specifically, the patent concerns a purportedly novel connection between two lengths of polyvinyl chloride pipe ("PVC pipe"). This connection is formed by screwing one end of one pipe (which has threads on the outside) into one end of a second pipe (which has threads on the inside).

PVC pipe is made using a well-known technology called "extrusion." In this process, PVC resin or powder is fed into one end of a heated steel barrel. The barrel contains a rotating screw mechanism. The heat of the barrel, and the force of the rotating screw, cause the PVC resin to melt and mix together. The rotating screw pushes the melted PVC through a "die" at the other end of the barrel. The die has a specially designed cross-section. As the melted PVC is

pushed through the die, it takes on the shape permitted by the die.  In the case of PVC pipe, this shape is a cylinder.

As it comes out of the die, the PVC is immediately cooled, typically using water.  The PVC is then pulled forward and cut into appropriate lengths, typically 20 feet in length.  One end of each length of pipe is then pushed into a special heated die to create an enlarged diameter, called a "bell" or "belled-end."  Threads are then cut into the interior of the belled-end.  The other end of the pipe is placed into a separate threading machine, to cut threads onto the exterior of the pipe.  Thus, each length of pipe has external threads on one end, the "male" end, and internal threads on the other end, the "female" end.  Two lengths of this pipe can be connected together by screwing the external threads on the male end of one pipe into the internal threads on the female end of the other pipe.

PVC pipe is manufactured in a wide range sizes and wall thicknesses.  The exterior diameter of the pipe is determined by the shape of the die.  The thickness of the pipe is determined by the rate at which the pipe is extruded, or as it is known in the industry, the "haul-off" rate.  A slower haul-off rate, allows a greater volume of PVC resin to pass through the die.  Because the shape of the die does not change, the exterior diameter of the pipe remains the same, and the excess material is forced to expand into the interior of the pipe.  Thus, by slowing down the haul-off rate, the thickness of the walls of the pipe is increased.  Naturally, the thicker the walls of the pipe are, the more force the pipe will be able to withstand.

There are a essentially two ways to manufacture PVC pipe using the extrusion process; extruding pipe using a fixed haul-off rate, in which the rate at which the pipe is extruded remains the same, or extruding pipe using a variable haul-off rate, in which the rate at which the pipe is extruded changes.  In a fixed haul-off rate, the amount of thickening in the walls of the pipe

remains consistent throughout the length of the pipe, thus resulting in a pipe with a consistent

interior diameter. In a variable haul-off rate, the amount of thickening in the walls of the pipe is

dependant on the speed of the haul-off rate. This results in a pipe with thicker walls at points in

the process where the haul-off rate is slowed down, and a thinner walls at portions where the

haul-off rate is sped up. Thus, using a variable extrusion rate process the interior diameter of the

pipe changes in accordance with the haul-off rate.

The '480 patent purports to disclose a novel way of connecting two lengths of PVC pipe

together that has "lateral strength." The specification of the '480 patent states that *any* lateral

strength comes from the second enlarged diameter section at the female end:

> Because the first cylinder section extends out for approximately one inch, *any*
> lateral forces on the connection are exerted against the first cylinder section
> instead of on the second cylinder section, which is threaded. This gives lateral
> strength to the drop pipe 103. (emphasis added)

'480 patent, col. 3 line 61 – col. 4 line 4 (the number "103" in this quote refers to a
corresponding number on the figures of the patent).

This issue of "lateral strength" was central to the United States Patent and Trademark

Office's ("USPTO") allowance of Modern Products' patent application. Indeed, the USPTO

rejected the defendants' patent application on three occasions, on the basis that the claimed

invention was obvious in light of a series of prior art references. The defendants overcame these

rejections only by withdrawing its original claim completely, submitting an entirely new claim,

and then adding several limitations to the new claim. One such claim limitations added requires

that the second enlarged diameter be "long enough to provide said lateral strength" and "at least

long enough to received [sic] most of said external threads from said similar adjacent PVC pipe

before threading." '480 patent, col. 5, claim 1. In addition, the defendants argued that the prior

art pipes cited by the USPTO did not have the "necessary lateral strength."

Another limitation the defendants added to distinguish its purported invention over the cited references was the term "a predetermine interior diameter" in claim 1. According to the defendants, a predetermined interior diameter, is an interior diameter of a pipe that is consistent throughout the length of the pipe (except at the female end), and determined in advance of making the pipe.[2] During the claim construction process of this suit, CertainTeed agreed to this interpretation because it acknowledged that the method of manufacturing the pipe disclosed in the '480 specification would necessarily result in a pipe having these characteristics. Because the specification of the '480 patent discloses a fixed extrusion rate process, i.e., extruding pipe using a fixed haul-off rate, the amount of thickening in the walls of the pipe would remain constant throughout the length of the pipe and therefore, necessarily result in a pipe having a consistent interior diameter.

