UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Appeal No.    05-40125-NG

---

IN RE ACCESS CARDIOSYSTEMS, INC.

Bankruptcy No. 05-40809-HJB

Chapter 11

IN RE ACCESS CARDIOSYSTEMS, INC., JAMES A. RADLEY, JOHN J. MORIARTY,
RICHARD F. CONNOLLY, JR. AND JOSEPH ZIMMEL
(Appellees)

V.

RANDALL FINCKE, represented by
HOLLAND & KNIGHT, LLP
(Appellant)

Adversary Proceeding No. 05-4076-HJB

---

On Appeal from an Order of the United States Bankruptcy Court
District of Massachusetts, Western Division

---

RECORD APPENDIX
RANDALL FINCKE

---

Ieuan G. Mahony
David G. Sobol
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617)523-2700

Dated:  August 24, 2005

## TABLE OF CONTENTS

1.      Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke, filed on July 13, 2005.

2.      Motion for a Protective Order, filed on July 18, 2005.

3.      Defendant's Memorandum of Law in Support of Motion for a Protective Order, filed on July 18, 2005.

4.      Motion for Expedited Hearing on Emergency Motion to Extend Discovery Deadlines, filed on July 18, 2005.

5.      Emergency Motion to Extend Discovery Deadlines (Expedited Determination Requested), filed on July 18, 2005.

6.      Transcript of Hearing Held in Bankruptcy Court on July 20, 2005 (regarding Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke).

7.      Defendant's Motion for Leave to Appeal and Request for Oral Argument, filed on August 1, 2005.

8.      Pretrial Stipulation, filed on May 25, 2005.

9.      Revised Proposed Discovery Plan, filed on June 9, 2005.

10.     Notice of Appeal, filed on August 1, 2005.

11.     Order Denying Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke, entered on July 20, 2005.

12.     Order Denying Motion for a Protective Order, entered on July 20, 2005.

13.     Order Denying Emergency Motion to Extend Discovery Deadlines, entered on July 20, 2005.

# 3170549_v1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>              Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>              Defendant | Adv. Proc. No. 05-04076 |

## MOTION OF HOLLAND & KNIGHT LLP TO WITHDRAW
## AS COUNSEL FOR RANDALL FINCKE

Pursuant to MLBR 2019-1, Ieuan G. Mahony, Esq. and David G. Sobol, Esq. and the firm of Holland & Knight LLP ("Counsel" or "Holland & Knight"), hereby move to withdraw as counsel for Randall Fincke ("Fincke" or the "Defendant") in the above action. As grounds therefore, Counsel states that irreconcilable differences have arisen between Counsel and Defendant, that preclude a continued attorney-client relationship.

In further support of this Motion, Counsel states as follows:

1.      In July of 2000, Randall Fincke founded Access Cardiosystems, Inc. ("Access" or the "Debtor"), then called Acelex, to exploit innovative defibrillator technology that he had developed. This technology is the subject of United States Patent Application No. 10/232,645

entitled "Automated External Defibrillator (AED) System" (the "'645 Application"). Fincke is the sole named inventor on the '645 Application and the sole owner of that patent application.

2.    Fincke initially owned 85% of Access and ran the company. Beginning in 2001, in order to enable Access to manufacture, market, and distribute an AED product based upon the technology he had developed, Fincke secured outside capital investments from James Radley, John Moriarty, Richard Connolly, and Joseph Zimmel (the "Investors"). Over time, the Investors took an equity stake in the company, joined its Board of Directors, and eventually gained control of Access.

3.    In the fall of 2003, the Investors and Fincke became involved in a dispute concerning the readiness of certain product for shipment. Ultimately, in November 2003, the Investors removed Fincke as Chief Executive Officer and President of Access.

4.    On or about January 7, 2004, Fincke entered into a written Engagement Letter with Holland & Knight which set forth the terms and conditions of Holland & Knight's representation. The Engagement Letter provides that "the representation is terminable at will" by either Counsel or the Defendant.

5.    In the spring of 2004, Access, the Investors, and Fincke sought to resolve their dispute through mediation.

6.    On or about July 6, 2004, Access and the Investors filed suit against Fincke in Massachusetts Superior Court, seeking, among other things, "a declaration that all right, title and interest in the subject matter of the intellectual property and know-how developed by Access, and disclosed and claimed in the '645 Application, belongs to the company, and further, that all right, title and interest in the intellectual property and know-how, the '645 application and the ensuing patent should be assigned to Access by Fincke." Access Cardiosystems, Inc. et al. v.

2

Randall Fincke, Mass. Sup. Ct. No. 04-2976-BLS2 (July 6, 2004) (the "State Court Action" at P. 24).

7.     On or about August 16, 2004, Counsel filed an answer and counterclaim on Finckle's behalf, for, among other relief, a declaratory judgment confirming his ownership of the '645 Application and related intellectual property.

8.     While in the early stages of discovery in the State Court Action, on or about February 18, 2005, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date").

9.     On or about March 25, 2005, Counsel filed a Notice of Removal, removing the State Court Action to the Bankruptcy Court.

10.     Since removal of the case, the relationship between Counsel and Fincke has deteriorated. Fincke and Counsel have had numerous communications seeking to resolve these differences. Counsel has notified Fincke of Counsel's intent to withdraw if these differences could not be resolved. The most recent of these communications provided a deadline of Monday, June 27, 2005 for such a resolution or, failing resolution, a withdrawal.

11.     Counsel has assisted the Defendant in efforts to locate successor counsel.

12.     Local Bankruptcy Rule 2091-1(a) governs an attorney's request for withdrawal in a bankruptcy case or proceeding, and provides that:

"An attorney may withdraw from a case or proceeding without leave of the Court by serving a notice of withdrawal on the client and all other parties in interest and filing the notice, provided that:

(1) such notice is accompanied by the filing of a notice of appearance of successor counsel;
(2) there are no motions pending before the Court; and
(3) no trial date has been set."

MLBR 2091-1(a).

3

13.    Because no successor counsel has appeared in this case, Counsel seeks to withdraw with leave of the Court. No motions are now pending before this Court; no trial date has been set. The parties are presently in the process of conducting discovery. Proof of service on Defendant and all other parties of said motion is attached.

14.    Where this type of permissive withdrawal is sought, the motion is determined at the discretion of the trial court. Danvers Savings Bank v. Cuddy (In re Cuddy), 322 B.R. 12, 16 (Bankr. D. Mass. 2005); Andrews v. Bechtel Power Corp., 780 F.2d 124, 135 (1st Cir. 1985), cert denied 476 U.S. 1172 (1986); see also Rivera-Domenech v. Calvesbert Law Offices, 402 F.3d 246, 250 (1st Cir. 2005)("A court's power to protect a lawyer against unfairness by his client in the context of a motion to withdraw seems to be an inherent power necessary to effectuate orderly judicial proceedings."); Fed. Sav. & Loan Ins. Corp. v. Ferrante, 364 F.3d 1037, 1041 (9th Cir. 2004).

15.    Moreover, where the differences between counsel and his or her client are sufficiently great, and where the client has been given notice of counsel's resulting need to withdraw from the case, several courts have found the denial of a motion to withdraw to be an abuse of discretion. See Rivera-Domenech, 402 F.3d at 249, citing Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 310 F.3d 537, 539 (7th Cir. 2002), Lieberman v. Polytop Corp., 2 Fed.Appx. 37, 39-40 (1st Cir. 2001)(unpublished opinion).

16.    Here, Counsel has provided Fincke with ample notice of their intent to withdraw, and the differences between the parties remain irreconcilable.

17.    The irreconcilable nature of these differences is heightened by the aggressive discovery tactics of the plaintiffs. At this time, although they appear to be reconsidering their position, the Investors have stated that they will need to take thirty-two (32) depositions in this

4

case between now and mid-August, at least four of which will be conducted in Europe. Many additional pretrial matters have yet to be resolved and the trial itself is estimated to last more than 7 days. Moreover, as detailed in the fee application filed by counsel to the Debtor, since the Petition Date, Duane Morris attorneys have billed a combined 294 hours on the Fincke litigation, at a cost of $116,072.00.

18.    Holland & Knight should not be expected to continue in this litigation, given the irreconcilable differences between it and the defendant inventor, Fincke.

WHEREFORE, Ieuan G. Mahony and David G. Sobol of the firm of Holland & Knight LLP respectfully request that this Court enter an Order:

(i)    approving the withdrawal of Holland & Knight LLP as counsel to Randall Fincke in the above-captioned matter; and

(ii)    granting such other and further relief as is fair and equitable.


Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP


/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: July 13, 2005

5

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 13, 2005, I served a copy of the foregoing *Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Finke* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony
Ieuan G. Mahony

# 3015606_v5

6

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

## Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
2 0 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

#2668328_v1

2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                    Plaintiffs<br><br>v.<br><br>RANDALL FINCKE,<br><br>                    Defendant | Adv. Proc. No. 05-04076 |

## MOTION FOR A PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(c), made applicable to this proceeding, Randall Fincke ("Fincke" or the "Defendant") hereby moves for a Protective Order to postpone three noticed depositions, a request for interrogatories and expert disclosures, and any other discovery by Access CardioSystems, Inc. (the "Company" or "Access") and its investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr. and Joseph Zimmel (the "Investors")(the Company and the Investors together referred to as the "Plaintiffs"), until this Court rules on the Emergency Motion to Extend Discovery Deadlines (the "Emergency Motion") and the Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke (the "Motion to Withdraw").

In support of this Motion, Fincke submits the memorandum of law filed herewith and states that the Protective Order will preserve the rights of the Defendant and will serve the interest of judicial economy.

WHEREFORE, the Defendant respectfully requests its Motion for a Protective Order be allowed.

Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP

/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: July 18, 2005

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 18, 2005, I served a copy of the foregoing *Motion* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony_____
Ieuan G. Mahony

# 3064120_v2

3

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

## Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Daryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

# 2668328_v1

2

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>                Defendant | Adv. Proc. No. 05-04076 |

## DEFENDANTS MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR A PROTECTIVE ORDER

Pursuant to Fed. R. Civ. P. 26(c), made applicable to this proceeding by Fed. R. Bankr. P.

7026, Randall Fincke ("Fincke" or the "Defendant") hereby submits this memorandum of law in

support of his Motion for a Protective Order (the "Motion"). In the Motion, Fincke requests a

protective order to postpone three noticed depositions, a request for interrogatories and expert

disclosures, and any other discovery by Access CardioSystems, Inc. (the "Company" or

"Access") and its investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr. and

Joseph Zimmel (the "Investors")(the Company and the Investors together referred to as the

"Plaintiffs"), until this Court rules on the Emergency Motion to Extend Discovery Deadlines (the

"Emergency Motion") and the Motion of Holland & Knight LLP to Withdraw as Counsel for

Randall Fincke (the "Motion to Withdraw").

In further support of this Motion, Fincke states as follows:

1.      Pursuant to the Pretrial Stipulation filed with the Court, responses to written discovery and expert witness disclosures are due on or before July 15, 2005. In addition, as of July 14, 2005, four depositions have been noticed by Plaintiffs counsel. These depositions are scheduled to take place on July 14, 19, 20 and 22.

2.      Due to irreconcilable differences that have arisen between the Defendant and undersigned counsel ("Counsel"), Counsel filed a motion to withdraw as counsel to the Defendant (the "Motion to Withdraw") on or about July 13, 2005. Immediately after filing the Motion to Withdraw, Counsel contacted counsel to the Plaintiffs and requested a brief postponement of the upcoming depositions and discovery deadlines in order to allow the Defendant an opportunity to retain successor counsel. As grounds for the requested postponement, undersigned counsel explained that it was inappropriate to continue to represent the Defendant's interest in light of the circumstances surrounding the Motion to Withdraw.

3.      Counsel to the Company and the Investors are unwilling to postpone the depositions or the discovery deadline by agreement. It is believed that Plaintiffs counsel intends to go forward with the scheduled depositions, including the deposition that was scheduled to take place on Thursday, July 14, 2005.

4.      The requested discovery extension is necessary to allow the Defendant an opportunity to retain successor counsel. If the Court permits the Plaintiffs to proceed with additional discovery before there is a ruling on the pending Motion to Withdraw and Emergency Motion, the result will likely be undue prejudice to the Defendant, duplicative discovery and waste.

2

5.    If the Court allows the Motion to Withdraw and Emergency Motion, successor counsel will surely want to be present at the depositions that the Plaintiffs have noticed. Successor counsel will also want to work with the Defendant to complete the interrogatory responses. Without the requested protective order, however, the Plaintiffs will proceed with this discovery *before* successor counsel is retained. If these depositions go forward now, it is likely that successor counsel would move to reopen the depositions to ensure that the Defendant is given a fair opportunity to examine each witness. Similarly, successor counsel would want to participate in any written discovery and obtain relevant documents from the Plaintiffs. As a result, prohibiting further discovery until a decision on the Motion to Withdraw has been made will also serve the interest of judicial economy.

6.    Finally, the Protective Order will not be overly prejudicial to Access or the Investors. A short delay would not cause the Plaintiffs any additional financial hardship, and the Plaintiffs can proceed with discovery a short time after the a decision is rendered on the Motion to Withdraw and Emergency Motion.

WHEREFORE, the Defendant respectfully requests that the Court issue a Protective Order in the form attached hereto as Exhibit A.

Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP


/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated:  July 18, 2005

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>                    Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                    Plaintiffs<br><br>v.<br><br>RANDALL FINCKE,<br><br>                    Defendant | Adv. Proc. No. 05-04076 |

## PROTECTIVE ORDER

This Court ORDERS that no party in this action may conduct any discovery in this action until the Court has rendered decisions on the Motion to Extend Discovery Deadlines and the Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke. Conducting discovery shall include, but not be limited to, noticing depositions, taking depositions, serving requests for production of documents, interrogatories, or requests for admission, or moving to compel responses to requests for production of documents, interrogatories, or requests for admission.

ENTERED THIS _____ DAY OF JULY, 2005.

_____
Henry J. Boroff
Worcester, Massachusetts                United States Bankruptcy Judge

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 18, 2005, I served a copy of the foregoing *Motion* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony_____
Ieuan G. Mahony

# 3064241_v2

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

<u>Service List</u>

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Minnitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

# 2668328_v1

2

4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>                Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                Plaintiffs<br><br>v.<br><br>RANDALL FINCKE,<br><br>                Defendant | Adv. Proc. No. 05-04076 |

## MOTION FOR EXPEDITED HEARING ON EMERGENCY
## MOTION TO EXTEND DISCOVERY DEADLINES

Randall Fincke ("Fincke" or the "Defendant") hereby moves, pursuant to Local Rule

9013-1(g), for an emergency hearing on the Emergency Motion to Extend Discovery Deadlines

(the "Emergency Motion") and the Motion of Holland & Knight LLP to Withdraw as Counsel

for Randall Fincke (the "Motion to Withdraw"). As grounds therefor, the Defendant submits that

irreconcilable differences have arisen between Defendant and its counsel, which led to the filing

of the Motion to Withdraw. Immediately upon filing the Motion to Withdraw, Defendant's

counsel requested a brief extension of discovery deadlines to allow the Defendant to retain

successor counsel. Plaintiffs' counsel has denied this request. Therefore, emergency

consideration is requested to provide the Defendant an opportunity to retain successor counsel.

This motion is filed in accordance with Local Rule 9013-1(g), requiring a separate pleading requesting that the Court hold an emergency hearing on the Emergency Motion and the Motion to Withdraw. Accordingly, through this motion, the Defendant respectfully requests that a hearing be scheduled on the Emergency Motion and Motion to Withdraw on Wednesday, July 20, 2005, or at this Court's convenience.

WHEREFORE, the Defendant, respectfully requests that the Court schedule a hearing on the Emergency Motion and Motion to Withdraw on Wednesday, July 20, 2005, or at this Court's convenience.

Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP

/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: July 18, 2005

2

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 18, 2005, I served a copy of the foregoing *Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Finke* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony_____
Ieuan G. Mahony

# 3063273_v2

3

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

## Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

# 2668328_v1

2

5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>                Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>                Defendant | Adv. Proc. No. 05-04076 |

## EMERGENCY MOTION TO EXTEND DISCOVERY DEADLINES
## (EXPEDITED DETERMINATION REQUESTED)

Randall Fincke ("Fincke" or the "Defendant"), by and through counsel, hereby moves this Court for an extension of the discovery deadlines set forth in the Pretrial Stipulation, filed with this Court on or about May 25, 2005. Fincke respectfully requests that the Court grant an extension of the discovery deadlines established in the Pretrial Stipulation for thirty (30) days from the date of the appearance of successor counsel or until such time as the Court deems reasonable.

In further support of this Motion, Fincke states as follows:

1.      Pursuant to the Pretrial Stipulation filed with the Court, responses to written discovery and expert witness disclosures are due on or before July 15, 2005.

2.      A number of depositions have been noticed by counsel to Access CardioSystems, Inc. (the "Company" or "Access") and its investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr. and Joseph Zimmel (the "Investors")(the Company and the Investors together referred to as the "Plaintiffs"). These depositions are presently scheduled to take place on July 14, 19, 20 and 22.

3.      Due to irreconcilable differences that have arisen between the Defendant and its counsel, counsel filed a motion to withdraw as counsel to the Defendant (the "Motion to Withdraw") on or about July 13, 2005.

4.      Immediately after filing the Motion to Withdraw, undersigned counsel contacted counsel to the Plaintiffs and requested a brief postponement of the upcoming depositions and discovery deadlines in order to allow the Defendant an opportunity to retain successor counsel. As grounds for the requested postponement, undersigned counsel explained that it was inappropriate to continue to represent the Defendant's interest in light of the circumstances surrounding the Motion to Withdraw.