Unlike the method disclosed in '480 patent, CertainTeed's Kwik-Set pipe is not manufactured through a fixed rate extrusion process. Instead, because CertainTeed's pipe does not have a first cylinder section long enough to provide lateral strength, CertainTeed utilizes a variable rate extrusion process to increase the thickness of the walls of the pipe at both the male and female threaded ends. As evident in the original specification for the Kwik-Set pipe, CertainTeed's Kwik-Set pipe has always been manufactured through a variable rate extrusion process.

The defendants questioned both John Stott and Steve Gross concerning this process during their depositions. As explained to the defendants, CertainTeed's Kwik-Set pipe is extruded from the machine in a single continuous length. As the length of the extruded pipe nears the appropriate size, the haul-off rate is slowed down, allowing the PVC resin to back up

---

[2]     See defendants' Proposed Claim Term Construction, June 11, 2004 at Exhibit F

into the interior diameter and thickening the walls of the pipe. The pipe is then cut in the middle of the thickened area, resulting in a section of pipe with thickened walls at both ends. One of the thickened ends of the pipe is then belled into the female end. The other thickened end of the pipe is cut into the male end of the next pipe. Thus, as a result of CertainTeed's variable haul-off rate extrusion process, both ends of the pipe have thickened walls. This increased wall thickness allows the CertainTeed pipe to withstand lateral forces, i.e., forces perpendicular to the length of the pipe, without the need for an extended lead-in section. Thus, the first cylinder section of the CertainTeed pipe acts solely as a funnel to aid in joining the two ends of pipe together.

As a result, CertainTeed's method of the producing its Kwik-Set product differs substantially from the method disclosed in the '480 patent and results in a substantially different product. CertainTeed's Kwik-Set pipe provides additional strength to resist lateral forces through thickened walls at the male and female ends of the pipe, instead of through a second enlarge diameter section at the female end. CertainTeed's increased thickness at the male and female ends of the pipe results in a decrease in the interior diameter of the pipe.

**B.     CertainTeed's Disclosures Concerning Its Process For Making Kwik-Set, And The Consequent Effect On Interior Diameter:**

**1.     CertainTeed Provided Its Written Design Specification For Kwik-Set To The Defendants Before The Patent-In-Suit Even Issued:**

On December 8, 2003, counsel for CertainTeed mailed counsel for the defendants a copy of the written design specification for the redesigned Kwik-Set pipe. See Exhibit A, Letter from counsel for CertainTeed to counsel for defendants enclosing CertainTeed's redesign specification. Counsel for the defendants acknowledged receipt of the redesigned specification during the deposition of John Stott on May 12, 2004:

> Now, these are not Bates stamped, but I'll represent to you that these are copies of drawings which I received from your counsel by mail for the redesigned product....

9

<u>See</u> Exhibit G, Excerpt of Deposition of John Stott (emphasis added).

In fact, counsel for Modern Products marked the redesigned specification as Deposition Exhibit Number 33. <u>See</u> Exhibit G. The first page of the specification expressly discloses the end thickening that occurs as a result of the variable haul-off rate extrusion process. Specifically, noted 2 of the written specification provides that the "bell end thickening" [i.e. the thickening at the female end] extends into the next spigot [i.e. male end] of the next pipe. Thus, both ends, the male and female ends, are thickened.

In addition to Note 2, page one of the written specification includes a diagram of the pipe depicting the exaggerated end thickening section. As illustrated below, the walls of the pipe are thickened as a result of the manufacturing process employed by CertainTeed to produce the pipe.



Thus Modern Products' allegation that CertainTeed "finally produced information relating to its redesigned Kwik-Set prouct [sic]" in the "past month" is simply puzzling. As acknowledged by counsel for the defendants, CertainTeed provided the defendants with a copy of their redesigned specification that expressly disclosed and clearly illustrated the end thickening process employed by CertainTeed, before the patent in suit even issued and this suit was filed.