5.      Counsel to the Company and the Investors are unwilling to postpone the depositions or the discovery deadline by agreement.

6.      The requested discovery extension is necessary to allow the Defendant an opportunity to retain successor counsel. The requested extension of the discovery deadline will not prejudice any party.

2

WHEREFORE, the Defendant respectfully requests that the Court enter an order extending the discovery deadlines established in the Pretrial Stipulation for thirty (30) days from the date of the appearance of successor counsel or until such time as the Court deems reasonable

Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP

/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: July 18, 2005

3

## CERTIFICATE OF SERVICE

     I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 18, 2005, I served a copy of the foregoing *Motion* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

                                 /s/ Ieuan G. Mahony
                                 Ieuan G. Mahony

\# 3063219_v2

4

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

## Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Monitor House
Ketse Road
Stirling
Sootland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

#2668328_v1

6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

IN RE:                          . Adv. Pro. 05-4076

  ACCESS CARDIOSYSTEMS, INC.,   .

            Debtor.   .
. . . . . . . . . . . . . . .

ACCESS CARDIOSYSTEMS, INC.,      .

        Plaintiff,     .

      v.              . Springfield, Massachusetts
                                 .
RANDALL FINCKE,                  .
                                 . July 20, 2005
        Defendant.  . 1:10 p.m.
. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE HENRY J. BOROFF
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Duane Morris LLP
                         By:  JEFFREY D. STERNKLAR, ESQ.
                              BARRY C. KLICKSTEIN, ESQ.
                         470 Atlantic Avenue
                         Suite 500
                         Boston, MA  02210
                         (Telephonic Appearances)

Audio Operator:          Laura L. Chambers

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311      Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd.):

For the Creditor's                  Hanify & King
Committee:                          By:  HAROLD B. MURPHY, ESQ.
                                    One Beacon Street
                                    Boston, MA  02108
                                    (Telephonic Appearance)


For James A. Radley, John           Law Offices of Jerry E. Benezra
F. Moriarity, Joseph R.             By:   JERRY E. BENEZRA, ESQ.
Zimmel, and Richard F.              20 West Emerson Street
Connelly, Jr.:                      Melrose, MA  02176
                                    (Telephonic Appearance)


For Randall Fincke:                 Holland & Knight, LLP
                                    By:   IEUAN G. MAHONY, ESQ.
                                    20 St. James Avenue
                                    Boston, MA  02116
                                    (Telephonic Appearance)

3

1       (Telephonic conference; speakers intermittently unclear)

2           THE CLERK:  Court is now in session.  Case No. 05-4076,

3  Access CardioSystems v. Fincke.  We are here on a motion of the

4  firm of Holland & Knight to withdraw as counsel to defendant

5  Randall Fincke, motion of defendant Randall Fincke for a

6  protective order, and emergency motion filed by defendant Randall

7  Fincke to extend the discovery deadline.  Mr. Murphy, do we still

8  have you on the telephone?  Mr. Murphy?

9           MR. MURPHY:  Yes, I'm here.

10          THE CLERK:  Mr. Mahony?

11          MR. MAHONY:  Yes, I'm here.

12          THE CLERK:  Mr. Benezra?

13          MR. BENEZRA:  Yes, I'm here.

14          THE CLERK:  Mr. Klickstein?

15          MR. KLICKSTEIN:  Yes, I'm here.

16          THE CLERK:  And Mr. Fincke?

17          MR. FINCKE:  Yes, I'm here.

18          THE CLERK:  Thank you, gentleman.  For the sake of a

19  clear record, could you please identify yourselves by name each

20  time you speak?  Thank you.

21          THE COURT:  All right, this is Judge Boroff.  I've got

22  the motion of Holland & Knight to withdraw and a motion for

23  protective order, as well as an emergency motion to extend

24  discovery rules.  I've reviewed the plaintiffs' joint opposition,

25  a joinder of the official committee of unsecured creditors,

4

1  although I appreciate the fact that there's an outstanding motion

2  to intervene.  Why don't we start then with Holland & Knight's

3  motion to withdraw.

4           MR. MAHONY:  Thank you --

5           THE COURT:  I'm --

6           MR. MAHONY:  Mr. Mahony, Ieuan Mahony, for Holland &

7  Knight.  Your Honor, starting with the motion to withdraw, it

8  makes some sense, as this motion ties together the other two

9  motions.

10          THE COURT:  Then why don't you discuss all three at

11  once?

12          MR. MAHONY:  I will do so.  Thank you, Your Honor.

13 Your Honor, last Wednesday, July 13th, we filed our motion to

14 withdraw.  Your Honor, because Mr. Fincke does not yet have

15 successor counsel, and we will address the successor counsel

16 issue momentarily, but because he does not have successor counsel

17 now, we have asked for leave of Court to withdraw.  We move to

18 withdraw, Your Honor, because of irreconcilable differences that

19 have arisen between Mr. Fincke and ourselves.  Your Honor, these

20 differences are addressed in our motion.  We are prepared to

21 provide the Court with additional details, and Mr. Fincke is

22 present on the call and available for the Court to ask questions

23 of if the Court desires.  However, Your Honor, if the Court does

24 have specific questions in this regard, I would ask that the

25 discussion take place at sidebar, as it were, because I don't

**J&J COURT TRANSCRIBERS, INC.**

5

1  believe that the plaintiffs or other parties have any need to

2  know specifics of the relationship between Holland & Knight and

3  Mr. Fincke.

4          Now, Your Honor, although we certainly can discuss the

5  specific reasons for the motion to withdraw, the key issue I

6  believe for each of these pending motions is an issue of timing

7  and how soon successor counsel is retained.  In terms of

8  successor counsel, we provided Mr. Fincke with a range of names

9  for potential successor counsel.  I understand that Mr. Fincke

10  has been discussing this matter with counsel and is in the

11  process of determining the correct fit for counsel and in the

12  process of determining other arrangements.

13          Now, Your Honor, Mr. Fincke is present on the call and

14  available to answer questions the Court may have about the

15  precise status of these discussions and the time frame for their

16  conclusion.  Your Honor, would the court like to hear from Mr.

17  Fincke directly, or would the Court prefer that I provide the

18  information I have from discussions with Mr. Fincke as to this

19  matter?

20          THE COURT:  Why don't -- before you tell me about what

21  discussions Mr. Fincke has had with successor counsel or what his

22  time frame is, and I will hear from you first and then give Mr.

23  Fincke an opportunity to supplement if he wishes, the -- one of

24  the questions, and I don't think that this is a particularly

25  intrusive question, but do the irreconcilable differences have to

6

1  do with the financial arrangements between Holland & Knight and

2  Mr. Fincke?

3              MR. MAHONY:  They do in part, Your Honor.  That's

4  correct.  That is not the entire range, but that is correct.

5              THE COURT:  Okay.  Did they start that way?

6              MR. MAHONY:  Yes, that's fair to say.

7              THE COURT:  All right.  Okay then, why don't you tell

8  me then, on Mr. Fincke's behalf, what steps he has taken and what

9  his plans are for retaining successor counsel?

10             MR. MAHONY:  As I understand, Your Honor, Mr. Fincke

11 has talked with successor counsel, a number of different

12 individuals, and also tried to set up meetings with other

13 counsel.  There is -- there are issues with vacations

14 unfortunately that have prevented some of these meetings to take

15 place.  My understanding from Mr. Fincke is a reasonable date

16 that he believes he can complete these discussions of the folks

17 that he thinks would be good successor counsel, given vacation

18 schedules, is August 15, and if that's -- and I've advised him

19 that successor counsel would need approximately 30 days to get up

20 to speed in the case, and that would take it out to September

21 15th.

22             THE COURT:  All right.  Mr. Fincke, is there anything

23 that you would want to supplement?  Do you disagree?

24             MR. FINCKE:  Your Honor, no.

25             THE COURT:  Okay.

1          MR. MAHONY:  Your Honor, if I could just briefly

2    address how that timing, in other words, that August 15,

3    September 15 dates, how those impact the case and in our view

4    impact the claims of prejudice that the plaintiffs have raised.

5    Your Honor, I submit that this extension that is being proposed

6    is a reasonable extension, and it will cause no prejudice for the

7    plaintiffs for four primary reasons, and let me walk through

8    those briefly.

9          First, Your Honor, the plaintiffs themselves will need

10   substantial extensions on discovery deadlines given the extensive

11   affirmative discovery they apparently seek.  Second, the

12   plaintiffs themselves have failed to respond to discovery

13   requests that are owed to Mr. Fincke, and this failure calls into

14   question their claim that they wish to move this matter forward

15   so expeditiously.  Third, Your Honor, back in June, back on June

16   7th, the plaintiffs filed a motion to extend the exclusivity

17   period.  They gave three reasons why they wanted to extend this

18   period to September 15.  They were (1) the Fincke litigation,

19   which is what we're talking about now, but (2) the redesign of

20   the AED product, which is the defibrillator product that Access

21   -- they're redesigning the product.  And the third reason was a

22   patent infringement litigation with Phillips.  Therefore, there

23   are a number of different reasons that require the plaintiffs to

24   have additional time in this case.  And the final reason, Your

25   Honor, and again I'll just go into a little bit more detail on

8

1  each of these, is the plaintiffs have rejected or disregarded a

2  range of proposals that Fincke has made that seek to resolve this

3  case.  Those actions are inconsistent with an interest in an

4  expeditious solution.

5         First, in terms of the plaintiffs' own affirmative

6  discovery, back on May 25 the parties submitted a pre-trial

7  stipulation.  That was revised slightly on June 8th.  Both of

8  those documents, the revised the discovery schedule and the

9  original schedule, listed July 29 as the deadline for completing

10  depositions.  By letter of June 17, so roughly two and a half

11  weeks after the initial pre-trial stipulation, the plaintiffs

12  stated that they wanted to take 32 depositions in this case, four

13  of them in Europe.  And during discussions, Your Honor, leading

14  up to this pre-trial stipulation, both parties had said six

15  depositions the first time, so probably 12 depositions total,

16  roughly, but nowhere near 32 by one party.

17         Your Honor, the plaintiffs didn't begin noticing these

18  32 depositions until July 7th, scheduling the first of the

19  depositions for July 14.  Your Honor, our understanding -- again

20  over our objection, we understand that the plaintiffs have taken

21  one deposition as of July 20.  Now, based on the original demand

22  for affirmative discovery, that would mean 31 depositions between

23  now and July 29, seven business days away.  Now, from the

24  plaintiffs' papers in opposition, we understand the plaintiffs

25  are now saying they don't need 32 depositions.  They need some

1  lesser number.  However, Your Honor, even if it is a lesser
2  number, the plaintiffs themselves will need relief from this
3  aggressive discovery schedule that did not anticipate the breadth
4  of the affirmative deposition schedule.

5          Second, Your Honor, the second reason why no prejudice
6  will be caused by this reasonable extension, the plaintiffs
7  themselves have not responded to Fincke's discovery.  Fincke
8  produced documents back in February of this past year.  The
9  parties had earlier exchanged sort of mirrored discovery requests
10 in the fall of 2004.  Roughly a month after that production by
11 Fincke, Access and the investors said, look, there's three
12 categories of documents that we, the plaintiffs, have.  First,
13 there are hard-copy documents at Access.  Second, there are
14 electronic copies of documents at Access.  And third there are
15 documents of the individual investors.  The hard-copy documents
16 were made available to counsel and to Mr. Fincke.  A number of
17 documents were selected and requested to be made copies of.  The
18 plaintiffs have refused to make copies of any of them.  In terms
19 of electronic documents, although the plaintiffs promised those
20 by May 24th, not a single electronic document has been produced.
21 As of the investor's documents, not a single document from the
22 investor plaintiffs have been produced.  The plaintiffs have not
23 produced, have not answered all interrogatories.  Therefore, the
24 plaintiffs claim to require expeditious work and, in fact, that
25 -- in terms of getting discovery done is belied by their actions.

10

1        Your Honor, I might also point out that as of mid-June,

2   the plaintiffs -- I'm just saying -- just Access, counsel just

3   for Access, submitted a fee petition for over $116,000 in this

4   particular case.  So there is a substantial amount of money being

5   poured in this case, although it does not appear to be going

6   toward -- affirmative discovery, no response.

7        Third, Your Honor, the exclusivity period has been

8   extended until September 15th.  There were three reasons for that

9   extension.  The Fincke litigation, yes, is definitely one of

10  those, but there are two other reasons for that extension.  The

11  plaintiffs' opposition mentioned nothing about those other two

12  reasons.  We have no idea whether those two reasons make the

13  plaintiffs' requests or concerns about unreasonable delay or

14  reasonable extension here entirely moot.

15        Finally, Mr. Fincke has made a number of proposals to

16  seek to resolve this case in an expeditious manner, a number of

17  settlements.  Mr. Fincke has also -- one of the issues in the

18  case is that there is a new product that Mr. Fincke has

19  developed.  The plaintiffs have said, we need to know about this

20  new product, we need to know what's going on, how can we talk

21  about resolving this unless we know about the new product?  And

22  we have said, you take a look at the new products, and we've

23  agreed to make it available.  We've answered questions they've

24  had about the new product and said, we will make it available to

25  you.  Your Honor, they have not taken up that opportunity.

11

1       In sum, Your Honor, a reasonable extension as we've

2   proposed will not prejudice the plaintiffs.  Because there is no

3   prejudice to the plaintiffs, the matter of the motion to withdraw

4   properly concerns only the Court, Mr. Fincke, and Holland &

5   Knight, those particular parties, the Court, Mr. Fincke and

6   Holland & Knight.  We are, again, willing to provide the Court

7   more information if the Court needs it or would desire it, in

8   terms of the relationship between counsel and client.  In terms

9   of the impact on this particular adversarial proceeding, the

10  extension is reasonable and will tie no prejudice to the

11  plaintiffs.  Thank you.

12       THE COURT:  All right, let me hear from counsel to the

13  debtor.

14       MR. KLICKSTEIN:  Your Honor, this is Barry Klickstein

15  speaking on behalf of Access.  I don't want to respond to my

16  brother's "He said, she said."  I don't see any purpose in that.

17  My only concern --

18       THE COURT:  I'm sorry, you don't see any purpose in

19  responding to what?

20       MR. KLICKSTEIN:  I think categorizing what has

21  happened, Your Honor, in the way that my brother did isn't going

22  to move us forward.  The only concern that Access has at this

23  day, as we sit here today, is not seeing an unreasonable delay

24  take place in a matter that has to move forward.  The problem

25  that we have, Your Honor, is that the parties agreed to an

12

1  aggressive schedule.  We were prepared to live by that schedule.

2  We were prepared to limit the number of depositions as of right

3  now to comply with what that schedule is, and we were suddenly

4  served -- after negotiating depositions dates, after discussions,

5  we were suddenly served with this motion to withdraw that

6  proposes at least a minimum delay of September 15th.  And based

7  on my experience, Your Honor, that's the most optimistic date

8  that could possibly come, considering the fact that Mr. Fincke is

9  just out in the market now.

10           Our concern is this.  This litigation is important for

11  the company to resolve because we're in a position where we need

12  to vindicate the product to have value in this company.  And the

13  only way the product can be vindicated against the allegations

14  that Mr. Fincke has made both in the Superior Court proceeding

15  and in the pleadings he's filed in this court alleging that the

16  company shipped defective product, the only way we can vindicate

17  the product and bring value to this company is to have a decision

18  on the merits that vindicates the product and assesses liability

19  where it properly belongs, on the defendant.  That's why we need

20  to get to the end of this.  That's why we wanted a schedule that

21  was that aggressive.  And that's why we've been doing everything

22  we can to comply with this kind of schedule.

23           THE COURT:  Well, Mr. Klickstein --

24           MR. KLICKSTEIN:  All I --

25           THE COURT:  Mr. Klickstein --

**J&J COURT TRANSCRIBERS, INC.**

13

1          MR. KLICKSTEIN:  Yes, Your Honor.

2          THE COURT:  -- how is it consistent with that

3   aggressive discovery schedule that the plaintiffs would have

4   issued 32 notices of taking deposition in June?

5          MR. KLICKSTEIN:  Your Honor, we -- Mr. Mahony misspoke

6   himself.  We didn't issue 32 notices of deposition.  He asked us

7   for how many depositions that we contemplate we might take, and

8   we said, in the absence of his agreement to bifurcate the damages

9   and liability issue, which we offered to him, in the absence of

10  agreeing to separate other issues, that depending on stage

11  discovery, this was the entire universe we might contemplate.  We

12  sent out three deposition notices, Your Honor, and, as we said in

13  today papers that we filed, we contemplate at most taking a dozen

14  depositions between both of the plaintiffs.  We gave him the

15  entire universe, and that universe was based on his providing us

16  in the pre-trial memorandum with a list of witnesses.  The first

17  of whom we deposed said they didn't know anything about any of

18  the subject matters that Mr. Mahony had offered them for.  So, we

19  have very, very limited discovery we want to take, and to posit

20  this case that we've overwhelmed them simply isn't fair.

21         THE COURT:  Have there been documents that the

22  defendant has requested be copied that the debtor has declined to

23  copy?

24         MR. KLICKSTEIN:  The way the documents have been

25  produced, Your Honor, is we gave the defendant unlimited access

14

1  to the documents at the company.  They made a preliminary visit

2  to the company and indicated they would be coming back, and they

3  tagged certain documents, requesting that we copy them.  When we

4  reviewed the documents that they requested be copied, we learned

5  that the documents they were requesting be copied consisted of

6  developments made in the product since the time Mr. Fincke left

7  the company and manuals and test procedures that were developed

8  after Mr. Fincke left the company, all of which would be valuable

9  in his development of his new product.  So, we declined to

10  produce those documents, copies of them, to them, until we could

11  reach some agreement as to how this would be handled.