     **2.    CertainTeed Produced Samples Of Kwik-Set To The Defendants In May 2004, But It Appears That The Defendants Did Not Inspect Those Samples Closely Until Expert Discovery:**

In addition to the written specifications, CertainTeed also provide samples of actual Kwik-Set pipe, manufactured in accordance with CertainTeed's redesigned specification, since at least as early as May 2004.  Undeniably, counsel for the defendants questioned John Stott extensively about these samples during his deposition on May 13, 2004 and marked the samples of pipe as Deposition Exhibit No. 7.  It appears, however, that defendants did not examine these samples until a few weeks ago, when upon a simple inspection, the decrease in interior diameter became readily apparent.

In accordance with this Courts scheduling order of April 28, 2004, expert discovery was completed on July,  2005.   CertainTeed submitted its technical expert report of Phillip Sharff to the defendants on July, XX 2005.  See Exhibit II?  Detailed in this report, were precision measurements of the thickness of the walls of the pipe confirming the decrease in interior diameter at the ends of the Kwik-Set pipe.  In response to CertainTeed's expert report, and for the first time in the almost two years that the defendants have had samples of Kwik-Set pipe, the defendants provided a sample of the Kwik-Set to their technical expert Mr. Vaden. [3]  Without the use of any precision measuring equipment what-so-ever, Mr. Vaden, was quickly able to confirm the decrease in interior diameter at the male end with the use of a simple straight edge ruler:

> when I measured the internal diameter of the first piece with the ruler, I observed that the sawed-off cross section measured approximately 2.3 centimeters and the male threaded end measured approximately 2.2 centimeters....

Rebuttal Expert Opinion of Frank S. Vaden III, pg. 2, ¶4, attached hereto as Exhibit H. Thus, within about two weeks after receiving CertainTeed's expert report, the defendants were able to confirm that the interior diameter at the male end of the Kwik-Set pipe is less than the

---

[3] Although CertainTeed reserves the right to contest the accuracy and admissibility of the report.

interior diameter of the rest of the Kwik-Set pipe with their own expert using only a ruler. Yet, despite it taking only two weeks to confirm the decrease in interior diameter, the defendants took almost two years to measure the samples of pipe provided to them, and would now have this court believe that this information was "sprung" on them "last month." Nothing could be further from the truth.

       **3.**     **CertainTeed's Employees, John Stott and Steven Gross, Testified In Deposition About The Process For Making Kwik-Set, And The Consequent Effect On Interior Diameter:**

On May 12, 2004, in preparation for the Joint Claim Construction Statement, the defendants took the deposition of John Stott, head of marketing for CertainTeed(?). In this deposition, spanning for a full nine hours, the defendants explored countless aspects of CertainTeed's Kwik-Set pipe, including the redesigned specification and its manufacturing process. As discussed above, the defendants had copies of both written specifications as well as actual samples of the redesigned Kwik-Set pipe previously produced by CertainTeed. See Exhibit to Stott Deposition Nos. 7 and 33.

The defendants questioned John Stott directly on the issue of the interior diameter of the Kwik-Set pipe. Contrary to the defendants mischaracterization of his testimony, John Stott specifically explained to counsel for the defendants that the interior of the pipe is <u>NOT</u> the same throughout the length of the pipe and, instead, the interior diameter at the male end decreases:

Q.     Is the interior diameter the same?

A.     Not always.

Q.     Okay. When does it vary?

A.     It varies when you thicken a product for various reasons.

Q.     Doesn't that—when you thicken it doesn't that just vary the exterior diameter?

A.     No, just the opposite. As I said earlier when you thicken a product you make the

> PVC pipe to a specific outside diameter and when you thicken that thickening goes into the I.D.

See Deposition John Stott, pg. 212, line 18 to pg. 213, line 8, attached at Exhibit G.

The process through which CertainTeed manufactures its pipe was categorically discussed and squarely disclosed to the defendants. If the defendants somehow found this testimony misleading, shame on them. Nothing could be more clear. Indeed, counsel for the defendants questioned John Stott concerning a number of emails that were produced by CertainTeed which specifically discussed the extent and reasoning for the thickening. The defendants enclosed a number of those emails to this Court in its Claim Construction Brief at Exhibit N, including an email from October 18, 2002 from Steve Gross to Ray Lotfi setting forth the details of the thickening of the pipe. In that email, Steve Gross explicitly states the "[r]equired end-thickening is around 12%, which I think is achievable... and any thickening that extends into the adjacent spigot end should not significantly affect flow performance." Modern Products cannot deny it was fully aware of the content of this, and other, emails when it negotiated the Proposed Joint Claim Construction.[4]

Furthermore, the deposition testimony of Steve Grosss, director of marketing for CertainTeed, only confirms what was already disclosed by John Stott. Again, during the seven hour deposition, Modern Products questioned Steve Gross on virtually every aspect of the redesigned Kwik-Set pipe, including its purpose, design, the process by which it was manufactured. Again, Modern Products had copies of the design specification for the redesigned

---

[4]    Also included in Modern Products Claim Construction Brief, is a copy of the original specification which plainly states at Note 2 that the thickening of the pipe wall overflows into both the bell end and male end. See Exhibit Q to Modern Products' Claim Construction Brief.