12        To put that into perspective, Mr. Mahony has refused to

13  produce documents to us regarding Mr. Fincke's product.  Except

14  upon agreement to some kind of clean room procedure, they

15  wouldn't even let our client see the documents.  So, we've gone

16  much farther than he has, and he hasn't followed that thing up.

17  So, I think, again, it was categorized a little bit unfairly.

18        MR. MAHONY:  Your Honor, this is Mr. Mahony.  If the

19  Court wishes to hear the side of Holland & Knight with respect to

20  what Mr. Klickstein has said, please let me know.

21        THE COURT:  No, I'm --

22        MR. MAHONY:  -- agreeing in any way with any of the

23  characterizations my brother has just made.

24        THE COURT:  No, I'm already sorry that I asked.  Go

25  ahead, Mr. Klickstein, with --

\

15

1          MR. KLICKSTEIN:  I think, Your Honor, I've said what I
2    wanted to say, which is that we have very limited discovery.
3    We've carved it back to fit into the time that we had available.
4    We want to go forward with this because the value to the company,
5    the opportunity of having value in this product is dissipating as
6    time goes on, and if we don't move this case along that's going
7    to be gone.

8          And we have no objection to Mr. Fincke selecting new
9    counsel.  What we do object to is that we're going to be left in
10   a position where several months will go buy without any action
11   taken on an ongoing basis.  And we want to move forward.  I think
12   that on a limited basis of the maximum ten or 12 depositions, I
13   think the equities would weigh -- since it does appear to be
14   primarily a financial issue, the equities would weigh that the
15   other parties in the company and the creditors not be prejudiced
16   by this abrupt withdrawal by Holland & Knight.

17          THE COURT:  Okay.

18          MR. KLICKSTEIN:  Thank you very much, Your Honor.
19   Unless you have some specific questions --

20          THE COURT:  No, I don't.  Mr. Murphy, were you
21   interested in weighing in?

22          MR. MURPHY:  Just briefly, Your Honor.  Harry Murphy on
23   behalf of the committee.  I'll speak solely on the issue of
24   prejudice.  Your Honor, two things.  First is we were informed by
25   the debtor that the resolution of the Fincke litigation, this

16

1  claim of ownership of the technology, a portion of the

2  technology, is essential to the resolution of the case, number

3  one.  So, we're obviously supportive of getting this matter

4  resolved as promptly as possible.

5          The prejudice arises because this company is not

6  producing any income.  The debtor's operations are being funded

7  by a DIP loan that obviously takes precedence over the claims of

8  the pre-petition unsecured creditors.  The burn rate that's being

9  experienced here exceeds several hundred thousand dollars a

10  month.  The consequences, obviously, of a two-month delay, as I

11  understand what was requested or discussed, is, you know, is what

12  -- nothing could be more clear it could be prejudicial, four or

13  $500,000 of additional senior indebtedness in front of the

14  unsecured creditors.  I don't know how that can seriously be

15  disputed.  We have, as you know, filed a motion to intervene.

16  We've agreed with the debtor not to take a real active role in

17  the litigation to avoid further accruals of fees.  We're

18  monitoring the litigation.  We understand its importance to the

19  case resolution, but no one wants to keep a lawyer in place

20  unnecessarily, for whatever reason, whether it's financial or

21  otherwise, but this is going to -- this is a real problem for the

22  debtor and to the creditors in terms of the consequences of the

23  -- of a delay and the effect it's going to have on creditor

24  recovery.  That's all I have --

25          THE COURT:  Anyone else?

1          MR. BENEZRA:  Yes, Your Honor, just briefly.  This is

2    Jerry Benezra on behalf of the investors.  And I second what Mr.

3    Murphy has said.  Just to briefly discuss those four -- the four

4    criteria, apart from the ones that I think we've already

5    addressed, because I think -- criteria, we will not be looking

6    for an extension.  We have been working on reducing the number of

7    depositions, and I think we gave an outside of 12, and I'll get

8    back to that in a second.  I think part of that, Your Honor, is

9    that the deposition we were supposed to take this morning, which

10   we decided out of respect for the Court in which this matter is

11   pending even though there has not been a protective order

12   allowed, we did not take Gerald Berklar, is one that we think

13   could be taken right away because we will represent to you as

14   officers of the court that we think as a result of that there

15   will be a motion for contempt filed very shortly.  We think that

16   there are ongoing actions being taken in relationship to the

17   particular product that need to be addressed as quickly as

18   possible, both on our behalf and behalf of the creditors.

19          So, we will not be asking for an extension, and I'll

20   leave it just what we said in our papers and what you've seen us

21   do.  We've only noticed three or four.  So rather than getting

22   into who's saying what, I think you can look at what we've done.

23   I think there was another one, the keeper of the records

24   deposition, Your Honor, so -- and the deposition that we took of

25   Ms. Merritt took only a half a day.  So, it's not our intention

1  to expend anybody's time or effort unnecessarily.

2          On the second criteria, that we failed to respond, what

3  we've done, Your Honor, is -- I think if you were to have it in

4  front of you, you'd find that unlike de minimis answers to

5  interrogatories that you've probably seen over the years, Your

6  Honor, I think you'll find that the ones that were filed by the

7  corporation and the ones that were filed by Mr. Radley were

8  significant -- I mean substantial.  I mean, the answers ran on

9  for pages, very, very detailed, and we did that in part, at least

10 from my point of view, because we wanted to be able to make sure

11 that everything was clear as to what our positions were.  It is

12 true that two of my clients have not filed.  They really have

13 minimum information.  Only -- the only other one who was going to

14 be deposed according to them was Mr. Moriarity, and I could file

15 those shortly, but he knows -- elected Mr. Radley, who has really

16 been the most active.

17         That you extend exclusivity, I have nothing to say.

18 I'd have to leave that to Mr. Sternklar.  As far as the

19 proposals, I don't believe that -- Your Honor, that we should be

20 getting into settlement proposals.  Let me just leave it at this.

21 We made a counterproposal --

22         THE COURT:  No, you're right.  I'm not -- I shouldn't

23 be listening to, nor --

24         MR. BENEZRA:  -- wanted to say to add, other than I

25 think everything else that's been said in our papers and what we

19

1 view as --

2        THE COURT:  Now, since somebody correctly noted in

3 their papers that the docket doesn't seem to reflect what are the

4 next steps in this case, you've told me that the discovery

5 deadline is the 29th of July.  When is the next step?  Is there a

6 hearing, a pre-trial hearing, that is set forth?

7        MR. KLICKSTEIN:  Your Honor, this is Mr. Klickstein.

8 Exhibit C to the opposition papers reflects -- reflects the

9 deadlines that were agreed to by the parties, sent over by Mr.

10 Sobol.  And that has a deposition deadline, is actually August

11 10th, 2005.  And the next scheduled event on that was dispositive

12 motions such as summary judgment be filed by September 13th.  We

13 would have no objection to a brief extension on the dispositive

14 --

15        THE COURT:  Well, I'm going to leave that to you.  I

16 just want to make sure that we don't somehow neglect to list a

17 hearing.  And so is there then a pre-trial hearing after those

18 motions?

19        MR. KLICKSTEIN:  You had indicated to us, Your Honor,

20 if my recollection is correct, that after the depositions were

21 completed in August, you were going to schedule a status

22 conference with us at the end of August.

23        MR. MAHONY:  I don't recall that, Mr. Klickstein.  The

24 next -- we had a pre-trial conference scheduled for as soon as

25 practical after sometime in October, when the Court was going to

20

1    schedule a summary judgment hearing.

2            MR. KLICKSTEIN:  I don't know if that's inconsistent,

3    Mr. Mahony, but that's fine.

4            THE COURT:  Okay.

5            MR. MAHONY:  Excuse me, there is a disclosure, expert

6    disclosure, that we would be willing to give an extension on.

7            THE COURT:  Well, you guys generally need to sit down

8    and have a cup of coffee, but the -- what I'm concerned about is,

9    I'm concerned that I remain consistent with what was the original

10   intention before you sit down to amend it.  So, was the original

11   intention that there would be either a pre-trial hearing or a

12   hearing on a motion for summary judgment, or both, at some point

13   in mis-October?

14           MR. STERNKLAR:  Your Honor, this Jeffrey Sternklar.  My

15   memory is at the last pre-trial conference we had submitted

16   proposed a proposed schedule that contemplated a significant

17   number of trial days, I think ten at the maximum, and Your Honor

18   was unwilling, for obvious reasons, to put aside ten days in

19   October without -- or November -- without knowing for certain we

20   would go forward.  So, I believe Your Honor stated to us that we

21   should do two things:  (1) submit a revised schedule, which we

22   did a day or so later, but for whatever reason hasn't been

23   docketed, and it's part of a stipulation, and (2) Your Honor

24   said, let me -- I will schedule a status conference in August to

25   see where we are so that I can determine how many -- you know,

21

1   whether there is likely to be a trial and, if so, how many days
2   I'll need.  That's not inconsistent with what Mr. Mahony said,
3   that if there were dispositive motions they would be heard later
4   on.  But in terms of the next event that I recall Your Honor
5   mentioning in our last telephonic hearing was there would be a
6   status conference that Your Honor would schedule in August.  I
7   don't believe it's been scheduled.

8        MR. BENEZRA:  Your Honor, this is Jerry Benezra.  Also,
9   you may recall, one of -- we were looking for a motion for
10  summary judgment, hopefully the end of August or beginning of
11  September, and the reason that was put off was to accommodate the
12  schedules, a two week vacation I believe by Mr. Mahony and then
13  another personal issue for Mr. Sobol.  So, if for some reason
14  they are going to withdraw, you know, we need to talk to new
15  counsel, but we really would like to get the -- at least that
16  motion for summary judgment out of the way as it relates to the
17  intellectual property as soon as possible.

18       THE COURT:  All right.

19       MR. MAHONY:  And, Your Honor, just -- Mr. Mahony.  The
20  current schedule says summary judgment oppositions are served
21  September 27th.  A hearing on the motion for summary judgment
22  will be set sometime in October, and then the pre-trial
23  conference will take place as soon as practical thereafter.  So,
24  right now the oppositions are due for summary judgment September
25  27th.

1          THE COURT:  Hold on just a moment.

2                         (Pause)

3          THE COURT:  Hold on just a moment, please.

4                         (Pause)

5          THE COURT:  Okay.  It is too late in the game in a case

6  that was well advertised as having time sensitivity problems to

7  allow counsel to withdraw primarily for financial reasons, even

8  though financial reasons occasionally begin to drift into other

9  reasons.  Mr. Fincke is free to locate new counsel, and Holland &

10 Knight is free to withdraw, but only when that counsel, when that

11 new counsel, is in place.

12          We're going to stay with these discovery deadlines, as

13 they were set forth in the stipulation, unless there's a mutual

14 agreement to extend one of them or any of them.  Accordingly, the

15 emergency motion to extend the discovery deadlines is denied.

16 The motion for protective order is denied.  The motion to

17 withdraw is denied without prejudice.

18          With respect to either side, any side, that finds

19 itself in default of a discovery obligation, I would commend to

20 them that they get themselves in compliance because my temper is

21 short on discovery matters.  We move things through the

22 Bankruptcy Court quickly because the economics of these cases

23 requires it, and I am prepared to act extraordinarily decisively

24 in the event that someone gives me cause to think that litigation

25 games are being played.

23

1     With respect to the creditors' committee's motion to

2  intervene, I have not set that for hearing.  I can decide it on

3  the papers, and here's the decision.  Ordinarily, frankly, I

4  would have seen absolutely no role for the creditors' committee,

5  and I would have seen it as an unnecessary expense.  But this

6  litigation, I think, is in some respects spiraling out of

7  control.  Someone who has regard exclusively for the interests of

8  unsecured creditors may need to step in and either calm the

9  waters, propose appropriate settlements, or tell me that the case

10 is spiraling out of control.  And although the United States

11 Trustee has historically taken that role, the creditors'

12 committee is here in the best position to do it, and so the

13 creditors' committee's motion to intervene is granted.  Thanks

14 very much.

15     UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

16                    *  *  *  *  *

17           C E R T I F I C A T I O N

18     I, DENISE M. O'DONNELL, court approved transcriber,

19 certify that the foregoing is a correct transcript from the

20 official electronic sound recording of the proceedings in the

21 above-entitled matter, to the best of my ability.

22 _____

23 DENISE M. O'DONNELL

24 J&J COURT TRANSCRIBERS, INC.        Date:  July 26, 2005

7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>       Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>       Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>       Defendant | Adv. Proc. No. 05-04076 |

### DEFENDANT'S MOTION FOR LEAVE TO APPEAL
### AND REQUEST FOR ORAL ARGUMENT

Pursuant to 28 U.S.C. § 158(a)(3) and Fed. R. Bankr. P. 8003, the firm of Holland &

Knight LLP ("Counsel" or "Holland & Knight"), counsel for the defendant, Randall Fincke

("Fincke"), hereby moves that the United States District Court for the District of Massachusetts

grant leave to appeal the order of the United States Bankruptcy Court for the District of

Massachusetts denying the *Motion of Holland & Knight LLP to Withdraw as Counsel for*

*Randall Fincke* (the "Motion to Withdraw"). The Court's Order on the Motion to Withdraw

entered on July 21, 2005 (the "Order"), in the form of a ruling from the bench. A copy of the

Hearing Transcript containing the Order is annexed hereto as Exhibit A, and the Order can be

found at Transcript page 22:5 – 22:11.

In the event that an opposition to this Motion (the "Appeal Motion") is timely filed, Counsel requests pursuant to LR 7.1(D) that this Court schedule oral argument on this Appeal Motion and any such opposition.

In support of this Appeal Motion, Counsel states as follows:

### Statement of Relevant Facts and Procedural History

1.      In July of 2000, Randall Fincke founded Access Cardiosystems, Inc. ("Access" or the "Debtor"), then called Acelex, to exploit innovative defibrillator technology that he had developed. This technology is the subject of United States Patent Application No. 10/232,645 entitled "Automated External Defibrillator (AED) System" (the "'645 Application").

2.      Fincke initially owned 85% of Access and ran the company. Beginning in 2001, Fincke secured outside capital investments from James Radley, John Moriarty, Richard Connolly, and Joseph Zimmel (the "Investors"). Over time, the Investors took an equity stake in the company, joined its Board of Directors, and eventually gained control of Access.

3.      In the fall of 2003, the Investors and Fincke became involved in a dispute and, in November 2003, the Investors removed Fincke as Chief Executive Officer and President of Access.

4.      On or about January 7, 2004, Fincke entered into a written Engagement Letter with Holland & Knight which set forth the terms and conditions of Holland & Knight's representation. The Engagement Letter provides that "the representation is terminable at will" by either Counsel or Fincke. Motion to Withdraw, ¶4.

5.      On or about July 6, 2004, Access and the Investors filed suit against Fincke in Massachusetts Superior Court, claiming that Fincke breached duties owed to them, and seeking a declaration that Access is the proper owner of the '645 Application and related intellectual

2

property. <u>Access Cardiosystems, Inc. et al. v. Randall Fincke</u>, Mass. Sup. Ct. No. 04-2976-BLS2

(July 6, 2004) (the "<u>State Court Action</u>" at P. 24).

6.      On or about August 16, 2004, Fincke filed an answer and counterclaim, claiming

that Access and the Investors breached certain duties and obligations owed to him, and seeking a

declaration that he is the proper owner of the '645 Application and related intellectual property.

7.      While in the early stages of discovery in the State Court Action, on or about

February 18, 2005, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy

Code. On or about March 25, 2005, Counsel filed a Notice of Removal, removing the State

Court Action to the Bankruptcy Court. Motion to Withdraw, ¶¶6-9.

8.      Since removal of the case, the relationship between Counsel and Fincke

deteriorated. Fincke and Counsel have had numerous communications seeking to resolve these

differences. In June of 2005, Counsel notified Fincke of Counsel's intent to withdraw if the

differences could not be resolved. Motion to Withdraw, ¶10.

9.      Fincke and Counsel could not reach a resolution and the Motion to Withdraw was

filed on or about July 13, 2005. As grounds for this Motion, Counsel cited irreconcilable

differences between Counsel and Fincke. A copy of the Motion to Withdraw is attached hereto

as <u>Exhibit B</u>. Because no successor counsel had appeared in the case, Counsel sought to

withdraw with leave of the Court, pursuant to Local Bankruptcy Rule 2091-1(a).

10.     On July 18, 2005, Counsel filed a Motion for Expedited Determination of the

Motion to Withdraw, as well as a Motion for Protective Order, seeking to suspend discovery

until such time as Fincke had retained successor counsel.

11.     On July 20, 2005, the Bankruptcy Court held a hearing on the Motion to

Withdraw and the Motion for Protective Order. During the Hearing, in response to questions

posed by the Court, Fincke agreed (a) that the irreconcilable differences involved in part his financial relationship with Holland & Knight; (b) that these differences had their genesis in the financial relationship with Holland & Knight; and (c) that he was interviewing successor counsel, who would be prepared to assume control of the case by September 15. Transcript, at 5:20 - 6:24.

12.     At the conclusion of the hearing, the Bankruptcy Court denied the Motion to Withdraw. Transcript at 22:5 – 22:11. The Bankruptcy Court also denied the Motion for Protective Order.

13.     Based upon the foregoing, and in light of applicable case law from the First Circuit, Counsel have filed contemporaneously with this Appeal Motion their *Notice of Appeal* and their *Election to Have Appeal Heard by the United States District Court,* wherein Counsel seek an order of the United States District Court for the District of Massachusetts reversing the Order.