Kwik-Set pipe, as well as actual samples of the pipe.  See Exhibit Nos. 7, 33 to the Deposition of John Stott.

Yet, despite having over ten pages of deposition testimony specifically concerning the thickening of the CertainTeed's Kwik-Set pipe walls, Modern Products cites only one generalized statement by Steve Gross to create the illusion that Steve Gross was hiding information.  Not surprisingly, Modern Products fails to disclose the direct questions pertaining to the thickness of the walls and the interior diameter of the pipe:

> Q.    So the – when the pipe comes off the extrusion line there's a section of the pipe that is actually thicker than the rest of the pipe?
>
> A.    Yes.
>
> Q.    Okay.  And how do you – how is that created?  How do you get that thicker section of the pipe?
>
> A.    This is not my area of expertise, but my understanding is they slow down the haul off rate allowing the material to back up and effectively thicken the pipe.
>
> Q.    I guess the idea would be that when it comes off and you have a thickened area and that thickened area is going to be for the belled end; is that right?
>
> A.    Primarily but some of that extra thickness into the male end.
>
> Q.    Before you cut it?
>
> A.    Where you cut it you will have extra thickness on the belled end and some extra thickness on the male end, as well.

It is unclear, how this deposition testimony could be interpreted to be contrary to testimony of John Stott or contrary to the conclusion that the Kwik-Set pipe "does not have a single interior diameter that is consistent throughout the pipe" presented in CertainTeed's expert report.  Motion to Construe at pg. 5.  Just the opposite, this testimony confirms those conclusions

and makes clear that CertainTeed's pipe is manufactured through a variable rate extrusion process and does *not* have a consistent interior diameter throughout the length of the pipe.

> **C.    The Parties Exchanged A Series Of Proposed Constructions Of The Claim Limitation "A Predetermined Interior Diameter," And The Final Agreed-Upon Version Was Drafted And Suggested By The Defendants Themselves:**

On May 20, 2004, following the deposition of John Stott, the defendants submitted a first draft, via facsimile, to CertainTeed of the defendants' first "Proposed Construction of Claim 1." See Exhibit C.  The defendants first "Proposed Construction of Claim 1" sought to construe eight separate terms, including the term "a predetermined interior diameter."[5] See Exhibit D.  In response, on May 21, 2004, CertainTeed sent a return fax, indicating the six terms CertainTeed felt were at issue and agreeing to the need to construe the term "a predetermined interior diameter."  In addition, CertainTeed also took the lead to draft a Proposed *Joint* Claim Construction, which combined all the terms, accurately reflecting the definitions submitted by both the parties, into a single document.  CertainTeed mailed a copy of this Proposed Joint Claim Construction to the defendants on June 4, 2004.  See Exhibit E.

Unlike it would have this Court believe, the defendants did not accept the definition of "a predetermined interior diameter" as set forth by CertainTeed in the Propose Joint Claim Construction.  Instead, after reviewing the proposal, on June 11, 2004 submitted a *new* version of the Proposed Joint Claim Construction to CertainTeed, *rejecting* CertainTeed's proposed construction of "a predetermined interior diameter," and instead, proposing its own construction. See Exhibit F.  The defendants proposed this claim term construction after having been provided with the written redesigned Kwik-Set specification, which plainly disclosed the end-thickening;

---

[5]    See Exhibit H detailing the progression of the construction of "a predetermined interior diameter."

after CertainTeed had produced samples of the Kwik-Set product, which the defendants' expert later confirm had a decreased interior diameter; and after Mr. Stott's deposition, which detailed the decrease in the interior diameter. Upon review of the specification and claims of the '480 patent, CertainTeed agreed to the defendants proposed claim term construction.