## Statement of Appellate Question

14.     Without waiving his right to clarify, add, and/or restate issues to be presented on appeal, Fincke states that the issue to be presented on appeal is whether the Bankruptcy Court abused its discretion in denying the Motion to Withdraw.

## Statement of Appellate Relief Requested

15.     Without waiving his right to clarify, add, and/or restate the appellate relief requested, Fincke seeks an order of this Court reversing the Order and granting the relief requested in the Motion to Withdraw.

## Argument

### I.    The Order Is Immediately Appealable

16.    This Court has discretionary authority to grant leave to appeal from interlocutory

orders under one of three precepts: (1) the collateral order doctrine, (2) application of the criteria

governing § 158(a)(3) review of interlocutory orders, or (3) the Forgay-Conrad doctrine.

Watson v. Boyajian (In re Watson), 309 B.R. 652, 659 (1st Cir. BAP 2004); See also

Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 156 n.1 (1st Cir.

2004)(collateral order doctrine is an exception to the finality rule); In re Nineteen Appeals

Arising Out of San Juan Dupont Plaza Hotel Fire Litigation, 982 F.2d 603, 608-09 (1st Cir.

1992)(cases cited).

17.    In the First Circuit, for a ruling to be immediately appealable under the collateral

order doctrine, an order must:

 (i)  concern a collateral issue so conceptually distinct from other issues being litigated in the underlying action that an immediate appeal would neither disrupt the main action, nor threaten to deprive the appellate court of useful context which might be derived from subsequent developments in the litigation;

 (ii)  completely and conclusively resolve the collateral issue;

 (iii)  infringe rights which appellant could not effectively vindicate in an appeal after final judgment in the case;  and

 (iv)  involve an important or unsettled legal issue, rather than merely challenge discretionary trial court rulings.

Gill v. Gulfstream Park Racing Assoc., 399 F.3d 391, 398 (1st Cir. 2005); United States v.

Quintana-Aguayo, 235 F.3d 682, 684 (1st Cir. 2000) (quoting United States v. Kouri-Perez, 187

F.3d 1, 5 (1st Cir. 1999)).

18.    It is black-letter law that interlocutory jurisdiction exists over an appeal from the

denial of a motion to withdraw. Rivera-Domenech v. Calvesbert Law Offices, PSC, 402 F.3d

246, 249 (1st Cir. 2005) ("We make a point clear at the start. At the time of the entry of the

denial of the motion to withdraw, there was interlocutory jurisdiction to take an appeal to this court").

19.    Moreover, appellate jurisdiction in this case also lies under the collateral order doctrine. First, the issues underlying the Motion to Withdraw are distinct from the factual and legal issues involved in the underlying litigation. Second, because discovery is continuing to go forward and Fincke is in the process of locating successor counsel, immediate appeal of this matter will not disrupt the litigation. Third, the Order completely resolves the issue of whether Counsel may immediately withdraw from this case. Fourth, the Order derogates from rights which Counsel cannot effectively vindicate in an appeal after final judgment in the litigation. Finally, Counsel asserts that the Bankruptcy Court committed error in denying the Motion to Withdraw.

## II.    The Bankruptcy Court Committed Legal Error in Denying the Motion to Withdraw

20.    It is undisputed that irreconcilable differences exist between Counsel and Fincke, and that these differences arose from the parties' financial relationship. Transcript, at 5:20 – 6:24. Fincke has been given notice that the failure to resolve these differences would lead to Counsel's seeking to withdraw from the case. Motion to Withdraw, ¶10.

21.    In cases similar to the present matter where counsel is owed fees, the client has been given notice that the failure to bring the account current will lead to counsel's withdrawal from the case, and counsel has no reasonable prospect of being paid, several courts have found the denial of a motion to withdraw to be an abuse of discretion. See Rivera-Domenech, 402 F.3d at 249, citing Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 310 F.3d 537, 539 (7th Cir. 2002), Lieberman v. Polytop Corp., 2 Fed.Appx. 37, 39-40 (1st Cir. 2001)(unpublished opinion).

6

22.    As the First Circuit Court of Appeals has stated under similar circumstances,

It simply expects too much of counsel to expend the additional energy necessary to go to trial, and to front the necessary expenses, without any real assurance that he will be paid for any of it, *especially where he already is owed a substantial sum and the client has violated the written fee agreement.* Further, if counsel does not expend the necessary effort and does not front the trial expenses, he very well could expose himself to civil liability to his client. We refuse to place counsel in such a position. Rivera-Domenech, 402 F.3d at 249, quoting Lieberman, 2 Fed. Appx. 39-40. (emphasis added).

23.    Holland & Knight faces substantial additional financial exposure should it be required to remain as counsel to Fincke in this case. Many depositions and additional pretrial matters have yet to be resolved and the trial itself is estimated to last more than 7 days. Counsel should not be expected to continue in this litigation on behalf of the Defendant, given the irreconcilable differences between them.

24.    Accordingly, Counsel submits that the Bankruptcy Court erred in denying the Motion to Withdraw.


[the remainder of this page intentionally has been left blank]

WHEREFORE, Counsel respectfully requests that this Court enter an order:

(i)    granting Counsel leave to appeal the Order;

(ii)   in the event that an opposition to this Appeal Motion is timely filed, scheduling a

       hearing for oral argument of this Motion and any such opposition; and

(iii)  granting Counsel such other and further relief as the Court deems proper.


                                 Respectfully submitted,


                                 HOLLAND & KNIGHT LLP


                                 /s/ Ieuan G. Mahony
                                 Ieuan G. Mahony (BBO # 552349)
                                 Stephen A. Izzi (BBO # 477488)
                                 David G. Sobol (BBO # 647057)
                                 10 St. James Avenue
                                 Boston, MA 02116
                                 (617) 523-2700


Dated:  August 1, 2005

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

IN RE:                          .   Adv. Pro. 05-4076

  ACCESS CARDIOSYSTEMS, INC.,  .

                Debtor.         .

. . . . . . . . . . . . . . .

ACCESS CARDIOSYSTEMS, INC.,     .

                Plaintiff,      .

        v.                      .   Springfield, Massachusetts

RANDALL FINCKE,                 .

                                .   July 20, 2005
                Defendant.      .   1:10 p.m.

. . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE HENRY J. BOROFF
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             Duane Morris LLP
                            By:  JEFFREY D. STERNKLAR, ESQ.
                                 BARRY C. KLICKSTEIN, ESQ.
                            470 Atlantic Avenue
                            Suite 500
                            Boston, MA  02210
                            (Telephonic Appearances)

Audio Operator:             Laura L. Chambers

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311     Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd.):

For the Creditor's            Hanify & King
Committee:                    By:  HAROLD B. MURPHY, ESQ.
                              One Beacon Street
                              Boston, MA  02108
                              (Telephonic Appearance)


For James A. Radley, John     Law Offices of Jerry E. Benezra
F. Moriarity, Joseph R.       By:   JERRY E. BENEZRA, ESQ.
Zimmel, and Richard F.        20 West Emerson Street
Connelly, Jr.:                Melrose, MA  02176
                              (Telephonic Appearance)


For Randall Fincke:           Holland & Knight, LLP
                              By:  IEUAN G. MAHONY, ESQ.
                              20 St. James Avenue
                              Boston, MA  02116
                              (Telephonic Appearance)

3

1    (Telephonic conference; speakers intermittently unclear)

2         THE CLERK:  Court is now in session.  Case No. 05-4076,

3    Access CardioSystems v. Fincke.  We are here on a motion of the

4    firm of Holland & Knight to withdraw as counsel to defendant

5    Randall Fincke, motion of defendant Randall Fincke for a

6    protective order, and emergency motion filed by defendant Randall

7    Fincke to extend the discovery deadline.  Mr. Murphy, do we still

8    have you on the telephone?  Mr. Murphy?

9         MR. MURPHY:  Yes, I'm here.

10        THE CLERK:  Mr. Mahony?

11        MR. MAHONY:  Yes, I'm here.

12        THE CLERK:  Mr. Benezra?

13        MR. BENEZRA:  Yes, I'm here.

14        THE CLERK:  Mr. Klickstein?

15        MR. KLICKSTEIN:  Yes, I'm here.

16        THE CLERK:  And Mr. Fincke?

17        MR. FINCKE:  Yes, I'm here.

18        THE CLERK:  Thank you, gentleman.  For the sake of a

19   clear record, could you please identify yourselves by name each

20   time you speak?  Thank you.

21        THE COURT:  All right, this is Judge Boroff.  I've got

22   the motion of Holland & Knight to withdraw and a motion for

23   protective order, as well as an emergency motion to extend

24   discovery rules.  I've reviewed the plaintiffs' joint opposition,

25   a joinder of the official committee of unsecured creditors,

4

1 although I appreciate the fact that there's an outstanding motion

2 to intervene.  Why don't we start then with Holland & Knight's

3 motion to withdraw.

4         MR. MAHONY:  Thank you --

5         THE COURT:  I'm --

6         MR. MAHONY:  Mr. Mahony, Ieuan Mahony, for Holland &

7 Knight.  Your Honor, starting with the motion to withdraw, it

8 makes some sense, as this motion ties together the other two

9 motions.

10         THE COURT:  Then why don't you discuss all three at

11 once?

12         MR. MAHONY:  I will do so.  Thank you, Your Honor.

13 Your Honor, last Wednesday, July 13th, we filed our motion to

14 withdraw.  Your Honor, because Mr. Fincke does not yet have

15 successor counsel, and we will address the successor counsel

16 issue momentarily, but because he does not have successor counsel

17 now, we have asked for leave of Court to withdraw.  We move to

18 withdraw, Your Honor, because of irreconcilable differences that

19 have arisen between Mr. Fincke and ourselves.  Your Honor, these

20 differences are addressed in our motion.  We are prepared to

21 provide the Court with additional details, and Mr. Fincke is

22 present on the call and available for the Court to ask questions

23 of if the Court desires.  However, Your Honor, if the Court does

24 have specific questions in this regard, I would ask that the

25 discussion take place at sidebar, as it were, because I don't

5

1 believe that the plaintiffs or other parties have any need to

2 know specifics of the relationship between Holland & Knight and

3 Mr. Fincke.

4          Now, Your Honor, although we certainly can discuss the

5 specific reasons for the motion to withdraw, the key issue I

6 believe for each of these pending motions is an issue of timing

7 and how soon successor counsel is retained.  In terms of

8 successor counsel, we provided Mr. Fincke with a range of names

9 for potential successor counsel.  I understand that Mr. Fincke

10 has been discussing this matter with counsel and is in the

11 process of determining the correct fit for counsel and in the

12 process of determining other arrangements.

13          Now, Your Honor, Mr. Fincke is present on the call and

14 available to answer questions the Court may have about the

15 precise status of these discussions and the time frame for their

16 conclusion.  Your Honor, would the court like to hear from Mr.

17 Fincke directly, or would the Court prefer that I provide the

18 information I have from discussions with Mr. Fincke as to this

19 matter?

20          THE COURT:  Why don't -- before you tell me about what

21 discussions Mr. Fincke has had with successor counsel or what his

22 time frame is, and I will hear from you first and then give Mr.

23 Fincke an opportunity to supplement if he wishes, the -- one of

24 the questions, and I don't think that this is a particularly

25 intrusive question, but do the irreconcilable differences have to

6

1  do with the financial arrangements between Holland & Knight and

2  Mr. Fincke?

3          MR. MAHONY:  They do in part, Your Honor.  That's

4  correct.  That is not the entire range, but that is correct.

5          THE COURT:  Okay.  Did they start that way?

6          MR. MAHONY:  Yes, that's fair to say.

7          THE COURT:  All right.  Okay then, why don't you tell

8  me then, on Mr. Fincke's behalf, what steps he has taken and what

9  his plans are for retaining successor counsel?

10          MR. MAHONY:  As I understand, Your Honor, Mr. Fincke

11  has talked with successor counsel, a number of different

12  individuals, and also tried to set up meetings with other

13  counsel.  There is -- there are issues with vacations

14  unfortunately that have prevented some of these meetings to take

15  place.  My understanding from Mr. Fincke is a reasonable date

16  that he believes he can complete these discussions of the folks

17  that he thinks would be good successor counsel, given vacation

18  schedules, is August 15, and if that's -- and I've advised him

19  that successor counsel would need approximately 30 days to get up

20  to speed in the case, and that would take it out to September

21  15th.

22          THE COURT:  All right.  Mr. Fincke, is there anything

23  that you would want to supplement?  Do you disagree?

24          MR. FINCKE:  Your Honor, no.

25          THE COURT:  Okay.

7

1          MR. MAHONY:  Your Honor, if I could just briefly

2     address how that timing, in other words, that August 15,

3     September 15 dates, how those impact the case and in our view

4     impact the claims of prejudice that the plaintiffs have raised.

5     Your Honor, I submit that this extension that is being proposed

6     is a reasonable extension, and it will cause no prejudice for the

7     plaintiffs for four primary reasons, and let me walk through

8     those briefly.

9          First, Your Honor, the plaintiffs themselves will need

10    substantial extensions on discovery deadlines given the extensive

11    affirmative discovery they apparently seek.  Second, the

12    plaintiffs themselves have failed to respond to discovery

13    requests that are owed to Mr. Fincke, and this failure calls into

14    question their claim that they wish to move this matter forward

15    so expeditiously.  Third, Your Honor, back in June, back on June

16    7th, the plaintiffs filed a motion to extend the exclusivity

17    period.  They gave three reasons why they wanted to extend this

18    period to September 15.  They were (1) the Fincke litigation,

19    which is what we're talking about now, but (2) the redesign of

20    the AED product, which is the defibrillator product that Access

21    -- they're redesigning the product.  And the third reason was a

22    patent infringement litigation with Phillips.  Therefore, there

23    are a number of different reasons that require the plaintiffs to

24    have additional time in this case.  And the final reason, Your

25    Honor, and again I'll just go into a little bit more detail on

8

1 each of these, is the plaintiffs have rejected or disregarded a

2 range of proposals that Fincke has made that seek to resolve this

3 case.  Those actions are inconsistent with an interest in an

4 expeditious solution.

5         First, in terms of the plaintiffs' own affirmative

6 discovery, back on May 25 the parties submitted a pre-trial

7 stipulation.  That was revised slightly on June 8th.  Both of

8 those documents, the revised the discovery schedule and the

9 original schedule, listed July 29 as the deadline for completing

10 depositions.  By letter of June 17, so roughly two and a half

11 weeks after the initial pre-trial stipulation, the plaintiffs

12 stated that they wanted to take 32 depositions in this case, four

13 of them in Europe.  And during discussions, Your Honor, leading

14 up to this pre-trial stipulation, both parties had said six

15 depositions the first time, so probably 12 depositions total,

16 roughly, but nowhere near 32 by one party.

17         Your Honor, the plaintiffs didn't begin noticing these

18 32 depositions until July 7th, scheduling the first of the

19 depositions for July 14.  Your Honor, our understanding -- again

20 over our objection, we understand that the plaintiffs have taken

21 one deposition as of July 20.  Now, based on the original demand

22 for affirmative discovery, that would mean 31 depositions between

23 now and July 29, seven business days away.  Now, from the

24 plaintiffs' papers in opposition, we understand the plaintiffs

25 are now saying they don't need 32 depositions.  They need some

1  lesser number.  However, Your Honor, even if it is a lesser

2  number, the plaintiffs themselves will need relief from this

3  aggressive discovery schedule that did not anticipate the breadth

4  of the affirmative deposition schedule.

5         Second, Your Honor, the second reason why no prejudice

6  will be caused by this reasonable extension, the plaintiffs

7  themselves have not responded to Fincke's discovery.  Fincke

8  produced documents back in February of this past year.  The

9  parties had earlier exchanged sort of mirrored discovery requests

10 in the fall of 2004.  Roughly a month after that production by

11 Fincke, Access and the investors said, look, there's three

12 categories of documents that we, the plaintiffs, have.  First,

13 there are hard-copy documents at Access.  Second, there are

14 electronic copies of documents at Access.  And third there are

15 documents of the individual investors.  The hard-copy documents

16 were made available to counsel and to Mr. Fincke.  A number of

17 documents were selected and requested to be made copies of.  The

18 plaintiffs have refused to make copies of any of them.  In terms

19 of electronic documents, although the plaintiffs promised those

20 by May 24th, not a single electronic document has been produced.

21 As of the investor's documents, not a single document from the

22 investor plaintiffs have been produced.  The plaintiffs have not

23 produced, have not answered all interrogatories.  Therefore, the

24 plaintiffs claim to require expeditious work and, in fact, that

25 -- in terms of getting discovery done is belied by their actions.

10

1          Your Honor, I might also point out that as of mid-June,

2     the plaintiffs -- I'm just saying -- just Access, counsel just

3     for Access, submitted a fee petition for over $116,000 in this

4     particular case.  So there is a substantial amount of money being

5     poured in this case, although it does not appear to be going

6     toward -- affirmative discovery, no response.

7          Third, Your Honor, the exclusivity period has been

8     extended until September 15th.  There were three reasons for that

9     extension.  The Fincke litigation, yes, is definitely one of

10    those, but there are two other reasons for that extension.  The

11    plaintiffs' opposition mentioned nothing about those other two

12    reasons.  We have no idea whether those two reasons make the

13    plaintiffs' requests or concerns about unreasonable delay or

14    reasonable extension here entirely moot.

15         Finally, Mr. Fincke has made a number of proposals to

16    seek to resolve this case in an expeditious manner, a number of

17    settlements.  Mr. Fincke has also -- one of the issues in the

18    case is that there is a new product that Mr. Fincke has

19    developed.  The plaintiffs have said, we need to know about this

20    new product, we need to know what's going on, how can we talk

21    about resolving this unless we know about the new product?  And

22    we have said, you take a look at the new products, and we've

23    agreed to make it available.  We've answered questions they've

24    had about the new product and said, we will make it available to

25    you.  Your Honor, they have not taken up that opportunity.