In its final proposal, the defendants construed the claim term "a predetermined interior diameter" as "a single interior diameter that is: (a) consistent throughout the length of the PVC pipe (except the female end); and (2) determined in advance of making the pipe." CertainTeed agreed to this construction because it is consistent with the claims of the '480 patent and it is consistent with the characteristics of the interior diameter of a pipe resulting from the method of manufacture disclosed in the '480 patent. Thus, it was the defendants who not only set forth the need to construe the term "a predetermined interior diameter," but also the defendants who proposed the final agreed-upon construction of the claim term, not CertainTeed.

### D.    Prior To May 2005, CertainTeed Did Not Make Any Change To Kwik-Set That Impacted Interior Diameter In Any Way:

There have been no changes to the Kwik-Set pipe impacting the interior diameter in any way prior to May 2005; period. On May 20, 2005, CertainTeed revised its redesign specification to further extend the length of the wall thickening in the pipe farther into the male end. Importantly, this revision did not increase the amount of thickening, only its length. Shortly after making the revision, CertainTeed produced this revised specification on June 17, 2005.[6] Also produced on June 17 was an October, 2004 revision of the Kwik-Set pipe. The October revision,

---

[6] The defendants are in no position to comment on production as they still owed us damages docs. Furthermore, the May 20 2005 revision came after the January 19, 2005 production order. Never-the-less, CertainTeed immediately produced the revised specification on June, XX 2005.

however, in no way concerned the thickening of the pipe walls or the size of the interior diameter, but only shortened the length belled area; an issue not in dispute in this motion.

Consistent throughout the history of the Kwik-Set pipe, CertainTeed has always manufactured its pipe through a variable haul-off rate extrusion process resulting in increased wall thickness and a decreased interior diameter. That process was disclosed to the defendants in December, 2003, and has never changed.

## II.    LAW AND ARGUMENT:

### A.    There Is No Reason For The Court To Re-Open The Claim Construction Process:

A determination of patent infringement is a two-step process. Civix-DDI, LLC v. Cellco Partnership, 2005 WL 831307, at 1 (N.D. Ill., April 6, 2005). In the first step, claim construction, the court interprets that patent claims that define the scope of the patentee's rights under a patent. Cyber Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998)(en banc). In the second step, the factfinder compares the properly construed claims to the accused device to determine, as a question of fact, whether all of the claim limitations are present in the accused device. Id. Claim construction is a matter of law exclusively for the court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-971 (Fed. Cir. 1995)(en banc).

"The Markman decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997). Courts routinely accept the constructions of disputed terms agreed upon by the parties. See Civix-DDI, 2005 WL 831307, at 2. "Claim construction is a matter of resolution of *disputed* meanings and technical scope, to clarify and *when necessary* to explain what the patentee covered by the claims, for use

in the determination of infringement.  It is not an obligatory exercise in redundancy." United States Surgical Corp., 103 F.3d at 1568 (emphasis added).

Ironically, section III of the defendants' Motion to Construe, "Authority for Clarifying Claim Constructions" cites *no* authority for the proposition that a court should construe a term previously agreed upon by the parties.  Nevertheless, the defendants rely on Jack Guttman, Inc, v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) (the Federal Circuit reinterpreted a district court's tentative claim term construction of a disputed claim term on appeal) and Utah Medical Products, Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1382 (Fed. Cir. 2003) (district court amended the disputed claim term construction to clarify its original intent) to argue that this Court should reinterpret the meaning of a claim term that was not in dispute.  Neither so holds.

In Guttman, the Federal Circuit bases its decision to revisit the claim term interpretation on two basis; 1) the district court had only tentatively construed the claim term in the preliminary injunction stage before any discovery had occurred; and 2) both parties had disputed the meaning of that term before the district court.  Jack Guttman, Inc, 302 F.3d 1352.  Neither of those two basis apply here.  In this case, the claim interpretation occurred at a Markman hearing after almost a year of discovery.  Furthermore, both parties agreed in advance to the meaning of the claim term after exchanging a series of proposed constructions and almost a month of discussions.  This Court did not make a tentative construction of a disputed term.

In Utah Medical Products, the district court amended it interpretation of a mean-plus-function claim term, "stiffener means," which was disputed by the parties, to clarify its intention not to foreclose any analysis of equivalent structures.  Utah Medical Products, Inc., 350 F.3d 1376.  As noted by the Federal Circuit, in that case the district court did not change the meaning

of the term itself, but instead refined its construction to clarify its original intent. Id. Here, the

defendants are not seeking a clarification of this Court's original intent. It seeks to have this

Court re-construe a claim term that was commonly agreed upon by the parties de novo. Utah

Medical Products provides no support for that.