11

1        In sum, Your Honor, a reasonable extension as we've
2   proposed will not prejudice the plaintiffs.  Because there is no
3   prejudice to the plaintiffs, the matter of the motion to withdraw
4   properly concerns only the Court, Mr. Fincke, and Holland &
5   Knight, those particular parties, the Court, Mr. Fincke and
6   Holland & Knight.  We are, again, willing to provide the Court
7   more information if the Court needs it or would desire it, in
8   terms of the relationship between counsel and client.  In terms
9   of the impact on this particular adversarial proceeding, the
10  extension is reasonable and will tie no prejudice to the
11  plaintiffs.  Thank you.

12        THE COURT:  All right, let me hear from counsel to the
13  debtor.

14        MR. KLICKSTEIN:  Your Honor, this is Barry Klickstein
15  speaking on behalf of Access.  I don't want to respond to my
16  brother's "He said, she said."  I don't see any purpose in that.
17  My only concern --

18        THE COURT:  I'm sorry, you don't see any purpose in
19  responding to what?

20        MR. KLICKSTEIN:  I think categorizing what has
21  happened, Your Honor, in the way that my brother did isn't going
22  to move us forward.  The only concern that Access has at this
23  day, as we sit here today, is not seeing an unreasonable delay
24  take place in a matter that has to move forward.  The problem
25  that we have, Your Honor, is that the parties agreed to an

12

1  aggressive schedule.  We were prepared to live by that schedule.

2  We were prepared to limit the number of depositions as of right

3  now to comply with what that schedule is, and we were suddenly

4  served -- after negotiating depositions dates, after discussions,

5  we were suddenly served with this motion to withdraw that

6  proposes at least a minimum delay of September 15th.  And based

7  on my experience, Your Honor, that's the most optimistic date

8  that could possibly come, considering the fact that Mr. Fincke is

9  just out in the market now.

10            Our concern is this.  This litigation is important for

11  the company to resolve because we're in a position where we need

12  to vindicate the product to have value in this company.  And the

13  only way the product can be vindicated against the allegations

14  that Mr. Fincke has made both in the Superior Court proceeding

15  and in the pleadings he's filed in this court alleging that the

16  company shipped defective product, the only way we can vindicate

17  the product and bring value to this company is to have a decision

18  on the merits that vindicates the product and assesses liability

19  where it properly belongs, on the defendant.  That's why we need

20  to get to the end of this.  That's why we wanted a schedule that

21  was that aggressive.  And that's why we've been doing everything

22  we can to comply with this kind of schedule.

23            THE COURT:  Well, Mr. Klickstein --

24            MR. KLICKSTEIN:  All I --

25            THE COURT:  Mr. Klickstein --

13

1    MR. KLICKSTEIN:  Yes, Your Honor.

2    THE COURT:  -- how is it consistent with that

3 aggressive discovery schedule that the plaintiffs would have

4 issued 32 notices of taking deposition in June?

5    MR. KLICKSTEIN:  Your Honor, we -- Mr. Mahony misspoke

6 himself.  We didn't issue 32 notices of deposition.  He asked us

7 for how many depositions that we contemplate we might take, and

8 we said, in the absence of his agreement to bifurcate the damages

9 and liability issue, which we offered to him, in the absence of

10 agreeing to separate other issues, that depending on stage

11 discovery, this was the entire universe we might contemplate.  We

12 sent out three deposition notices, Your Honor, and, as we said in

13 today papers that we filed, we contemplate at most taking a dozen

14 depositions between both of the plaintiffs.  We gave him the

15 entire universe, and that universe was based on his providing us

16 in the pre-trial memorandum with a list of witnesses.  The first

17 of whom we deposed said they didn't know anything about any of

18 the subject matters that Mr. Mahony had offered them for.  So, we

19 have very, very limited discovery we want to take, and to posit

20 this case that we've overwhelmed them simply isn't fair.

21    THE COURT:  Have there been documents that the

22 defendant has requested be copied that the debtor has declined to

23 copy?

24    MR. KLICKSTEIN:  The way the documents have been

25 produced, Your Honor, is we gave the defendant unlimited access

14

1 to the documents at the company.  They made a preliminary visit

2 to the company and indicated they would be coming back, and they

3 tagged certain documents, requesting that we copy them.  When we

4 reviewed the documents that they requested be copied, we learned

5 that the documents they were requesting be copied consisted of

6 developments made in the product since the time Mr. Fincke left

7 the company and manuals and test procedures that were developed

8 after Mr. Fincke left the company, all of which would be valuable

9 in his development of his new product.  So, we declined to

10 produce those documents, copies of them, to them, until we could

11 reach some agreement as to how this would be handled.

12        To put that into perspective, Mr. Mahony has refused to

13 produce documents to us regarding Mr. Fincke's product.  Except

14 upon agreement to some kind of clean room procedure, they

15 wouldn't even let our client see the documents.  So, we've gone

16 much farther than he has, and he hasn't followed that thing up.

17 So, I think, again, it was categorized a little bit unfairly.

18        MR. MAHONY:  Your Honor, this is Mr. Mahony.  If the

19 Court wishes to hear the side of Holland & Knight with respect to

20 what Mr. Klickstein has said, please let me know.

21        THE COURT:  No, I'm --

22        MR. MAHONY:  -- agreeing in any way with any of the

23 characterizations my brother has just made.

24        THE COURT:  No, I'm already sorry that I asked.  Go

25 ahead, Mr. Klickstein, with --

15

1          MR. KLICKSTEIN:  I think, Your Honor, I've said what I
2     wanted to say, which is that we have very limited discovery.
3     We've carved it back to fit into the time that we had available.
4     We want to go forward with this because the value to the company,
5     the opportunity of having value in this product is dissipating as
6     time goes on, and if we don't move this case along that's going
7     to be gone.

8          And we have no objection to Mr. Fincke selecting new
9     counsel.  What we do object to is that we're going to be left in
10    a position where several months will go buy without any action
11    taken on an ongoing basis.  And we want to move forward.  I think
12    that on a limited basis of the maximum ten or 12 depositions, I
13    think the equities would weigh -- since it does appear to be
14    primarily a financial issue, the equities would weigh that the
15    other parties in the company and the creditors not be prejudiced
16    by this abrupt withdrawal by Holland & Knight.

17         THE COURT:  Okay.

18         MR. KLICKSTEIN:  Thank you very much, Your Honor.
19    Unless you have some specific questions --

20         THE COURT:  No, I don't.  Mr. Murphy, were you
21    interested in weighing in?

22         MR. MURPHY:  Just briefly, Your Honor.  Harry Murphy on
23    behalf of the committee.  I'll speak solely on the issue of
24    prejudice.  Your Honor, two things.  First is we were informed by
25    the debtor that the resolution of the Fincke litigation, this

16

1 claim of ownership of the technology, a portion of the

2 technology, is essential to the resolution of the case, number

3 one. So, we're obviously supportive of getting this matter

4 resolved as promptly as possible.

5 The prejudice arises because this company is not

6 producing any income. The debtor's operations are being funded

7 by a DIP loan that obviously takes precedence over the claims of

8 the pre-petition unsecured creditors. The burn rate that's being

9 experienced here exceeds several hundred thousand dollars a

10 month. The consequences, obviously, of a two-month delay, as I

11 understand what was requested or discussed, is, you know, is what

12 -- nothing could be more clear it could be prejudicial, four or

13 $500,000 of additional senior indebtedness in front of the

14 unsecured creditors. I don't know how that can seriously be

15 disputed. We have, as you know, filed a motion to intervene.

16 We've agreed with the debtor not to take a real active role in

17 the litigation to avoid further accruals of fees. We're

18 monitoring the litigation. We understand its importance to the

19 case resolution, but no one wants to keep a lawyer in place

20 unnecessarily, for whatever reason, whether it's financial or

21 otherwise, but this is going to -- this is a real problem for the

22 debtor and to the creditors in terms of the consequences of the

23 -- of a delay and the effect it's going to have on creditor

24 recovery. That's all I have --

25 THE COURT: Anyone else?

**J&J COURT TRANSCRIBERS, INC.**

17

1          MR. BENEZRA:  Yes, Your Honor, just briefly.  This is
2     Jerry Benezra on behalf of the investors.  And I second what Mr.
3     Murphy has said.  Just to briefly discuss those four -- the four
4     criteria, apart from the ones that I think we've already
5     addressed, because I think -- criteria, we will not be looking
6     for an extension.  We have been working on reducing the number of
7     depositions, and I think we gave an outside of 12, and I'll get
8     back to that in a second.  I think part of that, Your Honor, is
9     that the deposition we were supposed to take this morning, which
10    we decided out of respect for the Court in which this matter is
11    pending even though there has not been a protective order
12    allowed, we did not take Gerald Berklar, is one that we think
13    could be taken right away because we will represent to you as
14    officers of the court that we think as a result of that there
15    will be a motion for contempt filed very shortly.  We think that
16    there are ongoing actions being taken in relationship to the
17    particular product that need to be addressed as quickly as
18    possible, both on our behalf and behalf of the creditors.
19          So, we will not be asking for an extension, and I'll
20    leave it just what we said in our papers and what you've seen us
21    do.  We've only noticed three or four.  So rather than getting
22    into who's saying what, I think you can look at what we've done.
23    I think there was another one, the keeper of the records
24    deposition, Your Honor, so -- and the deposition that we took of
25    Ms. Merritt took only a half a day.  So, it's not our intention

18

1  to expend anybody's time or effort unnecessarily.

2         On the second criteria, that we failed to respond, what

3  we've done, Your Honor, is -- I think if you were to have it in

4  front of you, you'd find that unlike de minimis answers to

5  interrogatories that you've probably seen over the years, Your

6  Honor, I think you'll find that the ones that were filed by the

7  corporation and the ones that were filed by Mr. Radley were

8  significant -- I mean substantial.  I mean, the answers ran on

9  for pages, very, very detailed, and we did that in part, at least

10 from my point of view, because we wanted to be able to make sure

11 that everything was clear as to what our positions were.  It is

12 true that two of my clients have not filed.  They really have

13 minimum information.  Only -- the only other one who was going to

14 be deposed according to them was Mr. Moriarity, and I could file

15 those shortly, but he knows -- elected Mr. Radley, who has really

16 been the most active.

17        That you extend exclusivity, I have nothing to say.

18 I'd have to leave that to Mr. Sternklar.  As far as the

19 proposals, I don't believe that -- Your Honor, that we should be

20 getting into settlement proposals.  Let me just leave it at this.

21 We made a counterproposal --

22        THE COURT:  No, you're right.  I'm not -- I shouldn't

23 be listening to, nor --

24        MR. BENEZRA:  -- wanted to say to add, other than I

25 think everything else that's been said in our papers and what we

19

1  view as --

2         THE COURT:  Now, since somebody correctly noted in

3  their papers that the docket doesn't seem to reflect what are the

4  next steps in this case, you've told me that the discovery

5  deadline is the 29th of July.  When is the next step?  Is there a

6  hearing, a pre-trial hearing, that is set forth?

7         MR. KLICKSTEIN:  Your Honor, this is Mr. Klickstein.

8  Exhibit C to the opposition papers reflects -- reflects the

9  deadlines that were agreed to by the parties, sent over by Mr.

10 Sobol.  And that has a deposition deadline, is actually August

11 10th, 2005.  And the next scheduled event on that was dispositive

12 motions such as summary judgment be filed by September 13th.  We

13 would have no objection to a brief extension on the dispositive

14 --

15        THE COURT:  Well, I'm going to leave that to you.  I

16 just want to make sure that we don't somehow neglect to list a

17 hearing.  And so is there then a pre-trial hearing after those

18 motions?

19        MR. KLICKSTEIN:  You had indicated to us, Your Honor,

20 if my recollection is correct, that after the depositions were

21 completed in August, you were going to schedule a status

22 conference with us at the end of August.

23        MR. MAHONY:  I don't recall that, Mr. Klickstein.  The

24 next -- we had a pre-trial conference scheduled for as soon as

25 practical after sometime in October, when the Court was going to

J&J COURT TRANSCRIBERS, INC.

20

1  schedule a summary judgment hearing.

2          MR. KLICKSTEIN:  I don't know if that's inconsistent,

3  Mr. Mahony, but that's fine.

4          THE COURT:  Okay.

5          MR. MAHONY:  Excuse me, there is a disclosure, expert

6  disclosure, that we would be willing to give an extension on.

7          THE COURT:  Well, you guys generally need to sit down

8  and have a cup of coffee, but the -- what I'm concerned about is,

9  I'm concerned that I remain consistent with what was the original

10  intention before you sit down to amend it.  So, was the original

11  intention that there would be either a pre-trial hearing or a

12  hearing on a motion for summary judgment, or both, at some point

13  in mis-October?

14          MR. STERNKLAR:  *Your Honor, this Jeffrey Sternklar.  My*

15  *memory is at the last pre-trial conference we had submitted*

16  *proposed a proposed schedule that contemplated a significant*

17  *number of trial days, I think ten at the maximum, and Your Honor*

18  *was unwilling, for obvious reasons, to put aside ten days in*

19  *October without -- or November -- without knowing for certain we*

20  *would go forward.  So, I believe Your Honor stated to us that we*

21  *should do two things:  (1) submit a revised schedule, which we*

22  *did a day or so later, but for whatever reason hasn't been*

23  *docketed, and it's part of a stipulation, and (2) Your Honor*

24  *said, let me -- I will schedule a status conference in August to*

25  *see where we are so that I can determine how many -- you know,*

21

1  whether there is likely to be a trial and, if so, how many days

2  I'll need.  That's not inconsistent with what Mr. Mahony said,

3  that if there were dispositive motions they would be heard later

4  on.  But in terms of the next event that I recall Your Honor

5  mentioning in our last telephonic hearing was there would be a

6  status conference that Your Honor would schedule in August.  I

7  don't believe it's been scheduled.

8          MR. BENEZRA:  Your Honor, this is Jerry Benezra.  Also,

9  you may recall, one of -- we were looking for a motion for

10 summary judgment, hopefully the end of August or beginning of

11 September, and the reason that was put off was to accommodate the

12 schedules, a two week vacation I believe by Mr. Mahony and then

13 another personal issue for Mr. Sobol.  So, if for some reason

14 they are going to withdraw, you know, we need to talk to new

15 counsel, but we really would like to get the -- at least that

16 motion for summary judgment out of the way as it relates to the

17 intellectual property as soon as possible.

18          THE COURT:  All right.

19          MR. MAHONY:  And, Your Honor, just -- Mr. Mahony.  The

20 current schedule says summary judgment oppositions are served

21 September 27th.  A hearing on the motion for summary judgment

22 will be set sometime in October, and then the pre-trial

23 conference will take place as soon as practical thereafter.  So,

24 right now the oppositions are due for summary judgment September

25 27th.

**J&J COURT TRANSCRIBERS, INC.**

22

1         THE COURT:  Hold on just a moment.

2                    (Pause)

3         THE COURT:  Hold on just a moment, please.

4                    (Pause)

5         THE COURT:  Okay.  It is too late in the game in a case

6    that was well advertised as having time sensitivity problems to

7    allow counsel to withdraw primarily for financial reasons, even

8    though financial reasons occasionally begin to drift into other

9    reasons.  Mr. Fincke is free to locate new counsel, and Holland &

10   Knight is free to withdraw, but only when that counsel, when that

11   new counsel, is in place.

12        We're going to stay with these discovery deadlines, as

13   they were set forth in the stipulation, unless there's a mutual

14   agreement to extend one of them or any of them.  Accordingly, the

15   emergency motion to extend the discovery deadlines is denied.

16   The motion for protective order is denied.  The motion to

17   withdraw is denied without prejudice.

18        With respect to either side, any side, that finds

19   itself in default of a discovery obligation, I would commend to

20   them that they get themselves in compliance because my temper is

21   short on discovery matters.  We move things through the

22   Bankruptcy Court quickly because the economics of these cases

23   requires it, and I am prepared to act extraordinarily decisively

24   in the event that someone gives me cause to think that litigation

25   games are being played.

23

 1          With respect to the creditors' committee's motion to
 2  intervene, I have not set that for hearing.  I can decide it on
 3  the papers, and here's the decision.  Ordinarily, frankly, I
 4  would have seen absolutely no role for the creditors' committee,
 5  and I would have seen it as an unnecessary expense.  But this
 6  litigation, I think, is in some respects spiraling out of
 7  control.  Someone who has regard exclusively for the interests of
 8  unsecured creditors may need to step in and either calm the
 9  waters, propose appropriate settlements, or tell me that the case
10  is spiraling out of control.  And although the United States
11  Trustee has historically taken that role, the creditors'
12  committee is here in the best position to do it, and so the
13  creditors' committee's motion to intervene is granted.  Thanks
14  very much.
15          UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.
16                          * * * * *
17                  C E R T I F I C A T I O N
18          I, DENISE M. O'DONNELL, court approved transcriber,
19  certify that the foregoing is a correct transcript from the
20  official electronic sound recording of the proceedings in the
21  above-entitled matter, to the best of my ability.
22  _____
23  DENISE M. O'DONNELL
24  J&J COURT TRANSCRIBERS, INC.        Date:  July 26, 2005

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>                    Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>                    Defendant | Adv. Proc. No. 05-04076 |

## MOTION OF HOLLAND & KNIGHT LLP TO WITHDRAW
## AS COUNSEL FOR RANDALL FINCKE

Pursuant to MLBR 2019-1, Ieuan G. Mahony, Esq. and David G. Sobol, Esq. and the firm of Holland & Knight LLP ("Counsel" or "Holland & Knight"), hereby move to withdraw as counsel for Randall Fincke ("Fincke" or the "Defendant") in the above action. As grounds therefore, Counsel states that irreconcilable differences have arisen between Counsel and Defendant, that preclude a continued attorney-client relationship.