In addition, Modern Products cites Ortho-McNeil Pharmaceuticals, Inc. v. Mylan

Laboratories, Inc., 348 F. Supp.2d 713, 721 (N.D.W.Va. 2004), where the Federal Circuit noted

"construction of the term 'compound' was *hotly contested*" in the district court. (emphasis

added). In Ortho-McNeil Pharmaceuticals, the Federal Circuit interpreted the term in light of the

what a person skilled in the art would have understood it to mean in light of its prosecution

history. Here, the term "a predetermined interior diameter" was not even a disputed term, much

less "hotly contested." Furthermore, the meaning of the term was set forth by the parties, not this

Court. Based on their knowledge of the relevant art, the teachings of the '480 patent and its

prosecution history, both parties negotiated for almost a month to come to a mutually acceptable

and commonly understood interpretation of the claim term. There is nothing for this Court to

clarify and Modern Products has provided this Court with no authority for it to intervene.

**B.     The Agreed-Upon Construction Of "A Predetermined Interior Diameter" Is
        Proper And Correct:**

**1.     Modern Products Has Not Met Its Burden**

It is well established that the surrender of subject matter during the prosecution of a

patent may preclude recapturing any part of that subject matter, even if it is equivalent to the

matter expressly claimed. Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17,

33 (1997). It is further understood that absent a clear purpose for the amendment unrelated to

patentability, the court should presume that the purpose behind the required amendment is such

19

that prosecution history estoppel would apply. Id. Succinctly put, the patent holder bears the burden of establish the reason for an amendment required during patent prosecution. Id.

Despite this burden, the only explanation proffered by the defendants to explain adding the limitation "a predetermined interior diameter" during the prosecution of the application is a lackluster statement that it was intended "to simplify the claim language."   This is not enough. This excuse is insufficient to explain why two responses to Office Actions, including the March 21, 2003 and the June 11, 2003 Responses to Office Action, were withdrawn in their entirety, and a new "Supplemental Response to Office Action Dated June 11, 2003" was substituted in their place, which canceled *all* pending claims, and added *six entirely new* claims.  Such a cursory explanation cannot meet their burden to explain the reason for the claim amendment.

### 2.   Modern Products' Provides No Support for its Interpretation

Furthermore, the defendants' attempt to set forth a new definition of the term "predetermined" is unavailing.  The Federal Circuit has made it clear "[t]he touchstone for discerning the usage of claim language is the understanding of those terms among artisans of ordinary skill in the *relevant art at the time of the invention*."  Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holding, 370 F.3d 1354, 1360 (Fed. Cir. 2004) (emphasis added). "Indeed, normal rules of usage create a 'heavy presumption' that claim terms carry their accustomed meaning in the *relevant community at the relevant time*.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999)) (emphasis added).  Here, the defendants' reliance on three cases involving completely unrelated technologies from vastly different time periods provides this court with no guidance to interpret a term in a claim involving patent on PVC pipe filed in the year 2001.

First, the defendants cite <u>Ferguson Beauregard/Logic Controls, Div. of Dover Resources,</u> <u>Inc. v. Mega Systems, LLC</u>, 350 F.3d 1327 (Fed. Cir. 2003), a case concerning a patent filed in 1983 on a computerized control system for removing petroleum from a well. The court interpreted the phrase "predetermine plunger performance" in the context a computer program that controlled the timing and operation of a "plunger mechanism" employed in a well. <u>Id</u>.

Next, the defendants cite <u>Pipe Liners, Inc. v. Pipelining Products, Inc.</u>, 1999 WL 1011974, at *10 (D.Del. 1999), involving a 1987 method for the insitu installation of thermoplastic liners within a host pipe. The patent involved a two-stage "predetermined" pressurization method designed to conform the pipe liner to the contours of the interior wall surface of the pipe. <u>Id</u>.

Last, the defendants cite a case concerning a 1982 patent on a pregnancy and ovulation test. <u>See</u> <u>Abbott Laboratories v. Syntron Bioresearch Inc.</u>, 2000 WL 968110, at *15 (S.D. Cal. 2000). In <u>Abbott Laboratories</u>, the court interpreted the phrase "predetermine amount of reactant" with regard to the amount of chemical substrate available in an immunochemistry or immunoassay technology used to detect the presence of a the pregnancy hormone "hCG" in a women's urine. <u>Id</u>.