In further support of this Motion, Counsel states as follows:

1.      In July of 2000, Randall Fincke founded Access Cardiosystems, Inc. ("Access" or the "Debtor"), then called Acelex, to exploit innovative defibrillator technology that he had developed. This technology is the subject of United States Patent Application No. 10/232,645

entitled "Automated External Defibrillator (AED) System" (the "'645 Application"). Fincke is the sole named inventor on the '645 Application and the sole owner of that patent application.

2.      Fincke initially owned 85% of Access and ran the company. Beginning in 2001, in order to enable Access to manufacture, market, and distribute an AED product based upon the technology he had developed, Fincke secured outside capital investments from James Radley, John Moriarty, Richard Connolly, and Joseph Zimmel (the "Investors"). Over time, the Investors took an equity stake in the company, joined its Board of Directors, and eventually gained control of Access.

3.      In the fall of 2003, the Investors and Fincke became involved in a dispute concerning the readiness of certain product for shipment. Ultimately, in November 2003, the Investors removed Fincke as Chief Executive Officer and President of Access.

4.      On or about January 7, 2004, Fincke entered into a written Engagement Letter with Holland & Knight which set forth the terms and conditions of Holland & Knight's representation. The Engagement Letter provides that "the representation is terminable at will" by either Counsel or the Defendant.

5.      In the spring of 2004, Access, the Investors, and Fincke sought to resolve their dispute through mediation.

6.      On or about July 6, 2004, Access and the Investors filed suit against Fincke in Massachusetts Superior Court, seeking, among other things, "a declaration that all right, title and interest in the subject matter of the intellectual property and know-how developed by Access, and disclosed and claimed in the '645 Application, belongs to the company, and further, that all right, title and interest in the intellectual property and know-how, the '645 application and the ensuing patent should be assigned to Access by Fincke." Access Cardiosystems, Inc. et al. v.

2

Randall Fincke, Mass. Sup. Ct. No. 04-2976-BLS2 (July 6, 2004) (the "State Court Action" at P. 24).

      7.      On or about August 16, 2004, Counsel filed an answer and counterclaim on Fincke's behalf, for, among other relief, a declaratory judgment confirming his ownership of the '645 Application and related intellectual property.

      8.      While in the early stages of discovery in the State Court Action, on or about February 18, 2005, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date").

      9.      On or about March 25, 2005, Counsel filed a Notice of Removal, removing the State Court Action to the Bankruptcy Court.

      10.      Since removal of the case, the relationship between Counsel and Fincke has deteriorated. Fincke and Counsel have had numerous communications seeking to resolve these differences. Counsel has notified Fincke of Counsel's intent to withdraw if these differences could not be resolved. The most recent of these communications provided a deadline of Monday, June 27, 2005 for such a resolution or, failing resolution, a withdrawal.

      11.      Counsel has assisted the Defendant in efforts to locate successor counsel.

      12.      Local Bankruptcy Rule 2091-1(a) governs an attorney's request for withdrawal in a bankruptcy case or proceeding, and provides that:

"An attorney may withdraw from a case or proceeding without leave of the Court by serving a notice of withdrawal on the client and all other parties in interest and filing the notice, provided that:

    (1) such notice is accompanied by the filing of a notice of appearance of successor counsel;
    (2) there are no motions pending before the Court; and
    (3) no trial date has been set."

MLBR 2091-1(a).

3

13.     Because no successor counsel has appeared in this case, Counsel seeks to withdraw with leave of the Court.  No motions are now pending before this Court; no trial date has been set.  The parties are presently in the process of conducting discovery.  Proof of service on Defendant and all other parties of said motion is attached.

14.     Where this type of permissive withdrawal is sought, the motion is determined at the discretion of the trial court.  Danvers Savings Bank v. Cuddy (In re Cuddy), 322 B.R. 12, 16 (Bankr. D. Mass. 2005); Andrews v. Bechtel Power Corp., 780 F.2d 124, 135 (1st Cir. 1985), cert denied 476 U.S. 1172 (1986); see also Rivera-Domenech v. Calvesbert Law Offices, 402 F.3d 246, 250 (1st Cir. 2005)("A court's power to protect a lawyer against unfairness by his client in the context of a motion to withdraw seems to be an inherent power necessary to effectuate orderly judicial proceedings."); Fed. Sav. & Loan Ins. Corp. v. Ferrante, 364 F.3d 1037, 1041 (9th Cir. 2004).

15.     Moreover, where the differences between counsel and his or her client are sufficiently great, and where the client has been given notice of counsel's resulting need to withdraw from the case, several courts have found the denial of a motion to withdraw to be an abuse of discretion.  See Rivera-Domenech, 402 F.3d at 249, citing Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 310 F.3d 537, 539 (7th Cir. 2002), Lieberman v. Polytop Corp., 2 Fed.Appx. 37, 39-40 (1st Cir. 2001)(unpublished opinion).

16.     Here, Counsel has provided Fincke with ample notice of their intent to withdraw, and the differences between the parties remain irreconcilable.

17.     The irreconcilable nature of these differences is heightened by the aggressive discovery tactics of the plaintiffs.  At this time, although they appear to be reconsidering their position, the Investors have stated that they will need to take thirty-two (32) depositions in this

4

case between now and mid-August, at least four of which will be conducted in Europe. Many additional pretrial matters have yet to be resolved and the trial itself is estimated to last more than 7 days. Moreover, as detailed in the fee application filed by counsel to the Debtor, since the Petition Date, Duane Morris attorneys have billed a combined 294 hours on the Fincke litigation, at a cost of $116,072.00.

18.    Holland & Knight should not be expected to continue in this litigation, given the irreconcilable differences between it and the defendant inventor, Fincke.

WHEREFORE, Ieuan G. Mahony and David G. Sobol of the firm of Holland & Knight LLP respectfully request that this Court enter an Order:

(i)    approving the withdrawal of Holland & Knight LLP as counsel to Randall Fincke in the above-captioned matter; and

(ii)    granting such other and further relief as is fair and equitable.

Respectfully submitted,

RANDALL FINCKE,

By his counsel,

HOLLAND & KNIGHT LLP

/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: July 13, 2005

5

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, counsel to Randall Fincke, hereby certify that on July 13, 2005, I served a copy of the foregoing *Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Finke* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony
Ieuan G. Mahony

\# 3015606_v5

6

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

### Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Diane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
2 0 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

# 2668328_v1

2

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, of Holland & Knight LLP, hereby certify that on August 1, 2005, I served a copy of the foregoing *Motion* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony
Ieuan G. Mahony

# 3079851_v3

9

*In re Access Cardiosystems, Inc.*
Ch. 11 Case No. 05-40809

## Service List

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

Jerry E. Benezra, Esq.
20 West Emerson Street
Melrose, MA 02176
(781) 662-7335

# 2668328_v1

8

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ACCESS CARDIOSYSTEMS, INC., | ) | Case No. 05-40809-HJB |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ACCESS CARDIOSYSTEMS, INC., | ) | |
| JAMES A. RADLEY, JOHN J. | ) | |
| MORIARTY, RICHARD F. CONNOLLY, JR., | ) | |
| AND JOSEPH R. ZIMMELL, | ) | |
| Plaintiffs, | ) | Adv. P. No. 05-4076 |
| v. | ) | |
| | ) | |
| RANDALL FINCKE, | ) | |
| Defendant. | ) | |
| | ) | |

## PRETRIAL STIPULATION

I.    **The Theory Of Each Party's Cause Of Action Or Defense**

A.    **Plaintiffs' Theory of the Case**

This is an action brought by Access CardioSystems, Inc. ( the "Company" or "Access")

and its investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr., and Joseph

Zimmel (the "Investors") (the Company and Investors together are referred to as the "Plaintiffs")

for declaratory judgment, breach of contract, promissory estoppel, breach of fiduciary duties,

constructive trust, fraud and securities fraud against Defendant Randall Fincke ("Fincke or

Defendant"), one of the founders of Access CardioSystems, Inc.  The Company's claims against

Fincke arise out of a dispute regarding the ownership rights in a pending United States Patent

(the "645 Application") for an automated external defibrillator ("AED") (the "Patent Dispute"),

and the validity of the Company's exercise of its rights to purchase Fincke's stock at book value

after his employment with the Company terminated ("Stock Ownership Dispute"), and breach of

fiduciary duty. The claims of the Company's investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr., and Joseph Zimmell ("Investors") arise out of Fincke's false representations and failure to state material facts which induced them to fund the Company, and suffer damages.

1.    **Company's Theory of the Patent Dispute**

      a.    **Fincke Has A Fiduciary Duty To Assign All Intellectual Property (Including The Pending Patent Application) To The Company**

The Company was formed in March 2000 for the sole purpose of developing defibrillator technology and intellectual property and then selling that intellectual property or marketing it. The inventive process evolved through the filing of the first provisional patent application filed August 31, 2001 (which was later abandoned) and the filing of the 645 Application and the international patent applications filed in August 2002. As a founder, officer and director of the Company, Fincke owes a fiduciary duty to assign the intellectual property to the Company. The same duty also arises from Fincke's previous conduct and representations both orally and in writing.

Unlike the identical international patent which could be filed in the name of the Company filed on the same date, by law the 645 Application could not be filed in a Company's name. Fincke caused himself to be named as the sole inventor of the 645 Application. He did so despite the fact that other persons engaged by the Company had made substantial and necessary contributions to the conception of the claimed inventions.

Fincke induced others to participate in the process of financing and developing the technology and intellectual property, all of whom understood that the Company owned the intellectual property, which was its only real asset. Fincke induced others to participate on a

2

sweat equity basis by leading them to believe that the Company would own the intellectual property and that they would receive stock or stock options.

In his roles as chief executive, sole director until April 2003, and officer of the Company, Fincke owed "an unyielding fiduciary duty to the corporation and its stockholders."[1] Folk on the Delaware General Corporation Law, § 141.2.1 (2002 Supplement), citing Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (Delaware law). Delaware law and Massachusetts law are in accord on this issue. See Chelsea Indus. v. Gaffney, 389 Mass. 1, 11-12 (1983) (Massachusetts law: senior executives considered to be corporate fiduciaries and to owe their company a duty of loyalty); Loft, Inc. v. Guth, 2 A.2d 225 (Del. Ch. 1938), aff'd 5 A.2d 503 (Del. 1939) (Delaware law: corporate officers and directors stand in a fiduciary relation to the corporation and its stockholders). As a corporate fiduciary, Finke was – and remains – prohibited from engaging in self-dealing by seizing corporate assets and/or corporate opportunities for personal gain. Geller v. Allied-Lyons PLC, 42 Mass. App. Ct. 120, 123 (1997) ("The prohibition against self-dealing on the part of corporate fiduciaries requires that the corporation receive the full benefit of transactions in which an officer engages on the corporation's behalf, without thought to personal gain; this is part of the bargain upon which investors rely when they purchase a corporation's stock."); see also Mills Acquisition Co. v.

---

[1]    The fiduciary duties owed are beyond any contract that may exist between Fincke and the Company, "and rest on an independent set of rights provided for in the Delaware corporation law. See Parfi Holding Ab v. Mirror Image Internet, 817 A.2d 149, 158 (2002). See also Diversified Ventures v. Moriarty, 1994 Mass. Super. LEXIS 249 (citing Restatement (Second) of Agency, § 387) ("[i]ndependent of contractual obligations, an employee has a fiduciary duty to act solely for his employer's benefit in all matters within the scope of his employment"). Accordingly, any claim Fincke may have that the Company forfeited its rights in the AED technology when it removed Fincke from office, or by allegedly breaching the terms of the Stockholders' Agreement, is without merit.

3

Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1988) ("The fiduciary nature of a corporate office is immutable.").

It is well established law that a corporate fiduciary is obliged to assign intellectual property to the corporation to which he or she owes a fiduciary duty. See e.g. Great Lakes Press Corp. v. Froom, 695 F. Supp. 1440 (W.D.N.Y. 1987); Lacy v. Rotating Productions Systems, Inc., 961 P.2d 1144 (Colo. Ct. App. 1998); Mechanical Plastics Corp. v. Thaw, 1977 N.Y. Misc. LEXIS 2725; 197 U.S.P.Q. 651 (N.Y. Sup. Ct. 1977) and cases cited therein.[2]

> **b.    Fincke Led the Company, the Investors, and Others Involved In The Inventive Process To Believe That The Company Owned The AED Technology And Intellectual Property**

Fincke led the Company, the Investors, and others involved in the inventive process to believe that the Company owned the intellectual property. Beginning in the first half of 2000, Fincke induced others to participate in the process of developing the technology and intellectual property by leading them to believe that the venture would own the intellectual property and that they would receive stock or stock options in the venture. Fincke induced the Investors to invest more than 2 million dollars in the Company by distributing a business plan, and other documents, which represented that the AED technology and patent applications were assets of the Company. Regardless of the nature of their participation, everyone involved, including the

---

[2]    In Massachusetts, even if Fincke were only an employee, and did not have the greater fiduciary obligations that he has, he would still be obliged to assign the intellectual property by virtue of his position as an employee whose position focused, during the relevant time period, on development of the AED technology. Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253, 269 (1977) ("While an employee, who was hired in a general capacity, may retain title to inventions developed while in another's employ, if he was either hired as an inventor or directed during the course of his employment to develop or perfect new or existing machinery or processes, his employer becomes the owner of resulting inventions and may compel the assignment of patents taken in the employee's name."); see also National Development Co. v. Gray, 316 Mass. 240, 247 (1944).

4

development team, Access' investors, and Access' corporate counsel, and its patent counsel,

understood and expected based on Fincke's representation and conduct, that Fincke would assign

the 645 Application, any ensuing United States patent(s), and all related intellectual property to

Access. While under Fincke's control Access compensated the engineering consultants and

employees; paid other expenses incurred in developing the product described in the patent

applications; and paid all of the attorneys' fees and filing fees incurred in preparing and filing the

patent applications, filed tax returns indicating that these were corporate expenses, and included

them on Company financial statements.

For example:

> In the October 2002 Offering Statement, Fincke stated that "[t]he purpose of
> the corporation is to develop, produce and market a line of automated external
> defibrillators . . . . Since its founding, *Access has expended* approximately
> $5.4 million, provided by investors, to develop *its* product."[3] (Emphasis
> added)[4]

> The Access Business Plan prepared by Fincke and distributed by him to
> Investors stated that the Company, *not* Fincke personally, "*designs*,
> manufactures, and markets" *its* AED. (Emphasis added)

> In the Business Plan, Fincke referred to the invention disclosed in the '645
> application as the "Access-AED product" and the "Access Product
> Technology."

---

[3]     Before the Investors began making their investments (June 30, 2001), Fincke's only
monetary investment in the Company was a loan of $325,000, of which only $43,465.38 remains
outstanding.

[4]     "The prohibition against self-dealing [in our case using company assets to develop a patent
that Fincke now claims, he and not the Company would own] on the part of corporate fiduciaries
requires that the corporation receive the full benefit of transactions in which an officer engages
on the corporation's behalf, without thought to personal gain; this is part of the bargain upon
which investors rely when they purchase a corporation's stock." Geller v. Allied-Lyons PLC, 42
Mass.App.Ct. 120, 123 (1997). These funds were invested in the Company, for the Company's
purposes, and were not given to Fincke to use for his own benefit.

BOS\131567.1

> The Business Plan represented that: "Access CardioSystems intends to become a leader in the defibrillation market...[w]ith *its* improved technology..." (Emphasis added).

> The Business Plan refers to the "Access CardioSystems waveform" and states that "Access CardioSystems has demonstrated the performance of *its* Biphasic WaveControl™ in the animal laboratory." (Emphasis added).

> The Business Plan states that "Access CardioSystems *has designed* a 360 J shock selection..." (Emphasis added).

> In various promotional materials , Access Cardiosystems, AccessAED, AccessALS, WaveControl and SpeedTray (claimed in the 645 Application) are represented to be trademarks or registered trademarks of Access.

> The Business Plan describes the electrode innovations as "*our design innovation*," and further states that "*the Access electrode design* contributes to saving lives." (Emphasis added).

> The Business Plan referred in the possessive form to "Access Product Technology," and describes the Company's "core technology" and "innovative technology," all of which was developed using company funds, equipment, and personnel.

> The "Technology Overview" section of the Business Plan further states that: "the *corporate goal* is to create an AED with clinical superiority . . . ."

> The corporate goals specifically refer to the "provisional patent application" which Fincke now asserts he owns.

> Fincke also provided financial statements and tax returns showing ownership of patents as assets of the Company.

On the basis of these written submissions, and similar oral representations, buttressed, as they were by Fincke's own words and conduct, the Investors rightfully concluded, as did others, that the Company and not Fincke personally owned the invention described in the U.S. Patent. Fincke's position, contrived once he lost control of the Company and decided to compete with it, is contrary to his written representations to the Investors. Having led the Company, the Investors, and others involved in the inventive process to believe that the Company was the

6

rightful and exclusive owner of the AED intellectual property, Fincke must assign the intellectual

property to Access. See, e.g. Great Lakes Press Corp. v. Froom, 695 F. Supp. at 1446.

        c.      **Fincke Is Not The Sole Inventor Of The Inventions Disclosed And The Subject Matter Claimed In The '645 Application, And Therefore He May Not Assert Sole Ownership And Control Over That Application**

Fincke and Gregory Baletsa originally established the venture for the sole purpose of

developing a novel defibrillator. Because Fincke lacked the technical expertise to develop the

product on his own, he and Baletsa enlisted outside consultants, Alan Adamsky and Kyle Bowers

to assist in the inventive process. Adamsky and Bowers, among others, made significant

contributions to the inventions disclosed and the subject matter claimed in the '645 application.