It is simply puzzling how the defendants expect this Court to glean the meaning of the term "a predetermined interior diameter" from any of these cases. "It is the use of the words in the context of the written description and customarily by those skilled in the relevant art that accurately reflects both the 'ordinary' and the 'customary' meaning of the terms in the claims of a patent." <u>Ferguson Beauregard/Logic Controls</u>, 350 F.3d at 1338. Computer programs, methods of installing pipe liners, and pregnancy tests surely cannot be considered the relevant art to a patent involving PVC pipe filed in the year 2001.

21

Instead, its ordinary and customary meaning has already been agreed to by the parties. The construction of the term "a predetermined interior diameter," as set forth by the defendants, reflects the true and accurate understanding of those skilled in the art. A simple reading of claim one confirms the parties commonly understood meaning:

We claim:

1. A single piece polyvinyl chlorine [sic] (PVC) pipe of <u>a</u> [single] <u>predetermined interior diameter</u> that had lateral strength when connected to a similar adjacent PVC pipe, said PVC pipe comprising:

a [one] male end...

a [one] female end...

a [one] first enlarged interior diameter of said PVC pipe at said female end, said first enlarged interior diameter being large than <u>said</u> [single] <u>predetermined interior diameter</u>...

The claim to a <u>single</u> piece of PVC pipe having "<u>a</u> predetermined interior diameter" unambiguously means a single interior diameter that is (a) consistent throughout the length of the PVC pipe (except the female end); and (b) determined in advance of making the pipe. By definition, a pipe having a variable interior diameter could not have <u>a</u> predetermined interior diameter, but instead, would have <u>multiple</u> predetermined interior diameters.

Furthermore, the claim clearly demonstrates the defendants ability to distinguish the diameters of the pipe as illustrated by their resitation of a first enlarged interior diameter and the second enlarged interior diameter. According to the interpretation the defendants now seek, this Court would have to construe the claim to mean, a portion of the firs enlarged interior diameter is actually enlarged, and a portion of the second enlarge interior diameter is enlarged. This is blatently self contradicting to the language of the claim.

In patent speak, the pipe would have a first predetermined interior diameter and a second predetermined interior diameter, whereby in accordance with CertainTeed's Kwik-Set pipe, said first p int diameter is a

INCLUDE FOOTNOTE RE: DROPPING THE "A"

The meaning of the term was set forth after a thorough review of the relevant sources of information; namely the written description, the prosecution history, and the claims.

The parties did not dispute the meaning of the term not to minimize disputes, as evident by the 7 other terms they sought the aid of this Court to construe, but because both parties mutually understood there to be only one correct interpretation, and were left with no choice but to agree.

Finally, Modern Products' new interpretation for the word "predetermined" is incongruent with the ordinary and customary meaning of the word. The construction proposed by Modern Products, and agreed to by CertainTeed and this Court, was developed after a thorough review of the specification and almost of month of discussions between the parties. The parties, who *are* skilled in the relevant art, have already mutually agreed to a construction of the term that most accurately reflects its customary meaning. As such, Modern Products should not be allowed to retrospectively broaden the scope of its claims by importing meaning into its claim terms from unrelated and irrelevant sources.

23

**C.    Modern Products' Proposed Re-Construction Of "A Predetermined Interior Diameter" Is Merely An Attempt To Re-Write Its Patent Claim To Cover CertainTeed's Product:**

Moreover, "[a] claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused devise." SRI International v. Matsushita Electric Corp. of America, 775 F.2d 1107, 1118 (Fed. Cir. 1985); Neomagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device"). "[C]laims are not construed 'to cover' or 'not to cover' the accused device." SRI International, 775 F.2d at 1118. Yet, this is exactly what Modern Products would have this court do; go back and reinterpret this claim term in light of CertainTeed's Kwik-Set product. In essence, Modern Products has asked this Court to reverse the infringement analysis process mandated by the Supreme Court by first comparing its claims to the accused device, and then interpreting the claims of the '480 patent to covered the accused device. This Court cannot be so easily fooled.

BOS\135758.1

24

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Western Division)

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| ACCESS CARDIOSYSTEMS, INC. ET AL. | ) | **Case No. 05-40809 (HJB)** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ACCESS CARDIOSYSTEMS, INC., | ) | |
| JAMES A. RADLEY, JOHN J. MORIARTY | ) | |
| RICHARD F. CONNOLLY, JR., and | ) | |
| JOSEPH R. ZIMMEL, | ) | |
| | ) | |
| Plaintiffs | ) | **Adversary Proceeding** |
| | ) | **No. 05-04076 (HJB)** |
| v. | ) | |
| | ) | |
| RANDALL FINCKE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PLAINTIFFS'
JOINT OPPOSITION TO DEFENDANT'S (i) MOTION TO EXTEND DISCOVERY (ii)
MOTION FOR A PROTECTIVE ORDER AND (iii) THE MOTION OF HOLLAND &
KNIGHT TO WITHDRAW AS COUNSEL FOR RANDALL FINKE**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-referenced Chapter 11 case (the "Case") of Access Cardiosystems, Inc. ("Access"), hereby joins in *Plaintiff's Joint Opposition to Defendant's (i) Motion to Extend Discovery (ii) Motion for a Protective Order and (iii) The Motion of Holland & Knight to Withdraw As Counsel for Randall*