They participated in the process of developing the technology and intellectual property because

they believed that the Company would own the intellectual property and that they would receive

stock or stock options in the Company. Accordingly, in addition to his representations and

conduct discussed above, Fincke cannot successfully claim that he fully conceived the invention

prior to the start of his fiduciary duties.

Fincke is not the sole inventor of the application, he is not the sole owner and may not

assert dominion and control over the application. See 8 Chisum on Patents § 22.01 (2003) ("The

presumptive owner of the property right in a patentable invention is . . . the several human

inventors, in the case of a joint invention"); University Patents, Inc. v. Kligman, 762 F. Supp.

1212, 1218-19 (E.D. Pa. 1991) ("Inventorship provides the starting point for determining

ownership of patent rights.").

        2.      **The Company and the Investors' Theory of Breach of Fiduciary Duty, Misrepresentation and Failure to State Material Facts**

Fincke misreported Company achievements and key performance indicators, provided

false and misleading projections, and withheld information in order to conceal his gross

7

mismanagement of the Company and to secure additional investor funding. Fincke made

misrepresentations with knowledge that they were false, concerning: the status of product

development, manufacturing capacity and stability, inventory, the demand for the AED,

availability of accessory products, sales and shipments, order rates, the existence of a qualified

sales force, the amount of capital investment needed to make the Company profitable, and when

the Company would become profitable. The Investors relied on these misrepresentations when

they made their investments in the Company.

The Company and the Investors have since learned that Fincke also omitted to inform

them regarding: the stability and capacity of the manufacturing in-house; shipments of product

that Fincke knew would result in returns and bad debt; that he had been advised that the

projections he was providing were not accurate and could not be achieved; that Fincke refused

requests to devote resources for test equipment as part of the quality control process; that he had

a pattern of misrepresenting to customers and distributors that he had sufficient inventory and

finished goods when he did not; that Philips Electronics North America Corporation had raised

an issue regarding an alleged patent infringement; that Fincke was taking money, other than

salary, out of the Company, during the same period of time that the Company was not paying it's

obligations to third parties; that Fincke was using Company funds to pay his personal bills; that

there were significant complaints from customers and distributors on an ongoing basis as

opposed to the good relationships and related projections that he was reporting; that there were

ongoing substantial product returns for various reasons[5]; that he refused requests by the

management team to invest resources necessary to ensure that financial systems and controls

---

[5]   This would have informed investors and directors of problems with shipments that they could
address and the impact on product manufacturing and projections.

were operational; that he was attempting to obtain asset backed lending on previously secured

receivables; that he was missing payroll; that he was not making all the tax payments and 401K

payments when they were due; that he refused to engage an independent audit firm to audit the

Company's results even though this was necessary for a bank covenant; that he was maintaining

multiple bank accounts and co-mingling money between accounts among other reasons so that

creditors could not attach funds; that on occasion he failed to pay rent; and that in fact an arrest

warrant was issued in late May 2003, by the landlord in an attempt to collect overdue rent; that

he was continuing to revise the product, even though he was directed not to do so.

### 3.    Company's Theory Of The Stock Ownership Dispute

The basic dispute revolves around the question of who has the legal right to the shares of

stock that Fincke owned prior to leaving the Company. The rights of the parties regarding

Fincke's stock are governed by the Company's by laws and a stockholder's agreement, *both of*

*which were drafted and executed at a time when Fincke was in control of the Company.* [6] Both

the Stockholder's Agreement, and § 5.1 of the Company's bylaws permit the Company to

remove him from his positions, *with or without cause.* Therefore, the reason for Fincke's

termination is irrelevant.

Once his employment terminated, the relevant portions of the Stockholder's Agreement

apply. Article 4 of the Stockholder's Agreement provides, "Repurchase Rights" by the

Company "if *for any reason* (other than death of a primary stockholder) a Primary Stockholder

ceases to be an employee of the Company, *including, without limitation, at the election of the*

---

[6]    The Company was originally formed as a Massachusetts S-corporation. It was subsequently
restructured into a Massachusetts C-corporation. It was then restructured and merged into a
Delaware corporation, and the original Stockholder's Agreement was amended to reflect that
change. Notwithstanding that fact, the Agreement according to its terms is to be governed by the
law of the Commonwealth of Massachusetts.

9

*Company, with or without cause*...." (Emphasis added.) The Stockholder's Agreement then goes on to specify the mechanism for exercise by the Company of its "repurchase Rights" at the "Book Value Price," as defined by generally accepted accounting principles. Based upon the unambiguous language of the agreement, Fincke had to offer for sale to the Company all of the shares of his stock at Book value. Because the Company had a negative book value at the time of Fincke's termination from the Company, in February 2004 the Company offered to repurchase all of Fincke's shares for one dollar, which reflected the Company's net book value using generally accepted accounting principles. Fincke has failed and refused to sell his shares of stock to Access in accordance with the terms of the Stockholders' Agreement.[7]

### B.    Defendant's Defenses

The Defendant, Randall Fincke ("Fincke") raises affirmative defenses that rely on misconduct by Access, and by James A. Radley, John J. Moriarty, Richard F. Connolly, Jr. and

---

[7]  Absent an agreement to the contrary, a Massachusetts court will apply the law of the state of Delaware, as the state of incorporation, regarding the rights of stockholders. Harrison v. NetCentric Corp., 433 Mass. 465, 471-472 (2001). Unlike Massachusetts, Delaware law does not impose broad fiduciary duties on stockholders of a closely held corporation. See Riblet Products Corp. v. Nagy, 683 A.2d 37 (Del.1996) (expressly declining to follow the analysis that a Massachusetts court would in cases involving the termination of employment of a minority stockholder; Nixon v. Blackwell, 626 A.2d 1366, 1379 (Del.1993) (minority stockholders, as the stockholders did in the present case, could protect themselves with appropriate stockholder agreements and other contractual arrangements); Ueltzhoffer v. Ueltzhoffer, 1991 WL 271584 (Del.Ch.1991), aff'd, 618 A.2d 90 (Del.1992).Even if Massachusetts law applied the same result would be reached. In Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404 (1995), the plaintiff complained that his termination violated the duty owed to him as a minority shareholder where the employment agreement and stock purchase agreement allowed for termination without cause and a repurchase of his stock *at book value*. Id. The Blank Court disagreed with plaintiff and enforced the agreements. Id. While recognizing the duties imposed upon the majority shareholders under Donohue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578 (1975), the court observed that "questions of good faith and loyalty with respect to rights on termination or stock purchase do not arise when [as here] all the stockholders in advance enter into agreements concerning termination of employment and for the purchase of stock of a withdrawing or a deceased shareholder." Id. at 408.

10

Joseph R. Zimmel (for convenience, Radley, Moriarty, Connolly and Zimmel are collectively referred to as the "Investors"). This misconduct involves wrongful acts undertaken by Access and the Investors in connection with the Investors' acquisition of ownership rights in Access, as well as wrongful acts committed subsequent to the Investors' acquisition of Access.

Fincke accordingly asserts the following defenses:

1.  The plaintiffs' Complaint fails to state a claim upon which relief can be granted.

2.  This action is barred, in whole or in part, by the doctrine of unclean hands.

3.  The plaintiffs are estopped by their conduct from asserting the claims set out in the Complaint.

4.  This action is barred, in whole or in part, by the doctrine of waiver.

5.  The plaintiffs breached the terms and conditions of the parties' agreement under which Fincke allowed the Investor Group to assume an ownership position in Access.

6.  This action is barred, in whole or in part, by the doctrine of laches.

7.  The plaintiffs' claims are barred, in whole or in part, due to a failure of consideration promised by the plaintiffs, and such failure releases Defendant from asserted obligations concerning the patent application.

8.  The Defendant reserves the right to assert any and all additional defenses as may be revealed by further investigation and discovery.

C.  **Defendant's Counterclaim**

The Defendant's counterclaims include a claim for (1) Breach of Contract against the Investors; (2) Breach of Contract against Access; (3) Promissory Estoppel against Access and

the Investors; (4) Breach of Fiduciary Duty against the Investors; (5) Wrongful discharge against Access; and (6) Declaratory Judgment.

### D.    Plaintiffs' Defenses To Defendants' Counterclaim

Plaintiffs assert the following defenses to Fincke's Counterclaim:

1.    The claims of Fincke are barred by reason of his unlawful and tortious conduct.

2.    Fincke lacks clean hands.

3.    Fincke's contract claims are barred by reason of a lack and/or failure of consideration.

4.    Fincke was not terminated, but even if he had been, his conduct justified any job actions Plaintiffs took, or might have taken.

5.    Based on the facts and circumstances of this case, neither the Company, nor any of its officers, directors, agents and/or employees, owed a fiduciary duty to Fincke barring them from taking the alleged employment action against him.

6.    There was no promise to Fincke upon which he could reasonably rely to support his claim of promissory estoppel.

7.    There was no enforceable contract between the Fincke and any of the Plaintiffs.

8.    Fincke's Counterclaim fails to state a claim upon which relief can be granted against the defendant Richard F. Connolly, Jr.

The Company reserves the right to assert additional defenses as discovery proceeds.

### II.    Each Party's Contention of Facts In Support Of That Party's Cause Of Action Or Defense

#### A.    Plaintiffs' Contention of Facts

The facts are also set forth in detail in the Complaint. A summary of the facts in support of Plaintiffs' causes of action is as follows:

12

1.    The Company is a small company that was formed for the sole purpose of developing, making and selling a novel, inexpensive and portable automated external heart defibrillator. Fincke was a founder, director and officer of the Company, and was employed by the Company until he voluntarily left the Company. Fincke and Greg Baletsa formed the Company for the sole purpose of developing defibrillator technology and intellectual property. Fincke's original concept, of a disposable defibrillator, was quite rudimentary.

2.    Beginning in March of 2000, a venture was formed and the Fincke induced others to participate in the process of financing and developing the technology and intellectual property (initially on a sweat equity basis), by leading them to believe that the venture would own the intellectual property and that they would receive stock or stock options in the venture. The initial development team included Kyle Bowers ("Bowers") and Alan Adamsky ("Adamsky"). The team abandoned Fincke's original rudimentary concept, and began to discuss other ideas that Fincke had not previously considered, ultimately leading to the development of the automated electronic defibrillator ("AED") manufactured and sold by the Company.

3.    Baletsa left the Company in 2001 because of his concerns with Fincke's unethical business practices and the changes Fincke made in direction of the Company.

4.    Also in reliance on Fincke's representations, a group of investors (co-plaintiffs James Radley, John Moriarty, Richard Connolly and Joseph Zimmel, collectively the "Investor Group") invested more than $20 million in the Company. Fincke's total monetary investment in the company was a loan of just $325,000, of which only $43,465 remains outstanding.

5.    In August 2002 a patent application concerning the Company's defibrillator technology was filed in the United States Patent and Trademark Office. The application is entitled "Automated External Defibrillator (AED) System" and has been assigned serial no.

13

BOS\131567.1

10/232,645 (the "'645 application"). Fincke caused himself to be named as the sole inventor of this application, notwithstanding that at least Adamsky and Bowers had made substantial and necessary contributions to the conception of the claimed inventions, including, for example, with respect to the control circuitry, PLD, charger circuitry, and the bi-phasic waveform. Fincke excluded other members of the development team from reviewing the draft patent application before it was filed.

6. On the same date, an international patent application was filed concerning the Company's defibrillator technology. The international application was identical to the United States application, and was filed in the Company's name, rather than in Fincke's name, as permitted by applicable law (unlike United States law, which requires that a patent application be filed in the name of the inventor).

7. Everyone involved in the venture, including the development team, the Company's investors, and the Company's patent counsel, understood and expected that, consistent with listing the Company as the applicant under the 645 application, Fincke would assign the United States patent application, any ensuing United States patent(s), and all related intellectual property to the Company. Consistent with this understanding, while under Fincke's control the Company compensated the engineering consultants and employees; paid other expenses incurred in developing the product described in the patent applications; and paid all of the attorneys' fees and filing fees incurred in preparing and filing the patent applications. These were carried as Company expenses on its books and records and tax returns. In addition, Fincke made numerous representations confirming everyone's reasonable expectation that the Company owned the AED technology.

14

8.      During his time as chief executive of the Company, Fincke fraudulently withheld information and made numerous false and misleading statements both to the Company's Investors and the Board of Directors. These false and misleading statements concerned the company's purported achievements; its manufacturing, distribution and sales operations; and its financial condition.

9.      In order to obtain sales and shipment figures that he could use for his knowingly false projections to investors, Fincke personally, and through others he directed, caused the Company to be involved in a pattern of lying to customers, distributors, contractors, vendors, suppliers, and others dealing with the Company that led to substantial returns of product and bad debt, substantially injured the Company's reputation with key distributors and customers, several of whom returned product delayed or refused to make payments, cancelled orders, substantially reduced the amount of business they were doing with the Company, or who ceased doing business with Access.

10.     Fincke's unethical and deceptive practices with suppliers and vendors caused the Company to go to other more expensive suppliers and forced the company to expend substantial funds to qualify the new suppliers, in cases to redesign the product, and pushed out lead times to committed customer deliveries.

11.     Fincke's deceptive and unethical practices also led to a significant number of lawsuits that resulted in legal fees and payments.

12.     Fincke's making false claims to potential customers also caused the Company to close down its manufacturing line on occasion in order to develop the features that he had falsely stated the Company's AED had.

15

13.     Fincke's failure to deal with the Philips claims in a timely fashion led to a costly lawsuit.

14.     Fincke's various unethical and deceptive practices caused the Company to waste considerable human and financial resources.

15.     In addition, Fincke directed members of the management team not to speak with or otherwise disclose the Company's problems to the Board of Directors. In late November 2003, having learned of Fincke's misrepresentations and other wrongdoing, the Company's Board of Directors informed Fincke that he could not remain as President and CEO, but that he could remain with the title of Chief Technology Officer and non-executive chairman, with no cut in pay or benefits. Shortly thereafter, Fincke voluntarily terminated his relationship with the Company.

16.     Fincke's misrepresentation, withheld information, and unethical practices violated his fiduciary duties to the Company, and prevented its Board of Directors from dealing with the problems that the Company was facing in a timely and efficient manner, while substantially increasing its liabilities.

17.     Only after leaving the Company, contrary to his previous statements and actions, Fincke has asserted for the first time that he owns the '645 application and related intellectual property, and has threatened the Company and its customers with suit for violation of his purported rights. By letter dated June 14, 2004, Fincke's counsel wrote to the Company asserting that Fincke "holds all rights" to the United States patent application and related know-how.

## B.     Defendant's Contention Of Facts

Fincke is the sole named inventor on U.S. Patent Application No. 10/232,645 entitled "Automated External Defibrillator (AED) System" (the "'645 Application"), which is the patent

16

application at issue in this case. Beginning in March 2000, Fincke worked intensively on the inventions that are disclosed in the '645 Application, and by the end of June 2000, Fincke had completed the conceptual design for the defibrillator system and inventions disclosed in this Application. After Fincke completed the conceptual design for the AED device, in early July 2000, Fincke formed Access to exploit this design.

Fincke engaged Peter Hermes of Hermes, Netburn, O'Connor, & Spearing, P.C. as counsel to advise him in connection with the formation of Access. Upon Hermes' advice, Fincke executed a Stockholders Agreement, dated July 7, 2000, with two minor stockholders in the company. With Fincke as 85% owner of Access, the Stockholder Agreement had essentially no application to Fincke. In March 2001, Access hired its first employee and, subsequently, Fincke first began taking a salary from Access.

As the company grew, Hermes stated that the issues were beyond his expertise, and in early 2001 Michael Elefante, of Hemenway & Barnes, began to advise Fincke and Access. By the spring of 2001, Access was in a position to seek, and required, additional capital and outside investment. In July 2001, John Moriarty loaned Access funds and, in exchange, received convertible promissory notes. Fincke sought short-term investment, and did not prefer equity investors, in order to preserve his 85% majority ownership position. Access later received further funding from Connolly, Radley, and Zimmel. Like Moriarty, Connolly and Radley received convertible promissory notes in exchange for their investments. Zimmel made an equity investment in December 2002.

Before the Investors made their investments, they received substantial information concerning Access's financial circumstances, and the risks Access presented. Acting as company counsel, Attorney Elefante prepared disclosure documents that were provided to each Investor.

17

For additional funding, Fincke later obtained a Small Business loan from Middlesex Bank, in the amount of $500,000. Fincke personally guaranteed this amount, as Fincke had personally guaranteed the lease for Access' office space.

In May, 2001, Access applied for FDA approval of a version of the portable defibrillator system disclosed in the '645 Patent Application. Before publicly disclosing the product, with the assistance of patent counsel, Fincke filed the '645 Patent Application, in August, 2001. This Application was filed in Fincke's name, as inventor and owner of the technology disclosed in the Application. Fincke did not assign this Application to Access, and has retained ownership of this Application. Fincke has never stated to or promised anyone that he would assign the '645 Patent Application to Access. Until he was locked out of Access, no one requested that Fincke assign this Application to Access.

In January 2002 Access applied for FDA approval of a second version of the system. Access was successful in its FDA applications, and received necessary approvals in May 2002 and August 2002. In August 2002, Access similarly obtained necessary approvals to sell the device in Europe. Accordingly, in September 2002 Access began selling the AED product.