*Finke* (the "Opposition"), filed by the Plaintiffs in the above-captioned adversary proceeding.[1]

1.     The Committee joins in and adopts the arguments set forth in the Plaintiff's Opposition, and hereby opposes the Defendant Randall Finke's *Motion to Extend Discovery*, *Motion for a Protective Order*, and *The Motion of Holland & Knight to Withdraw As Counsel for Randall Finke*.

**WHEREFORE**, the Committee respectfully requests that the Court deny the Defendant's pending *Motion to Extend Discovery*, *Motion for a Protective Order*, and *The Motion of Holland & Knight to Withdraw As Counsel for Randall Finke* and grant to the Committee such other and further relief as may be just and proper in the circumstances.

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
By its Attorneys,


/s/ Christian J. Urbano
Harold B. Murphy (BBO #326610)
Charles R. Bennett, Jr. (BBO #037380)
Christian J. Urbano (BBO #644471)
HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
Dated:  July 20, 2005                         Tel:  (617) 423-0400
Fax:  (617) 423-0498
Email:  cju@hanify.com

---

[1]     On June 3, 2005, the Committee filed a motion to intervene as plaintiff in the above-captioned adversary proceeding (the "Motion to Intervene").  On June 10, 2005, the Plaintiffs filed an opposition to the Motion to Intervene.  On June 17, 2005, the Committee filed a response to the opposition.  As of July 20, 2005, the Court has not scheduled a hearing on the Motion to Intervene.

2

434669-v1

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Western Division)

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| ACCESS CARDIOSYSTEMS, INC. ET AL. | )  **Chapter 11** |
|  | )  **Case No. 05-40809 (HJB)** |
| Debtor. | ) |
|  | ) |

|  |  |
|---|---|
| ACCESS CARDIOSYSTEMS, INC., | ) |
| JAMES A. RADLEY, JOHN J. MORIARTY | ) |
| RICHARD F. CONNOLLY, JR., and | ) |
| JOSEPH R. ZIMMEL, | ) |
|  | ) |
| Plaintiffs | )  **Adversary Proceeding** |
|  | )  **No. 05-04076 (HJB)** |
| v. | ) |
|  | ) |
| RANDALL FINCKE, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

### CERTIFICATE OF SERVICE

I, Christian J. Urbano, hereby certify that on July 20, 2005, I served a copy of the JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PLAINTIFFS' JOINT OPPOSITION TO DEFENDANT'S (i) MOTION TO EXTEND DISCOVERY (ii) MOTION FOR A PROTECTIVE ORDER AND (iii) THE MOTION OF HOLLAND & KNIGHT TO WITHDRAW AS COUNSEL FOR RANDALL FINKE via the ECF System established by this Court and by email or facsimile to the parties listed on the attached service list.

/s/ Christian J. Urbano
Christian J. Urbano (BBO #644471)
HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA  02108
Tel:  (617) 423-0400
Fax:  (617) 423-0498
Email:  cju@hanify.com

Dated:  July 20, 2005

*Counsel to the Committee*

Jerry E. Benezra, Esq.
20 West Emerson Street
Melrose, MA 02176
jeblaw@benezra.com
(*Counsel for Plaintiffs James A Radley,
John J. Moriarty, Joseph R. Zimmel,
Richard F. Connolly, Jr.*)

Ieuan G Mahony, Esq.
David G. Sobol, Esq.
John J. Monaghan, Esq.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
ieuan.mahony@hklaw.com
*(Counsel to Defendant Randall Fincke)*

Jeffery Sternklar, Esq.
Jennifer Hertz, Esq.
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
jlhertz@duanemorris.com
  *(Counsel to Access Cardiosystems, Inc.)*

Richard T. King, Esq.
Office of the U.S. Trustee
1184 O'Neill Federal Office Building
10 Causeway Street
Richard.t.king@usdoj.gov
Boston, MA  02222

4

434669-v1