As of the spring of 2003, the company was an attractive prospect for further investment. In April 2003, Summit Accelerator Fund ("Summit") provided Access with a signed term sheet expressing its interest in investing in Access. In this same period, Access received another term sheet from a venture capital firm interested in investing in the company. Summit's term sheet reflected a post-money valuation of the company at $28.0 million. The post-money valuation Summit placed on Access made Fincke's stock interest worth $11.1 million. Yet Radley stated that Summit placed too low a value on Access.

18

The Investors to this point had all been debt investors, and had no ownership or control of the company (except in accordance with the equity conversion options). Fincke's position, and leadership of the company, therefore, had been straightforward. The Investors wished to change this structure. Radley, in addition, sought to change the conversion rates defined in the contracts in order to obtain additional shares in Access. Radley thus advocated that the company reject Summit's term sheet, and adopt the following course: (i) that Radley's promissory notes, and those of the other Investors, should be converted in part into equity; (ii) that Fincke would turn control over to a Board of Directors including Radley and other of the Investors; and (iii) that the Investors would provide the additional funding needed to support Access' continued growth.

Attorney Elefante advised Fincke that the offer was very favorable to the company and Fincke personally. When Attorney Elefante advised Fincke that the offer was favorable to him, Attorney Elefante did not mention the Stockholder Agreement, and did not advise Fincke on the potential for events to unfold as they have. An employment agreement for Fincke was also discussed. This employment agreement was to provide Fincke with protections in light of the change in structure, and the Investors' acquisition of ownership interests in Access. The Board agreed to provide Fincke with such an agreement, and this obligation was reflected in the Board's minutes. The Board at the time consisted of Radley, Moriarty, Zimmel (the "Board Members"), and Fincke.

Despite this obligation, the employment agreement was never provided. And despite their promises to provide needed funding, the Investors did not provide the needed working capital. The failure of the Investors to provide requisite and agreed-upon working capital severely constrained the company's ability to meet targets, fill orders, and conduct operations. Meanwhile, the Board continued to issue more shares. Although Fincke believed he still

19

controlled 51% of the shares, this was, in fact, incorrect, as the Investors had effectively gained

control of the company by the fall of 2003.

In the fall of 2003, the Board Members and Fincke became involved in a dispute

concerning the readiness of certain units for shipment. Certain component parts were faulty.

Fincke indicated that the products that contained these parts, if shipped, would result in

unacceptable failures in the field, potential problems with the FDA, and other exposure for

Access. The Board Members disagreed and, upon information and belief, the products

subsequently shipped.

In late November, 2003, the Board held a meeting, and the Board Members purportedly

voted to remove Fincke as Chief Executive Officer and President. In his place, the Board

Members elected Radley. The Board Members offered Fincke a position with substantially

reduced duties. Fincke explained that he had no wish to step down in favor of Radley, and that

this action was directly contrary to the understanding concerning the employment agreement. At

the direction (upon information and belief) of Radley, Fincke was then locked out of Access.

Access disabled Fincke's email account, deactivated his magnetic card key access to the

company's offices, and ceased issuing salary checks to Fincke as of the first week in January,

2004. The company then claimed a right to exercise repurchase provisions of the Stockholders

Agreement, and acquire all of Fincke's stock for $1.00. The Investors thus terminated Fincke's

employment, deprived him of a salary, claimed unfettered rights in the '645 Patent Application,

and asserted ownership of his approximately 40% ownership interest in the company, all for

$1.00.

### III.   Parties' Proposed Discovery Plan

The parties propose and jointly request that the Court adopt the following joint proposed

discovery and trial schedule for this matter:[8]

| EVENT: | PROPOSED DEADLINE: |
|---|---|
| Parties to respond to initial written discovery requests previously propounded. (When parties respond to document requests, parties shall at the same time produce all responsive documents). <br><br> Parties reserve the right to serve follow-up written discovery requests, if necessary, based upon deposition testimony. However, all written discovery shall be served and answered no later than July 15, 2005, prior to the deadline for filing dispositive motions. | June 15, 2005 |
| Motions to amend and other procedural motions. | June 30, 2005 |
| Parties to disclose expert witnesses, and respond to expert interrogatories | July 15, 2005 |
| Depositions – the completion of depositions (including expert depositions, if any) | July 29, 2005 |
| Dispositive motions – motions for summary judgment served by hand or overnight delivery (parties reserve the right to serve summary judgment motions prior to this date) | August 23, 2005 |
| Oppositions to motions for summary judgment served | September 13, 2005 |
| Hearing on motions for summary judgment | September 21, 2005 |
| Pre-trial conference | As soon as practicable thereafter |
| Trial on all issues | October 24, 2005 |

---

[8]      The proposed schedule reflects the parties' discovery propounded to date, as this action
was pending in the Business Litigation Session of Suffolk Superior Court prior to Fincke's
removal of the action to this Court under 28 U.S.C. § 1334, 1452 and Fed. R. Bankr. P. 9027.

21

For purposes of the case remaining in this Court, the parties also waive their respective jury demands.

**IV.    Additional Pleading or Motions To Be Filed By Each Party**

    **A.    Plaintiffs' Additional Pleadings or Motions**

Plaintiffs intend to seek leave to file an amended complaint, and may move for summary judgment on some or all of their claims.

    **B.    Defendant's Additional Pleadings or Motions**

The Defendant may file dispositive pleadings upon conclusion of discovery as set forth in Section III above.

**V.    Each Party's Good Faith Estimate Of The Time Required For Trial**

The parties estimate that the trial of this action should last for approximately seven to ten days.

    **B.    Defendant's Estimate**

**VI.    The Date and Time Of The Fed. R. Civ. P. 26(f) Conference**

The parties met on Wednesday, May 18, 2005 via telephonic conference to discuss the matters set forth herein.

BOS\131567.1

Respectfully submitted,

ACCESS CARDIOSYSTEMS, INC.,

By its attorneys,


/s/ Barry L. Klickstein
Anthony J. Fitzpatrick (BBO # 564324)
Barry L. Klickstein (BBO # 275160)
Duane Morris LLP
470 Atlantic Avenue
Boston, MA 02210
(617) 289-9200


RANDALL FINCKE
By his attorneys,


/s/ David Sobol
Ieuan G. Mahony (BBO # 552349)
David Sobol (BBO# 647057)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

May 25, 2005

JAMES A. RADLEY,
JOHN J. MORIARTY,
RICHARD F. CONNOLLY, JR. and
JOSEPH R. ZIMMEL,
By their attorney,


/s/ Jerry E. Benezra
Jerry E. Benezra (BBO # 037100)
26 Island Rock
Plymouth, MA 02360
(508) 209-0077

23

9

## Sobol, David G (BOS - X72030)

| | |
|---|---|
| **From:** | Sobol, David G (BOS - X72030) |
| **Sent:** | Thursday, June 09, 2005 9:18 AM |
| **To:** | 'Stephen_Reynolds@mab.uscourts.gov' |
| **Cc:** | 'Sternklar, Jeffrey D.' |
| **Subject:** | FW: Access v. Fincke- Discovery Plan |
| **Attachments:** | ACS_Fincke- Discovery Plan 6.8.05.DOC |

Steve,

In advance of the 9:30 hearing, I wanted to send to you a reviewed proposed discovery plan that the parties agreed to yesterday.  The summary judgment hearing date has been left blank, subject to Judge Boroff's availability in October.

Thank you.

David Sobol

| EVENT: | PROPOSED DEADLINE: |
|---|---|
| Parties to respond to initial written discovery requests previously propounded. (When parties respond to document requests, parties shall at the same time produce all responsive documents.)<br><br>Parties reserve the right to serve follow-up written discovery requests, if necessary, based upon deposition testimony. However, all written discovery shall be served and answered no later than July 15, 2005, prior to the deadline for filing dispositive motions. | June 28, 2005 |
| Motions to amend and other procedural motions. | June 30, 2005 |
| Parties to disclose expert witnesses, and respond to expert interrogatories | July 25, 2005 |
| Depositions – the completion of depositions (including expert depositions, if any) | August 10, 2005 |
| Dispositive motions – motions for summary judgment served by hand or overnight delivery (parties reserve the right to serve summary judgment motions prior to this date) | September 13, 2005 |
| Oppositions to motions for summary judgment served | September 27, 2005 |
| Hearing on motions for summary judgment | October ___, 2005 |
| Pre-trial conference | As soon as practicable thereafter |
| Trial on all issues | As soon as practicable thereafter |

10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

|  |  |
|---|---|
| In re<br><br>ACCESS CARDIOSYSTEMS, INC.,<br><br>               Debtor. | Case No. 05-40809-HJB<br>Chapter 11 |
| ACCESS CARDIOSYSTEMS, INC.,<br>JAMES A. RADLEY, JOHN J. MORIARTY,<br>RICHARD F. CONNOLLY, JR., and<br>JOSEPH R. ZIMMEL,<br><br>               Plaintiffs<br>v.<br><br>RANDALL FINCKE,<br><br>               Defendant | Adv. Proc. No. 05-04076 |

## NOTICE OF APPEAL

The firm of Holland & Knight LLP ("Counsel" or "Holland & Knight"), counsel for the

defendant, Randall Fincke ("Fincke" or the "Defendant") hereby gives notice of appeal, pursuant

to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8001, from the judgment, order, or decree of the

United States Bankruptcy Court for the District of Massachusetts, Western Division, Boroff, H,

denying the *Motion of Holland & Knight LLP to Withdraw as Counsel for Randall Fincke* (the

"Motion to Withdraw") entered on July 21, 2005 (the "Order") in the above-captioned adversary

proceeding.

The names of all parties to the Order appealed from, and the names, address and

telephone numbers of their respective attorneys are as follows:

Plaintiff/Access CardioSystems, Inc.

*Represented by:*

Jeffrey D. Sternklar, Esq.
Barry C. Klickstein, Esq.
Andrew J. Fitzpatrick, Esq.
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289.9200

Plaintiff/Investors James A. Radley, John J. Moriarty, Richard F. Connolly, Jr., and
Joseph R. Zimmell

*Represented by:*

Jerry E. Benezra, Esq.
20 West Emerson Street
Melrose, MA 02176
(781) 662-7335

and

Official Committee of Unsecured Creditors

*Represented by:*

Harold Murphy, Esq.
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400

Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ Ieuan G. Mahony
Ieuan G. Mahony (BBO # 552349)
David G. Sobol (BBO # 647057)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: August 1, 2005

3

## CERTIFICATE OF SERVICE

I, Ieuan G. Mahony, of Holland & Knight LLP, hereby certify that on August 1, 2005, I served a copy of the foregoing *Notice of Appeal* by first-class mail, postage prepaid and/or electronic mail upon the attached list of interested parties.

/s/ Ieuan G. Mahony
Ieuan G. Mahony

# 3080318_v1

4

*In re Access Cardiosystems, Inc.*
*Ch. 11 Case No. 05-40809*

**Service List**

Jeffrey D. Sternklar
Jennifer L. Hertz
Duane Morris LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210

Jerry E. Benezra
26 Island Rock
Plymouth, MA 02360

Internal Revenue Service
Special Procedures Function STOP 20800
P.O. Box 9112
JFK Federal Building
15 New Sudbury Street
Boston, MA 02203

Lawrence G. Green, Esq.
Perkins Smith & Cohen, LLP
One Beacon Street, 30th Floor
Boston, MA 02109-3106

Jesse Garringer
Matrx Medical Inc.
210 Gats Road
Ballentine, SC 29002

Deryl Santo
Aved Electronics Inc.
59 Technology Drive
Lowell, MA 01851-2729

Jeffrey O. Parshall
Ford, Parshall & Baker, LLC
609 E. Walnut Street
Columbia, MO 65201

William S. Pritchard
Pritchard, McCall & Jones LLC
800 Financial Center
505 N. 20th Street
Birmingham, AL 35203

Richard King
Assistant U.S. Trustee
Office of the United States Trustee
446 Main Street, 14th Floor
Worcester, MA 01608

CIT Communications Finance Corp.
1 CIT Drive
Livingston, NJ 07039

Massachusetts Department of Revenue
Bankruptcy Unit
200 Arlington Street
Chelsea, MA 02150

Kurt Waldren
SMTEK International, Inc.
200 Science Drive
Dept. 2874
Moorpark, CA 93021

David M. Barash
428 Lowell Road
Concord, MA 01742

Kim Spaner
Ropes & Gray
One International Place
Boston, MA 02110-2624

Sheila Gayatari
Gayatari Software
28 Newcastle Drive, No. 9
Nashua, NH 03060

Bob Treadwell
Healthcare Tech. Intl. Ltd.
15/F., Blk B
Veristrong Ind. Centre
34-46 Au Pui Wan Street
Fotan, NT

Arthur M. Dolby
R.L. Dolby & Company, Ltd.
Monitor House
Kerse Road
Stirling
Scotland FK7 7RZ

Kevin Hewlett
Katecho, Inc.
4020 Gannett Avenue
Des Moines, IA 50321

Brian Healey
79 Beaver Brook Road
North Andover, MA 01845

Mark Pandiscio
Pandiscio & Pandiscio, P.C.
470 Totten Pond Road
Waltham, MA 02451

Steven Goldstein
United Emergency Networks, Inc.
1214 East 35 Street
Brooklyn, NY 11210

Harold B. Murphy
Jesse I. Redlener
Hanify & King, P.C.
One Beacon Street
Boston, MA 02108

Jerry E. Benezra, Esq.
20 West Emerson Street
Melrose, MA 02176
(781) 662-7335

Sherry Dixon
All Mold, Inc.
3841 Buffalo Road
Rochester, NY 14624

Craig J. Lewandowski
Merrill Communications, LLC
1 Merrill Circle
St. Paul, MN 55108

John Devlin
Lane Powell Spears Lubersky
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

Mark H. Totman
38 Jefferson Road
Winchester, MA 01890

Jim Bleck
Bleck Design Group
51 Middlesex Street
No. Chelmsford, MA 01863

Mr. Randall W. Fincke
72 Bristers Avenue
Concord, MA 01742

# 2668328_v1

2

11

## UNITED STATES BANKRUPTCY COURT, DISTRICT OF MASSACHUSETTS
### Proceeding Memorandum/Order of Court

**In Re:** Access Cardiosystems, Inc. et al v.    **Case Number:** 05-04076    **Ch:**
Fincke

**MOVANT/APPLICANT/PARTIES:**

#20   Motion the firm of Holland & Knight to Withdraw as Counsel to Defendant Randall Fincke
David G. Sobol, Esq.

**OUTCOME:**

_____Granted_____Denied_____Approved_____ Sustained

_____Denied_____Denied without prejudice_____Withdrawn in open court_____Overruled

_____OSC enforced/released

_____Continued to:_____ For:_____

_____Formal order/stipulation to be submitted by:_____Date due:_____

_____Findings and conclusions dictated at close of hearing incorporated by reference

_____Taken under advise ment: Brief(s) due_____From_____

                              Response(s) due_____From_____

_____Fees allowed in the amount of: $_____Expenses of: $_____

_____No appearance/response by:_____

___✓___DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

DENIED.

IT IS SO NOTED:                          IT IS SO ORDERED:

                                         *Henry Jack Boroff*

_____          _____ Dated: 07/20/2005

Courtroom Deputy                         Henry J. Boroff, U.S. Bankruptcy Judge

12

UNITED STATES BANKRUPTCY COURT, DISTRICT OF MASSACHUSETTS
Proceeding Memorandum/Order of Court

**In Re:** Access Cardiosystems, Inc. et al v.    **Case Number:** 05-04076    **Ch:**
Fincke

**MOVANT/APPLICANT/PARTIES:**

#24   Motion of Defendant Randall Fincke for Protective Order
Randall Fincke, Pro Se

**OUTCOME:**

_____Granted_____Denied_____Approved_____ Sustained

_____Denied_____ Denied without prejudice_____Withdrawn in open court_____Overruled

_____OSC enforced/released

_____Continued to:_____ For:_____

_____Formal order/stipulation to be submitted by:_____Date due:_____

_____Findings and conclusions dictated at close of hearing incorporated by reference

_____Taken under advise ment: Brief(s) due_____From_____

                              Response(s) due_____From_____

_____Fees allowed in the amount of: $_____Expenses of: $_____

_____No appearance/response by:_____

___✓___DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:

DENIED.

IT IS SO NOTED:                          IT IS SO ORDERED:

_____                 _____    Dated: 07/20/2005

Courtroom Deputy                         Henry J. Boroff, U.S. Bankruptcy Judge

13

UNITED STATES BANKRUPTCY COURT, DISTRICT OF MASSACHUSETTS
Proceeding Memorandum/Order of Court

**In Re:** Access Cardiosystems, Inc. et al v.     **Case Number:** 05-04076     **Ch:**
Fincke

**MOVANT/APPLICANT/PARTIES:**

#22 Emergency Motion filed by Defendant Randall Fincke to Extend Extend Discovery Deadlines
Randall Fincke, Pro Se

**OUTCOME:**

_____Granted_____Denied_____Approved_____ Sustained

_____Denied_____Denied without prejudice_____Withdrawn in open court_____Overruled

_____OSC enforced/released

_____Continued to:_____For:_____

_____Formal order/stipulation to be submitted by:_____Date due:_____

_____Findings and conclusions dictated at close of hearing incorporated by reference

_____Taken under advise ment: Brief(s) due_____From_____

Response(s) due_____From_____

_____Fees allowed in the amount of: $_____Expenses of: $_____

_____No appearance/response by:_____

  ✓  DECISION SET OUT MORE FULLY BY COURT AS FOLLOWS:


DENIED.


IT IS SO NOTED:                              IT IS SO ORDERED:

                                             *Henry Jed Boroff*

_____            _____ Dated: 07/20/2005

Courtroom Deputy                             Henry J. Boroff, U.S. Bankruptcy Judge